UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JULIANA PAICE, Individually and on Behalf Of All Others Similarly Situated,<br><br>              Plaintiff,<br><br>v.<br><br>ALDEYRA THERAPEUTICS, INC., TODD C. BRADY, JOSHUA REED, and BRUCE GREENBERG,<br><br>              Defendants. | CIVIL ACTION NO.: 1:23-cv-11737-DJC<br><br>AMENDED CONSOLIDATED CLASS ACTION COMPLAINT<br><br><u>JURY TRIAL DEMANDED</u> |

## TABLE OF CONTENTS

I.      NATURE OF THE ACTION ........................................................................... 1

II.     JURISDICTION AND VENUE ..................................................................... 8

III.    PARTIES ......................................................................................................... 9

IV.     SUBSTANTIVE ALLEGATIONS ............................................................. 10

        A.    Background Of Aldeyra's Business ..................................................... 10

        B.    The FDA Drug Approval Process ......................................................... 12

        C.    Overview Of Aldeyra's NDA For Reproxalap To Treat Dry Eye Disease .......... 17

        D.    The Start Of The Class Period: Aldeyra Announces Positive Results From A Run-In Cohort Of One Of The Pivotal Sign Trials Required For The Reproxalap NDA ............................................................................................................. 22

        E.    On December 20, 2021, Aldeyra Discloses That The Phase 3 TRANQUILITY-1 Trial Failed To Meet Its Primary Endpoint And Extends The Expected Reproxalap NDA Submission To Mid-2022 ...................................................... 38

        F.    Defendants Continue To Tout Their Progress Towards FDA Approval Of The Reproxalap NDA And The ADX-2191 NDA ............................................... 40

        G.    On June 21, 2023, The Truth Partially Materializes When Aldeyra Discloses Receipt Of A CRL For The ADX-2191 NDA ............................................... 70

        H.    On October 16, 2023, The Truth Further Materializes When Aldeyra Discloses "Substantive Review Issues" With The Reproxalap NDA ............................. 70

        I.    After The Class Period, The Risks Of Defendants' Fraudulent Scheme Continue To Materialize With Receipt Of A CRL For The Reproxalap NDA ............... 72

        J.    Regulation S-K Required Defendants To Disclose The Truth About The Deficiencies In The Reproxalap And ADX-2191 NDAs ............................... 74

              1.    Disclosure Requirements Under Regulation S-K Item 303 ............ 74

V.      MATERIALLY FALSE AND MISLEADING STATEMENTS ................. 77

        A.    Defendants' Misstatements From The Start Of The Class Period On January 7, 2021 Through The End Of 2021 ...................................................................... 77

        B.    Defendants' Misstatements Throughout 2022 ..................................... 98

     C.     Defendants' Misstatements Throughout 2023 ..................................................... 125

VI.    ADDITIONAL SCIENTER ALLEGATIONS ................................................................. 132

     A.     Aldeyra Was Reliant On Fundraising To Remain A Going Concern................. 132

     B.     Defendants Were Motivated To Defraud Investors For Personal Gain ............. 135

     C.     Defendants' Fraudulent Statements Concerned Aldeyra's Core Operations...... 136

     D.     Aldeyra Acted With Corporate Scienter .............................................................. 138

VII.   LOSS CAUSATION.................................................................................................... 138

VIII.  CLASS ACTION ALLEGATIONS .......................................................................... 139

IX.    APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET
       DOCTRINE) ............................................................................................................... 142

X.     NO SAFE HARBOR ................................................................................................. 144

XI.    CLAIMS ..................................................................................................................... 144

XII.   PRAYER FOR RELIEF ............................................................................................ 148

XIII.  JURY TRIAL DEMANDED ...................................................................................... 148

Lead Plaintiff Joseph Lombard and additional named Plaintiff John Levon (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged based upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Aldeyra Therapeutics, Inc. ("Aldeyra", or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Aldeyra; and (c) review of other publicly available information concerning Aldeyra.

## I.    NATURE OF THE ACTION

1.    This is a securities fraud class action on behalf of persons and entities that purchased or acquired Aldeyra Therapeutics, Inc. common stock between January 7, 2021, and October 16, 2023, both dates inclusive (the "Class Period"), who lost millions of dollars as a result of Defendants'[1] fraudulent scheme and are seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.    Aldeyra is a biotechnology company headquartered in Lexington, Massachusetts. Aldeyra focuses on the development and commercialization of immune-mediated diseases, which are conditions that result from an imbalance of the immune system.

3.    Since Aldeyra's inception in 2004, the Company has incurred significant losses and has funded its operations primarily from the sale of equity securities and convertible equity securities and borrowings under credit facilities. After depleting its cash reserves, acquiring a company named Helio Vision, Inc. in early 2019 for an upfront payment of about $10 million in common stock, drawing down $15 million from its debt facility in late 2019, and with no source of revenue from sales because Aldeyra had not gained regulatory approval of any of its drug candidates despite its many years of research, development and clinical trials, Aldeyra halted the

---

[1] "Defendants" refer collectively to Aldeyra, Todd C. Brady, Joshua Reed and Bruce Greenberg.

clinical development of two of its systemic disease programs and pinned all its hopes on its ocular disease program.  Namely, Aldeyra turned its primary focus to reproxalap, a topical ophthalmic solution that Aldeyra was exploring for the treatment of dry eye disease ("DED") and allergic conjunctivitis.  Aldeyra made its secondary priority ADX-2191, an injectable formulation that Aldeyra had acquired the rights to from Helio Vision, Inc., which Aldeyra was exploring for the prevention of proliferative vitreoretinopathy ("PVR").

4.     Before the start of the Class Period, Aldeyra conducted several late- stage clinical trials for reproxalap for dry eye disease and allergic conjunctivitis, with mixed results.  For example, on December 3, 2019, Aldeyra released the results of its Phase 3 RENEW Part 1 Trial for reproxalap for DED, which achieved a statistically significant improvement on the symptom of ocular dryness, but failed to show a statistically significant improvement on the sign of staining.  Similarly, on February 24, 2020, Aldeyra released the results of the Phase 2 Formulation Trial for reproxalap for DED, which achieved a statistically significant improvement on the symptom of ocular dryness, but failed to achieve a statistically significant improvement on the sign of staining.

5.     In addition, before the start of the Class Period, in March 2020, Aldeyra commenced a late-stage clinical trial to test the safety of ADX-2191 for the prevention of proliferative vitreoretinopathy called the Phase 3 GUARD Safety Trial, but the trial experienced serious delays in patient enrollment which Aldeyra attributed to a lack of clinical site availability and staffing due to the COVID-19 pandemic.

6.     As a result of the delays in patient enrollment in the Phase 3 GUARD Safety Trial, Aldeyra started to explore other indications for ADX-2191, such as primary vitreoretinal lymphoma ("PVRL"), a rare ocular cancer.   Though PVRL is a relatively rare type of cancer— about 300-600 people in the United States are diagnosed with PVRL each year—the FDA offers significant financial incentives to companies that develop drugs to treat rare conditions through its orphan drug designation program, including, but not limited to, seven years of market exclusivity beyond what the patent regime offers, and tax credits.

7.      By the start of the Class Period on January 7, 2021, Aldeyra had an accumulated deficit of $236.9 million and was under immense pressure to gain FDA approval of and subsequently commercialize one of its drug candidates.  Aldeyra narrowed its focus further and made reproxalap specifically for the treatment of dry eye disease its top priority and made ADX-2191 for the treatment of PVRL its next most important priority.

8.      In order to gain FDA approval of reproxalap for DED and ADX-2191 for PVRL, Aldeyra would need to submit a new drug application ("NDA") for each drug, supported by sufficient evidence from clinical trials demonstrating both the safety and efficacy of the drug for its intended use.

9.      Clinical trials that support FDA approvals of wholly novel drugs are extremely costly and time consuming.  In recent years, the average total cost for a new drug applicant to complete the first three phases of clinical trials necessary to support its application has been $375 million.  In most cases, it takes an applicant six to seven years or more to proceed through those stages of clinical trials.

10.     However, if a company seeks FDA approval of a drug that modifies an FDA-approved drug—for example, by changing the dosage, strength, or manner of administration of an FDA-approved drug—a company may be able to obtain FDA approval in a less costly and less time-consuming manner by filing an NDA pursuant to §505(b)(2) of the Federal Food, Drug, and Cosmetic Act ("FDCA").  The intent of §505(b)(2) was to eliminate redundancy and the waste involved in requiring an applicant to conduct clinical trials to prove what is already known about an FDA-approved drug.

11.     A §505(b)(2) applicant must demonstrate the same level of safety and efficacy as an applicant seeking approval of a wholly novel drug.  But, unlike an applicant for a wholly novel drug, a §505(b)(2) applicant can carry its burden of proof in whole or in part with clinical studies conducted by other companies for which it does not have the right to reference the raw data underlying the studies.  However, to the extent an FDA-approved drug and the proposed drug differ (*e.g.*, different strength or different dosage form), a §505(b)(2) NDA must provide

"bridging" data between the approved and proposed drug sufficient to demonstrate that reliance on the other submitted evidence about the approved drug is scientifically justified. In many cases, if a §505(b)(2) applicant conducts a bioequivalence study which demonstrates that the proposed drug functions equivalently in the biologic context of the human body relative to the approved drug, that will constitute sufficient "bridging" data.

12.    As reproxalap for DED was a wholly novel drug, Aldeyra was required to conduct all of the necessary clinical trials to demonstrate its safety and efficacy. Further, pursuant to FDA guidance, a company seeking to gain FDA approval of a new drug to treat dry eye disease must, among other things, provide at least two clinical trials demonstrating statistically significant improvement on the symptoms of DED, and at least two clinical trials demonstrating statistically significant improvement on the signs of DED. Further, an applicant must submit sufficient clinical evidence of the safety of the drug; before submission of the NDA, an applicant should ensure that at least 300 patients have completed at least 6 weeks of follow-up after the initiation of treatment and that at least 100 patients have completed 12 months of follow-up after the initiation of the treatment.

13.    On the other hand, the active component of ADX-2191 is methotrexate. Methotrexate has been FDA-approved for decades starting in tablet form for the treatment of acute leukemia in adults. For years, the standard of care to treat certain ocular conditions including PVRL has consisted of injecting compounded methotrexate into the eye. However, compounded methotrexate ocular injections require a large volume of the drug to be injected into the small space of the eye, which can result in toxicity. Aldeyra touted ADX-2191 as a non-compounded "novel formulation" of methotrexate, which as Defendants stated on a conference call on March 9, 2023, was "designed to be vitreous compatible with a lower volume and a higher density", thus requiring a lower volume of material injected into the eye and resulting in fewer adverse side effects compared to compounded methotrexate.

14.    As ADX-2191 modified an FDA-approved drug, Aldeyra decided to pursue what it hoped would be a much quicker, less costly approval process under §505(b)(2). The

commercial prospects for ADX-2191 to treat PVRL are limited due to the rarity of the disease, thus Aldeyra sought orphan drug designation of ADX-2191, which, if obtained would make the Company's pursuit of regulatory approval of ADX-2191 more attractive to investors.

15.    Throughout the Class Period, Aldeyra repeatedly touted the comprehensiveness and breadth of the clinical trials and evidence it had gathered and was in the process of gathering to support FDA approval of the reproxalap for DED NDA (the "Reproxalap NDA").  Defendants represented that they were on track with all aspects of the NDA submission, including the requisite safety study and ensuring their chemistry, manufacturing and controls data ("CMC") were adequate.  Defendants reassured investors that they had multiple backup plans to ensure that their submission would not just meet the requirements for submission, but would go above and beyond them.

16.    But, unbeknownst to investors, the progress of the Reproxalap NDA was not on track, Defendants had not met the requirements for submission of the NDA, and Defendants had no viable backup plans to ensure a successful submission.  Instead, during the Class Period, Defendants were scrambling to try to find ways to make up for the deficiencies in the Reproxalap NDA, and ultimately, they were unsuccessful.  For example, Defendants repeatedly claimed that they had achieved two symptom trials, but that was not the case.  One of those two trials, the Phase 3 RENEW Part 1 Trial, had failed to meet both of its co-primary endpoints.  Pursuant to FDA guidance, a clinical trial that fails to meet each of its co-primary endpoints is not sufficient to demonstrate the efficacy of a drug.  And, Aldeyra claimed that although it had met all the NDA efficacy requirements, it stated that it was initiating two additional clinical trials just for extra support of the already-sufficient NDA: the 1-Day Schirmer's Test and the Crossover Trial.  But, given that Aldeyra ultimately submitted the Crossover Trial as one of its pivotal trials in support of the Reproxalap NDA, the more plausible inference is that Aldeyra hoped the trial would make up for deficiencies in the other sign and symptom trials submitted with the NDA.

17.    Further, throughout the Class Period, Aldeyra repeatedly told investors that it would not need to conduct any clinical trials to support the NDA for ADX-2191 to treat PVRL

(the "ADX-2191 NDA"). Defendants told investors that because methotrexate had been FDA-approved for decades and because its safety and efficacy was supported by a surfeit of preexisting evidence, Aldeyra would be able to gain regulatory approval with a literature-based submission. Defendants told investors that they would also submit the results of the Phase 3 GUARD Safety Trial for proliferative vitreoretinopathy as extra support for the ADX-2191 NDA.

18.     But, unbeknownst to investors, Aldeyra's literature-based submission would not be sufficient to gain FDA approval of the ADX-2191 NDA. Pursuant to FDA guidance, Aldeyra could rely on published literature and the Phase 3 GUARD Safety Trial to demonstrate safety and efficacy only to the extent that ADX-2191 for PVRL shared characteristics (e.g., dosage strength or form) in common with the FDA-approved iterations of methotrexate. Pursuant to FDA guidance, to the extent that an FDA-approved drug differs from a new drug, including differences in dosage form, strength, or bioavailability[2], an applicant must include sufficient data supporting and justifying those differences. As ADX-2191 for PVRL consisted of a "novel formulation" including non-compounded, highly concentrated methotrexate that was "designed to be vitreous-compatible and optimized for excipient composition, viscosity, density, tonicity, pH, concentration, and volume of administration," as Defendants stated in a press release issued on June 21, 2023, Defendants knew or should have known that they would need to conduct clinical studies to demonstrate the safety and efficacy of ADX-2191 for PVRL to gain FDA approval.

19.     Defendants' materially false and misleading representations enabled them to artificially inflate Aldeyra's share price and raise much-needed cash for the Company to continue as a going concern during the Class Period. Between January 13, 2021 and January 20, 2021, Aldeyra raised gross proceeds of $74.7 million in gross proceeds in a public offering of its

---

[2] Bioavailability refers to the extent and rate at which an active drug accesses a site (consider "biological target" instead of "site"). Bioavailability is heavily influenced by the properties of the dosage form.

common shares. Between April 27, 2021 and May 6, 2021, Aldeyra raised gross proceeds of $125 million in a follow-on public offering of its common shares. Defendants' misrepresentations further enabled Aldeyra to secure a lucrative licensing and commercialization agreement for reproxalap to treat DED with one of the largest biomedical companies in the world, AbbVie.

20.    The truth first started to emerge on December 20, 2021, when Defendants disclosed the poor results of the main cohort of the reproxalap Phase 3 TRANQUILITY-1 Trial. Defendants disclosed that the trial had failed to achieve statistically significant improvement on the signs of dry eye disease and extended the anticipated submission date of the Reproxalap NDA to mid-2022. Investors were shocked. After all, at the start of the Class Period on January 7, 2021, Aldeyra had announced exceedingly positive results from a run-in cohort of the Phase 3 TRANQUILITY-1 Trial—results so positive that Defendants told investors that they expected to submit the trial as one of the two required pivotal sign trials and expected that they could submit the Reproxalap NDA by as early as the end of 2021.

21.    On this news, Aldeyra's share price dropped by $3.63 per share, or **50.9%,** to close at $3.50, on December 21, 2021 on unusually heavy volume.

22.    Ultimately, it was not until November 29, 2022 that Aldeyra submitted the Reproxalap NDA.

23.    The truth further emerged on June 21, 2023, when Defendants disclosed the receipt of a Complete Response Letter from the FDA denying the ADX-2191 NDA. Defendants disclosed in the press release that the reason for the denial was "***a lack of 'substantial evidence of effectiveness' due to 'a lack of adequate and well-controlled investigations' in the literature-based NDA submission.***" Brady stated that, "While we appreciate the FDA's position with respect to providing evidence from adequate and controlled trials, ***we do not currently believe that randomized clinical trials of ADX-2191 in PVRL ... are feasible[.]***"

24.    On this news, Aldeyra's stock price fell $2.92 per share, or ***27.44%***, to close at $7.72 per share on June 21, 2023.

25.    On October 16, 2023, the truth further materialized when Defendants disclosed the results of a late-cycle review meeting with the FDA regarding the Reproxalap NDA, wherein the FDA "noted substantive review issues".  Defendants disclosed that the FDA had "requested certain chemistry, manufacturing, and controls ('CMC') details" and ***"indicated that Aldeyra needs to conduct an additional clinical trial to satisfy efficacy requirements."***  However, Defendants stated that following receipt of the FDA's feedback, they had "submitted responses to the FDA that Aldeyra believes to be sufficient to mitigate the identified issues[.]"

26.    On this news, Aldeyra's share price fell by $3.60, or ***66.3%,*** to close at $1.83 on October 16, 2023, on unusually heavy volume.

27.    After the Class Period, the risks of Defendants' fraudulent scheme continued to materialize.  On November 27, 2023, Defendants disclosed the receipt of a Complete Response Letter from the FDA denying the Reproxalap NDA.  Specifically, Defendants stated in a press release issued that same day,

> ***[T]he FDA stated in the letter that the NDA did not demonstrate 'efficacy in treating ocular symptoms associated with dry eyes' and that 'at least one additional adequate and well-controlled study to demonstrate a positive effect on the treatment of ocular symptoms of dry eye' should be conducted.***

28.    On a public conference call held on November 28, 2023, Defendants admitted that the Reproxalap NDA symptom trials had been deficient because the Phase 3 RENEW Part 1 Trial failed to meet both of its co-primary endpoints and the Crossover Trial had been insufficient to count as one of the required symptom trials.

29.    As a result of Defendants' fraudulent scheme, investors lost millions.  Aldeyra's share price has never recovered, hovering around $3.51 per share as of the date of this filing—a far cry from the Class Period high of $15.95 per share on April 27, 2021.

## II.    JURISDICTION AND VENUE

30.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

31.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

32.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Aldeyra is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

33.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.     PARTIES

34.     Lead Plaintiff Joseph Lombard ("Plaintiff"), as set forth in the certification (Dkt. No. 14-2), acquired Aldeyra securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

35.     Plaintiff John Levon, as set forth in the certification filed concurrently herewith, acquired Aldeyra securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

36.     Defendant Aldeyra is a Delaware corporation with principal executive offices located at 131 Hartwell Avenue, Suite 320, Lexington, Massachusetts 02421.  Aldeyra's common stock trades in an efficient market on the NASDAQ under the ticker symbol "ALDX".

37.     Defendant Todd C. Brady ("Brady") has served as Aldeyra's Chief Executive Officer ("CEO") at all relevant times.

38.     Defendant Joshua Reed ("Reed") served as Aldeyra's Chief Financial Officer ("CFO") from prior to the start of the Class Period until April 2022.

39.     Defendant Bruce Greenberg ("Greenberg") has served as Aldeyra's Interim CFO since April 2022.

40.    Defendants Brady, Reed, and Greenberg are sometimes referred to herein as the "Individual Defendants."

41.    The Individual Defendants possessed the power and authority to control the contents of Aldeyra's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Aldeyra's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Aldeyra, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

42.    Aldeyra and the Individual Defendants are collectively referred to herein as "Defendants."

IV.    **SUBSTANTIVE ALLEGATIONS**

A.    **Background Of Aldeyra's Business**

43.    Aldeyra is a biotechnology company which was founded in 2004.  The Company is focused on the development and commercialization of treatments for immune-mediated diseases.

44.    Since Aldeyra's inception, the Company has incurred significant losses and has funded its operations primarily from the sale of equity securities and convertible equity securities and borrowings under credit facilities.  Having drawn $15 million from its debt facility in late 2019, and with increasingly depleted cash reserves, in 2020, Aldeyra decided to halt the clinical development of two systemic disease programs (reproxalap to treat Sjorgen-Larsson syndrome and ADX-1612, an inhibitor of a protein widely implicated in viral disease) and focus entirely on its ocular disease program.

45.     Namely, Aldeyra decided to make reproxalap, a topical ophthalmic solution to treat dry eye disease ("DED") and allergic conjunctivitis, its top priority, and decided to make ADX-2191, an injectable solution containing the FDA-approved active ingredient of methotrexate to treat proliferative vitreoretinopathy ("PVR") and primary vitreoretinal lymphoma ("PVRL" or "ocular lymphoma") its secondary priority.  By the start of the Class Period on January 7, 2021, Aldeyra had an accumulated deficit of $236.9 million and the pressure was building for it to gain FDA approval of and subsequently commercialize one of its ocular drug candidates.

46.     Before the start of the Class Period, Aldeyra had already conducted several late stage clinical trials for reproxalap for dry eye disease and allergic conjunctivitis, with mixed results.  For example, Aldeyra's Phase 3 RENEW Part 1 Trial for reproxalap for DED failed to meet each of its co-primary endpoints—the trial met the co-primary symptom endpoint of ocular dryness, but did not meet the co-primary sign endpoint of staining.

47.     With respect to ADX-2191, Aldeyra's secondary lead drug candidate, by the start of the Class Period Aldeyra was already in the process of conducting a late stage trial to examine the safety of the drug in treating proliferative vitreoretinopathy.  Specifically, on March 12, 2020, Aldeyra announced the commencement of the Phase 3 GUARD Safety Trial.  Shortly thereafter, Defendants stated that the progress of the Phase 3 GUARD Safety Trial was significantly delayed due to the COVID-19 pandemic and as such, Aldeyra was exploring ADX-2191 for the treatment of primary vitreoretinal lymphoma ("PVRL").

48.     The path to FDA approval appeared possibly more straightforward for ADX-2191 than reproxalap to Defendants.  The active ingredient in ADX-2191 is methotrexate.  Where a new drug consists of a modified FDA-approved drug, whether modified in strength, dosage form, or in other ways, the FDA approval process can be faster and less costly compared to the process for a wholly novel drug because fewer clinical trials are necessitated in most cases.

49.     During the Class Period, Defendants sought FDA approval of both reproxalap for the treatment of dry eye disease and ADX-2191 for the treatment of PVRL.  To gain FDA

approval of reproxalap for dry eye disease and ADX-2191 for PVRL, Aldeyra was required to submit NDAs to the FDA demonstrating the safety and efficacy of each drug for their intended uses.

### B.    The FDA Drug Approval Process

50.    Under the Federal Food, Drug, and Cosmetic Act (the "FDCA"), the FDA is tasked with ensuring that drugs and devices are safe and effective for their intended uses.  *See* 21 U.S.C. §§ 351-360.  All new drugs in the United States must be approved by the FDA as safe and effective for their intended use prior to marketing.

51.    To gain FDA approval for a novel drug that has not been previously approved by the FDA, a company is required to file a new drug application pursuant to FDCA §505(b)(1).  A §505(b)(1) NDA requires an applicant to conduct all studies needed to demonstrate the safety and efficacy of a drug.

52.    Companies seeking to begin a clinical investigation of a new drug must submit an Investigational New Drug Application ("IND") to the FDA. 21 C.F.R. § 312.20.  If the IND is granted, the investigative drug enters clinical trials, *i.e.*, trials on human subjects.

53.    A clinical investigation is generally divided into three phases, though there is the potential for certain phases to overlap.  *See* 21 C.F.R. § 312.21.  Phase 1 includes the initial introduction of the drug into humans, and generally involves 20 to 80 patients.  21 C.F.R. § 312.21(a).  The goals of Phase 1 are to determine the most frequent side effects, dose tolerance, and how the drug is metabolized and excreted.  The latter is determined through pharmacokinetic and pharmacodynamic testing and analysis.   Phase 2 includes controlled clinical studies conducted to evaluate possible adverse effects and safety risks, to evaluate the efficacy of the drug for specific targeted indications, and determine dose tolerance and optimal dosage.  Phase 2 trials generally involve no more than several hundred subjects.  21 C.F.R. § 312.21(b).  Phase 3 includes expanded controlled and uncontrolled trials performed after preliminary evidence gathered in Phase 2 suggesting effectiveness of the drug has been obtained, and usually includes several hundred to several thousand subjects.  21 C.F.R. § 312.21(c).  The purpose of Phase 3

trials is to further evaluate dosage and obtain evidence of potential clinical efficacy and safety. Data gathered from Phase 3 trials may be used to provide adequate information for the drug's labeling, if the drug is approved.

54.    The "endpoints" of clinical trials are variables that are supposed to reflect the intended effects of a drug.  For example, in a clinical trial for a potential drug to treat the flu, reducing fever is a common endpoint.  Endpoints are grouped in a hierarchy based on importance.  Pursuant to final FDA guidance for Multiple Endpoints in Clinical Trials, "[t]he endpoint(s) that establish the effect(s) of the drug and will be the basis for concluding that the study meets its objective are designated the primary endpoint family[,]" and "[s]econdary endpoints can provide useful description to support the primary endpoint(s) and/or demonstrate additional clinically important effects."

55.    Further, FDA guidance provides that "[f]or some disorders, there are two or more features that are so critically important to the disease under study that a drug will not be considered effective without demonstration of a treatment effect on all of these disease features. The term used … to describe this circumstances of multiple primary endpoints is co-primary endpoints …. "Multiple primary endpoints become co-primary endpoints when demonstrating an effect on each of the endpoints is critical to concluding that the drug is effective."

56.    An example of a disease where co-primary endpoints are needed to evaluate a potential drug's efficacy is migraine headaches.  Pain is a common significant symptom of migraine headaches, but it is often accompanied by other symptoms such as nausea, photophobia and/or phonophobia.  Thus, one approach for a clinical trial for a drug to treat migraine headaches would be to designate (1) subsidence of headache pain after dosing and (2) demonstrated positive effect on the most bothersome migraine-associated symptom other than pain (with the patient identifying before treatment the most bothersome migraine-associated symptom other than pain to them) as co-primary endpoints.

57.     Pursuant to FDA guidance, in a trial with co-primary endpoints, if a sponsor fails to show a statistically significant positive effect on each of the co-primary endpoints, the trial will be insufficient to demonstrate the requisite efficacy needed for FDA approval of a drug.

58.     After the three clinical trial phases are complete, but prior to filing a New Drug Application ("NDA"), a sponsoring company meets with the FDA in a "pre-NDA meeting" to exchange information about the proposed drug marketing application.  21 C.F.R. § 312.47(2). The pre-NDA meeting provides an opportunity for the sponsoring company to: (1) "uncover any major unresolved problems," (2) "identify those studies that the sponsor is relying on as adequate and well-controlled to establish the drug's effectiveness," (3) "identify the status of ongoing or needed studies adequate to assess pediatric safety and effectiveness," (4) "acquaint FDA reviewers with the general information to be submitted in the marketing application (including technical information)," (5) "discuss appropriate methods for statistical analysis of the data," and (6) "discuss the best approach to the presentation and formatting of data in the marketing application." 21 C.F.R. § 312.47(b)(2).

59.     For a study to be considered "adequate and well-controlled" pursuant to FDA regulations, it must, among other things, include an analysis of the results of the study adequate to assess the effects of the drug, a clear statement of the objectives of the investigation and a summary of the proposed or actual methods of analysis and its results, it must use a design that permits a valid comparison with a control to provide a quantitative assessment of the drug's effect, utilize adequate measures to minimize biases on subjects, observers and analysts, and demonstrate adequate selection of patients.  *See* 21 C.F.R. § 314.126.

60.     Following the pre-NDA meeting, a sponsor may then formally request FDA approval of a drug for marketing in the United States through submission of an NDA.  21 C.F.R. § 314.50.  A drug developer is required to include all information about a drug in an NDA— from preclinical data to Phase 3 trial data.  Clinical trials designated as "pivotal" by a sponsor are those that are intended to fulfill FDA pre-market clinical requirements for safety and efficacy in support of a sponsor's submission to the FDA for approval of a drug.  Trials indicated as pivotal

are ordinarily Phase 3 trials.  Pivotal trials are thus very important, because their results will be evaluated by the FDA to decide whether a sponsor has carried its evidentiary burden of demonstrating substantial evidence of efficacy and safety in order to be approved and commercialized.

61.    Pursuant to final FDA guidance entitled "Integrated Summary of Effectiveness Guidance for Industry", the NDA should also include an integrated summary of effectiveness ("ISE").  The ISE is a comprehensive integrated analysis of the effectiveness of a study drug.  The purpose of the ISE is to describe the available information regarding effectiveness, delineate strengths and weaknesses, and highlight the important missing information.  Integrated analyses should summarize, examine and compare the results from individual studies as well as combined or "pooled" analyses.  However, as noted by FDA guidance, ***the integrated analysis is not a substitute for the analysis of individual studies." "[T]he individual studies" identified as "adequate and well-controlled investigations and that demonstrate the effect of the drug…are [the] studies that provide the substantial evidence of effectiveness required for approval."***

62.    While pooled analyses should be performed as part of the ISE, it is very uncommon for a clinical development program to include a planned analysis of efficacy across more than one study.  Thus, as provided by FDA guidance, "[b]ecause prospectively planned efficacy analyses across two or more studies in a development program is uncommon, the majority of pooled analyses described for inclusion in the ISE are exploratory in nature.  They are designed to probe the data for trends across more than one study[.]"

63.    The FDA has 60 days after an NDA is received to decide whether to file the NDA for review.  21 C.F.R. § 314.101(a).  Where the FDA finds no basis to refuse the filing of an NDA, the FDA will file the NDA for substantive review.  21 C.F.R. § 314.101(a), (a)(2).  When an NDA has been filed for substantive review, the FDA may designate the NDA for Standard Review or Priority Review.  Under the Prescription Drug User Fee Act ("PDUFA"), the FDA aims to complete review of Standard Review NDAs within ten months from the time the NDA

15

was accepted for filing and the FDA aims to complete review of Priority Review NDAs within six months after acceptance of filing.

64.     Once the FDA's review is complete, the FDA will either approve the NDA or issue a Complete Response Letter ("CRL") rejecting the application.  21 C.F.R. § 314.110(a). Approvals are not granted until after the FDA "determines that the drug meets the statutory standards for safety and effectiveness, manufacturing and controls, and labeling[.]"  21 C.F.R. § 314.105(a), (c).  CRLs describe deficiencies in the application and, where possible, provide recommendations for the sponsor to achieve approval.

65.     Once a new drug is FDA-approved, the approved drug becomes a "reference-listed drug" by the FDA.  A company can seek FDA approval to market generic versions of reference-listed drugs through submission of an abbreviated new drug application ("ANDA").  In support of an ANDA, an applicant does not need to conduct clinical trials demonstrating safety and efficacy.  Instead, an applicant must show that the generic version is pharmaceutically equivalent to the reference-listed drug, meaning that it has the same active ingredient(s), dosage form, strength, route of administration and conditions of use or labeling as the reference-listed drug.  The applicant must also show that the generic version is bioequivalent to the reference-listed drug, meaning it is absorbed in the body at the same rate and to the same extent.

66.     If a company wants to commercialize a modified form of a reference-listed drug by, for example, changing the dosage form (such as from a solid oral dosage to a liquid injectable form), changing the route of administration (such as a change from intravenous to intrathecal route), or changing an active ingredient, the company still must file an NDA, however, it can file the NDA pursuant to §505(b)(2) of the FDCA.  §505(b)(2) was intended to encourage innovation without requiring waste and duplicative studies to demonstrate what is already known about a drug.[3]

---

[3] Aldeyra submitted the ADX-2191 NDA pursuant to §505(b)(2).

67.    A §505(b)(2) NDA must contain full reports of investigations of safety and efficacy to the same standards as a §505(b)(1) NDA, but existing data from studies not conducted by the applicant and for which the applicant does not have the right of reference to the raw data underlying the study may be used to meet some or all of the safety and efficacy requirements.  Thus, development programs for new drugs subject to §505(b)(2) are quicker and far less costly than development programs for new drugs subject to §505(b)(1).

68.    While a §505(b)(2) applicant may use published literature to demonstrate safety and efficacy of a new drug, FDA guidance provides that "this does not mean **any** reference to published general information (e.g., about disease etiology, support for particular endpoints, methods of analysis) or to general knowledge" will suffice (emphasis in original), "[r]ather, reference should be to specific information (clinical trials, animal studies) necessary to the approval of the application."

69.    FDA guidance provides that ***"[a] 505(b)(2) applicant may rely on FDA's finding of safety and/or effectiveness for a listed drug only to the extent that the proposed product in the 505(b)(2) application shares characteristics (e.g., active ingredient, dosage form, route of administration, strength, indication or other conditions of use) in common with the relied-upon listed drug(s).*** The applicant is expected to establish a bridge (e.g., by using comparative bioavailability data) between the proposed drug product and each listed drug that the applicant seeks to rely upon to demonstrate that reliance on the listed drug is scientifically justified. ***To the extent that the listed drug and the drug proposed in the 505(b)(2) application differ (e.g., a product with a different dosage form or a product that is intentionally more bioavailable than the listed drug), the 505(b)(2) application must include sufficient data to support those differences."***

C.    <u>Overview Of Aldeyra's NDA For Reproxalap To Treat Dry Eye Disease</u>

70.    To gain FDA approval of reproxalap for DED, pursuant to FDA guidance, Aldeyra was required to, among other things, conduct two adequate and well controlled studies demonstrating statistically significant improvement in the signs of DED, conduct two adequate

17

and well controlled studies demonstrating statistically significant improvement in the symptoms of DED, conduct a 12-month clinical trial demonstrating the drug's safety, and provide sufficient data concerning its CMC.

71.     All of the data that Aldeyra had gathered in connection with reproxalap for DED would have to be submitted to the FDA with its NDA, but the Company could choose which trials it designated as "pivotal", meaning, which trials that it believed satisfied the FDA requirements for efficacy.

72.     According to FDA guidance, approvable objective signs of DED include corneal staining, conjunctival staining, and decreased tear breakup time and decreased Schirmer's tear test score; approvable subjective symptoms of DED include ocular pain, ocular itching, and blurred vision.  Thus, pursuant to FDA guidance, Aldeyra needed to conduct at least two adequate and well-controlled studies demonstrating statistically significant improvement on a symptom of DED and at least two adequate and well-controlled studies demonstrating statistically significant improvement on a sign of DED.

73.     As described above, a clinical trial must meet each of its predetermined primary endpoints in order to be deemed a pivotal trial sufficient to demonstrate the efficacy of a drug. Further, pursuant to FDA guidance, an applicant cannot pool the positive results of multiple trials together to demonstrate efficacy.  Thus, for example, if a clinical trial for a drug to treat DED was designed with two co-primary endpoints, one a sign and the other a symptom, and the trial results only met the symptom endpoint, the trial would not count as one of the two required symptom trials.  If a trial is designed with secondary endpoints and meets the secondary endpoints, but fails to meet a primary endpoint, the trial will not constitute sufficient evidence of efficacy either—thus, for example, if a clinical trial for a drug to treat DED is designed with a sign as a primary endpoint and a symptom as a secondary endpoint and only meets the symptom endpoint, the trial will not count as one of the two required symptom trials.  Further, if a trial is designed for example with a primary endpoint as a sign and a secondary endpoint of a symptom,

if the trial achieves all endpoints, it will count as one of the required sign trials but will not count as meeting one of the required symptom trials.

74.    Before the start of the Class Period, Aldeyra had already conducted several late stage clinical trials for reproxalap for dry eye disease and allergic conjunctivitis, with mixed results.  For example, Aldeyra's Phase 3 RENEW Part 1 Trial for reproxalap for DED failed to meet each of its co-primary endpoints—the trial met the co-primary symptom endpoint of ocular dryness, but did not meet the co-primary sign endpoint of staining.  Defendants announced the results of the Phase 3 RENEW Part 1 Trial on December 3, 2019 and stated that the primary objective of the trial, which was to confirm dosing regimen, endpoints, and sample size for RENEW Part 2 had been achieved; Defendants stated that RENEW Part 2 was expected to commence in the first half of 2020, and would have the same co-primary endpoints as Part 1, of staining and ocular dryness.  However, the RENEW Part 2 trial never occurred.

75.    In addition, before the start of the Class Period, Defendants announced on February 24, 2020 that the Phase 2 Formulation Trial for reproxalap for DED had achieved its primary symptom endpoint of ocular dryness.  Defendants did not disclose whether the Phase 2 Formulation Trial had any other endpoints and if so, what the results on those other endpoints were, but Defendants stated that a shortness of fluorescein liquid drops had negatively impacted the results of that trial as well as the Phase 3 RENEW Part 1 Trial with respect to demonstrating statistically significant improvement on the sign of staining.

76.    Nonetheless, throughout the Class Period, Defendants represented that they had met the symptom trial requirements with the Phase 3 RENEW Part 1 Trial and the Phase 2 Formulation Trial.

77.    Aldeyra represented throughout the Class Period that it intended to designate as one of its two pivotal sign trials the Phase 3 TRANQUILITY-1 Trial and/or the Phase 3 TRANQUILITY-2 Trial.  The Phase 3 TRANQUILITY-2 Trial was intended to confirm the results of TRANQUILITY-1 and Defendants stated that the results of both trials were expected in 2021.  The Phase 3 TRANQUILITY-1 Trial set the sign of ocular redness as the trial's

primary endpoint and set Schirmer's Test as a secondary endpoint.  Defendants represented that if one of the TRANQUILITY trials was unsuccessful, they could pool the positive results from the other TRANQUILITY trial with it, or with other positive results from other trials, as a backup plan.

78.     On November 2, 2021, Aldeyra announced that the Phase 2 Dry Eye Chamber Trial had achieved the primary sign endpoint of ocular redness.  However, the trial failed to meet its secondary endpoints of Schirmer's Test and symptoms.  As the trial had met its primary sign endpoint of ocular redness, Aldeyra announced that it would designate the trial as one of its pivotal sign trials and only one of the TRANQUILITY trials needed to succeed to meet the other sign trial requirement.

79.     While the results of a run-in cohort of the Phase 3 TRANQUILITY-1 Trial announced on January 7, 2021 were positive and demonstrated statistically significant improvement on the primary sign endpoint, ultimately, the final results as announced on December 20, 2021 were a failure: the trial failed to meet the primary sign endpoint of ocular redness.  However, the trial met the secondary endpoint of Schirmer's Test and in a post-hoc analysis, demonstrated a statistically significant improvement on Schirmer's Test responder analysis.  Post-hoc analyses are insufficient to demonstrate the requisite efficacy of a trial but can be a useful tool in analyzing trial results.  Nonetheless, Defendants represented during the Class Period, that the Phase 3 TRANQUILITY-1 Trial Schirmer's Test and Schirmer's Test Responder Analysis results could be used to meet Aldeyra's efficacy requirements.

80.     On May 24, 2022, Aldeyra changed the primary endpoint of the Phase 3 TRANQUILITY-2 Trial from ocular redness to Schirmer's Test and changed ocular redness to a secondary sign endpoint.  The results of the Phase 3 TRANQUILITY-2 Trial, which Aldeyra announced on June 8, 2022, met the primary endpoint of Schirmer's Test but failed to meet the secondary sign endpoint of ocular redness.  Defendants represented that they had met the sign requirements and efficacy requirements with the results of the Phase 3 TRANQUILITY-2 Trial, but that they had initiated two additional trials as extra support for the Reproxalap NDA: the 1-

Day Schirmer's Test Trial and the Crossover Trial.  Defendants represented that they had achieved two sign trials, two symptom trials, and that in total, they would submit five adequate and well-controlled clinical trials to support the Reproxalap NDA along with an extra supportive trial if either the Crossover Trial or 1-Day Schirmer's Test Trial were successful.

81.    On July 12, 2022, Defendants announced the successful results of the Crossover Trial: the trial had met each of its primary sign endpoints—ocular redness and Schirmer's Test—and it also met its secondary symptom endpoints.  Defendants stated that they had halted the 1-Day Schirmer's Test due to the exceedingly positive results of the Crossover Trial and that FDA approvability had been put to bed.

82.    Aldeyra ultimately submitted in support of the Reproxalap NDA, the Phase 3 RENEW Part 1 Trial and Phase 2 Formulation Trial as its two pivotal symptom trials; the Phase 3 TRANQUILITY-2 Trial and the Phase 2 Dry Eye Chamber Trial as its two pivotal sign trials, and submitted the Crossover Trial as its fifth pivotal trial.

83.    Further, while Defendants initially represented during the Class Period that they expected to be able to submit the Reproxalap NDA by the end of 2021, Defendants pushed the timeline back several times: to mid-2022, the second half of 2022, and then the third quarter of 2022.  Ultimately, Aldeyra did not submit the Reproxalap NDA until November 29, 2022.

84.    Despite Aldeyra's repeated representations to the contrary, following the end of the Class Period on November 27, 2023, the FDA denied the Reproxalap NDA because Defendants did not meet the symptom trial requirements.  On November 28, 2023, Defendants admitted that the Phase 3 RENEW Part 1Trial had been insufficient as a symptom trial and that the Crossover Trial had also been insufficient as a symptom trial—effectively admitting that the Crossover Trial had not been conducted as extra unnecessary support for the NDA, but rather, as an attempt to make up for the NDA's known deficiencies.

D.     **The Start Of The Class Period: Aldeyra Announces Positive Results From A Run-In Cohort Of One Of The Pivotal Sign Trials Required For The Reproxalap NDA**

85.     At the start of the Class Period, on January 7, 2021, Aldeyra issued a press release entitled, "Aldeyra Therapeutics Announces Positive Top-Line Symptom and Sign Results from Run-In Cohort of Phase 3 TRANQUILITY Trial in Dry Eye Disease" (the "Jan. 7, 2021 PR"). The Jan. 7, 2021 PR announced that the initial results of the Phase 3 TRANQUILITY-1 Trial had demonstrated statistically significant improvement in the primary sign endpoint of ocular redness as well as statistically significant improvement in symptoms.   As Defendants intended to designate the Phase 3 TRANQUILITY-1 Trial as one of the two pivotal sign trials necessary for the Reproxalap NDA, the market reacted very favorably to this news.  The Jan. 7, 2021 quoted Brady as follows:

> "The symptom improvement observed in the run-in cohort of TRANQUILITY announced today support the first-line potential use of reproxalap in dry eye disease, and represent the first results from an ophthalmic solution for chronic use that demonstrate activity acutely following drug administration," stated Todd C. Brady, M.D., Ph.D., President and Chief Executive Officer of Aldeyra.   "The activity of reproxalap in reducing ocular redness, initially demonstrated in the allergen chamber Phase 2 clinical trial, was also observed in the dry eye chamber run-in results of TRANQUILITY, and we look forward to initiating enrollment of the main cohort."

86.     On that same day, Aldeyra held a conference call to further discuss the positive results of the run-in cohort of the Phase 3 TRANQUILITY Trial (the "Jan, 7, 2021 Call").  On the Jan. 7, 2021 Call, Brady touted the results further, noting that the results supported Aldeyra's two symptom trials (the Phase 3 RENEW Part 1 Trial and the Phase 2 Formulation Trial).  Brady further stated that the Phase 3 TRANQUILITY-2 Trial, which would be conducted to confirm the final results of the Phase 3 TRANQUILITY-1 Trial, would constitute the second pivotal sign trial needed for submission of the Reproxalap NDA.  Specifically, Brady stated,

> *[O]ur upcoming milestones, [ ] include initiation of TRANQUILITY 2 this quarter. TRANQUILITY and TRANQUILITY 2 are expected to represent the 2 pivotal sign trials required for NDA filing.*

87.    On the Jan. 7, 2021 Call, Brady Brady touted the Company's progress towards meeting the requirements for submission of the Reproxalap NDA and the Company's Chief Business Officer guided submission of the Reproxalap NDA by the end of 2021.  Specifically, Defendants stated,

The data announced this morning are quite spectacular in so many ways.  The direct answer is absolutely yes.  Disease signs and symptoms are all approvable in the eyes of the FDA.  *I want to point out that we have, we believe, already achieved the symptom endpoints or the symptom trials required for NDA submission.  We're quite focused on signs.*

*What's remarkable from today's results is that we were able to confirm the symptomatic effects, the symptomatic activity of reproxalap that we've already previously demonstrated over 12 weeks of therapy, and we were able to confirm symptomatic drug activity within minutes of dosing, which is completely unique.*

As I mentioned in my prepared comments, we believe this is the first drug for chronic administration in dry eye disease to demonstrate activity within minutes of dosing, which is quite important to patients and physicians, especially in a standard of care landscape today where drugs require weeks, at least, of therapy to demonstrate effects.  The ocular sign we described today, ocular redness, is an approvable sign endpoint.

I think one of the key take-home messages from our call today is that the run-in demonstrated that we have options regarding our signs.  We're not dependent on 1 sign or another now that we've demonstrated ocular redness changes acutely in dry eye patients, which is consistent with what we previously demonstrated in allergic conjunctivitis patients.  We believe now we have important options as it relates to FDA approvable signs.

<Q - DAVID B. MCMULLIN, CHIEF BUSINESS OFFICER, ALDEYRA THERAPEUTICS, INC.>: *…We've seen chronic efficacy and now we've seen, with reproxalap, acute efficacy.* This is important in combination because the profile simplifies the journey that patients have to go through in order to manage their disease.  That's important because it affects the way that we'll be able to position the product in the marketplace.  We believe that we have a first-line potential with our profile, and we believe that payers will recognize the advantages of having 1 chronic treatment that can also address the signs and the symptoms of the disease acutely.

…. The pricing will be decided at a later date, but we have done payer research, and payers are very interested in the profile that they see with reproxalap.  We've gotten good feedback, and we're confident in the guidance we provided

23

previously that we will price reproxalap in line with leading dry eye disease branded products.

.... *As we've guided previously, we expect to be in a position to file our NDA at the end of this year.*

*So this is the year [] that we also will be looking at building out the organization in preparation for commercialization.*  In addition, we're committed to finding the best path forward for making this product a success and that includes partnering discussions, and we continue to have ongoing partnering discussions and keeping them up-to-date on the latest developments.

88.    On the Jan. 7, 2021 Call, Brady described the significance of the data gathered in run-in cohort of the Phase 3 TRANQUILITY Trial as follows:

The activity, the onset of activity is critical.  *As I mentioned in my prepared comments, we had what we believed was industry-leading onset activity -- of activity at 1 week after initiation of therapy.  And that's the data we presented today from RENEW Part 1 that had disclosed previously.*

TRANQUILITY was about how quickly can we measure differences in activity or onset of activity following acute dosing, that is give a dose of drug, measure within minutes, signs and symptoms.  What's so remarkable is that reproxalap works within minutes.  The dots on these graphs that you see from the chamber are about 5 minutes apart, in general.  So within 5 minutes, one can see activity in signs and symptoms, which is tremendous....

I don't think the current challenge in dry eye therapy today is efficacy.  I think it's keeping patients on drug to reach levels of efficacy over weeks or months of therapy.  And the great news from today's data is that reproxalap seems to work acutely.

*The other way of thinking about the data, Julian, versus RENEW Part 1, which was a 12-week, a highly durable effect, is that the data from RENEW Part 1 is really a culmination of acute-acting or rapid-acting activity, both the symptom and the sign level of reproxalap.  And so in a sense, we have what we believe potentially the best of all worlds: an acute-acting drug that is able to sustain activity over a long period of time.  And in the case of RENEW 1 and the Phase II formulation trial, that was 12 weeks.*

89.    In addition, when asked on the Jan. 7, 2021 about the remaining requirements for submission of the Reproxalap NDA, Brady stated,

*TRANQUILITY 1 and 2, as I mentioned in my prepared comments, will be the 2 pivotal sign trials.*  The safety study that Matt just asked about will be part -- a key part of the of the NDA submission....

24

And then finally, a large part of the NDA submission has to do with chemistry manufacturing controls, which means that your commercial process has to be clarified and qualified.

It means that the commercial batch, the commercial product needs to pass stability requirements and so forth. So that's another major ongoing effort internally. *I would say, between the completion of the TRANQUILITY trial and the safety study and the CMC requirements that I just mentioned, those would be the major components remaining for NDA submission.*

90.     On the heels of Aldeyra's positive representations regarding the Reproxalap NDA, on January 13, 2021, Aldeyra announced an underwritten public offering of 6,842,106 shares of its common stock at $9.50 per share. In a press release issued that same day entitled "Aldeyra Therapeutics, Inc. Announces Pricing of Public Offering of Common Stock", Aldeyra stated,

The gross proceeds from the offering, before deducting underwriting discounts and commissions and estimated offering expenses payable by Aldeyra, are expected to be approximately $65.0 million. In addition, Aldeyra granted the underwriters a 30-day option to purchase up to 1,026,315 additional shares of common stock at the public offering price, less the underwriting discounts and commissions. All of the shares in the offering are being sold by Aldeyra. Aldeyra anticipates using the net proceeds from the offering for the continued development of Aldeyra's lead compound, reproxalap, and its other product candidates, as well as for working capital, and other general corporate purposes.

91.     On January 14, 2021, the Company filed a Form 8-K with the SEC which stated that Aldeyra had received positive preliminary comments from the FDA regarding an NDA for ADX-2191 for PVRL. Specifically, the Form 8-K stated,

On January 12, 2021, Aldeyra received from the U.S. Food and Drug Administration ("FDA") preliminary written comments in preparation for a Pre-IND ("Investigational New Drug") Type B meeting regarding ADX-2191 for the treatment of primary vitreoretinal lymphoma ("PVRL"), a rare cancer that occurs in the eye. *Aldeyra believes the comments indicated that submission of a New Drug Application ("NDA") for ADX-2191 for the treatment of PVRL may be possible without performing clinical trials.* In the first quarter of 2021, Aldeyra expects to hold a teleconference with the FDA to discuss the preliminary written comments and clarify the ADX-2191 NDA submission requirements for the treatment of PVRL. Aldeyra has applied for and expects to receive orphan designation for ADX-2191 for the treatment of PVRL in the first half of 2021.

92.    On January 20, 2021, Aldeyra issued a press release entitled, "Aldeyra Therapeutics, Inc. Announces Closing of Public Offering of Common Stock and Full Exercise of Underwriters' Option to Purchase Additional Shares" (the "Jan. 20, 2021 PR"). The Jan. 20, 2021 PR announced that, having sold 7,868,421 shares of its common stock at the public offering price of $9.50 per share, including 1,026,315 additional shares of common stock sold pursuant to the full exercise of the underwriters' option to purchase additional shares, Aldeyra had raised gross proceeds of $74.7 million in its public offering announced on January 13, 2021, before deducting underwriting discounts and commissions and offering expenses.

93.    On February 4, 2021, Aldeyra issued a press release entitled, "Aldeyra Therapeutics Announces Phase 3 TRANQUILITY Dry Eye Disease Trial Design" (the "Feb. 4, 2021 Press Release"). The Feb. 4, 2021 Press Release reiterated the positive results of the Phase 3 TRANQUILITY-1 run-in cohort and described the final trial design for the main cohort as such to confirm those positive results. Specifically, the Feb. 4, 2021 PR stated,

> Consistent with previously announced results from the run-in cohort of TRANQUILITY, ocular redness over 90 minutes in a dry eye chamber will be the primary endpoint. Approximately 150 dry eye disease patients are expected to be enrolled per arm. The TRANQUILITY protocol will utilize the two-day dosing paradigm, dry eye challenge design, and enrollment criteria of the run-in cohort….

> "The rapid activity of reproxalap demonstrated in the run-in cohort of TRANQUILITY in improving ocular redness, potentially the only dry eye disease sign of interest to patients, allows for the use of a two-day challenge design — a time and cost-efficient model for Phase 3 clinical testing," stated Todd C. Brady, M.D., Ph.D., President and Chief Executive Officer of Aldeyra. ***"Consistent with the observed rapid improvement in dry eye disease signs and symptoms, the reduction of tear RASP levels was evident after single doses of reproxalap, representing, to our knowledge, the first confirmation of drug mechanism in clinical trials of a topical ocular dry eye disease drug."***

> ***TRANQUILITY and the confirmatory Phase 3 TRANQUILITY-2 Trial are expected to initiate in the first half of 2021. Results from both trials are expected in the second half of 2021.***

94.    On March 11, 2021, Aldeyra held a public conference call to discuss its FY 2020 results (the "March 11, 2021 Call"). On the March 11, 2021 Call, Brady touted the Company's progress towards submission of the Reproxalap NDA, stating,

> *Over the past several quarters, we have focused on 3 primary objectives. First, advance reproxalap into 2 Phase III trials in a clinically relevant sign of dry eye disease, ocular redness, augmenting the statistically significant symptom improvement we achieved in previous Phase II and Phase III trials and positioning our compound as a novel, rapidly acting potential first-line therapy….I'm pleased to report that we have succeeded on all fronts.*

> TRANQUILITY and the confirmatory Phase III TRANQUILITY 2 trial are on schedule to begin enrollment in the first half of this year, with top line results expected in the second half of the year. *Based on demonstrated symptom control in clinical trials and differentiated mechanisms of action, reproxalap has the potential to provide first-line ocular symptom control for dry eye disease patients.*

95.    On the March 11 2021 Call, Brady assured investors that the Phase 3 TRANQUILITY-1 Trial was designed to optimize approvability of the Reproxalap NDA. Specifically, Brady stated,

> *The Type C meeting we held with the FDA in the middle of last year, was designed specifically to clarify the agency's position on our potential primary endpoints for TRANQUILITY. You can rest assured that we clarified with the agency that redness can be used as a primary endpoint. Other companies have used redness as a primary endpoint at least as redness relates to an objective sign of dry eye disease.*

> *So we're quite comfortable that redness will be acceptable in our case. As you know, the agency also clarified that RASP, the target of reproxalap and ADX-629 can be used as an objective sign of dry disease. And as you also know, Schirmer test is also a possible signs. All 3 of those will be assessed in the TRANQUILITY trial with redness being the primary endpoint….*

> Reproxalap, therefore, is a true paradigm shift and solves many of the problems that I've just described, because the drug acts rapidly, that is within minutes, as was demonstrated not only in the run-in cohort of TRANQUILITY, but also in the Phase II allergen chamber trial, reproxalap offers a manner of treating the disease rapidly.

96.    On the March 11, 2021 Call, Brady confirmed that the Company was on track to submit the Reproxalap NDA by the end of 2021. Specifically, Brady stated,

*[T]here are many aspects of a successful new drug application submission, which you allude to, only one of them are -- is your efficacy trials. Obviously … we're very optimistic about TRANQUILITY based on the Phase II trials in allergy and the running cohort of TRANQUILITY, not to mention the prior trials in dry disease that have demonstrated activity of reproxalap and symptoms and signs.*

The other components of NDA submission concern safety studies. Safety studies are a requirement for NDA submissions….We have now over 1,100 patients that have been exposed to a reproxalap at concentrations higher than 0.25%, which is our concentration we intend to take forward or are taking forward. And at dosing frequencies that exceed the dosing frequencies that we are currently using, we have experienced or observed no safety events….

The third aspect of NDA submission concerns chemistry manufacturing and controls as there, the FDA is primarily concerned with the manufacturing process, the commercial process, and the stability of the commercial batch. And *I'm happy to say that we believe we're in very good shape with regard to all those standards as they relate to CMC.*

*The only thing I'll add is that the safety trial for dry eye disease is ongoing. The FDA requires that for NDA submission we have a certain number of patients with 6 months of exposure to drug. And we believe that we're on track to reach that milestone by the end of this year, Kelly.*

97.     On March 11, 2021, Defendants also filed with the SEC Aldeyra's Form 10-K for FY 2020 (the "2020 10-K"). The 2020 10-K described the ADX-2191 NDA progress as follows:

Primary vitreoretinal lymphoma ("PVRL") is a rare, aggressive, high-grade cancer that arises in the vitreous and retina….In January 2021, we received from the FDA preliminary written comments in preparation for a Pre-IND ("Investigational New Drug") Type B meeting regarding ADX-2191 for the treatment of PVRL. *We believe the comments indicated that submission of a New Drug Application ("NDA") for ADX-2191 for the treatment of PVRL may be possible without performing clinical trials. In the first quarter of 2021, we held a teleconference with the FDA to discuss the preliminary written comments and clarify the ADX-2191 NDA submission requirements for the treatment of PVRL. We applied for orphan designation for ADX-2191 for the treatment of PVRL in the first half of 2021. ADX-2191 has the potential to be the first drug approved to treat PVRL.*

98.     On April 27, 2021, Aldeyra issued a press release announcing a $125 million public offering of Aldeyra's common stock. Aldeyra described its intended use for the funds as follows:

Aldeyra anticipates using the net proceeds from the offering for the preparation of a potential New Drug Application submission for Aldeyra's lead compound, reproxalap; the preparations for the commercial launch of reproxalap and the subsequent commercialization of reproxalap, if approved; early stage pipeline development programs, as well as for working capital and other general corporate purposes.

99.    On May 6, 2021, Aldeyra announced in a press release entitled, "Aldeyra Therapeutics Reports First-Quarter 2021 Financial Results and Recent Business Highlights" that it had sold 10,000,000 shares of its common stock in the previously-announced public offering, at the price of $12.50 per share in an underwritten public offering. The offering generated gross proceeds of $125 million and net proceeds of $117.3 million after deducting underwriting discounts, commissions, and estimated offering expenses. The press release also quoted Brady as follows:

> ***"We expect 2021 to be a catalyst-rich year for Aldeyra as we continue to advance reproxalap, our lead program, toward potential commercialization in anterior ocular inflammatory disease,"*** stated President and CEO Todd C. Brady, M.D., Ph.D. "In addition, we remain on track to report top-line results in the second half of this year from the Phase 3 TRANQUILITY and TRANQUILITY-2 clinical trials of reproxalap in dry eye disease."

100.    On May 6, 2021, Aldeyra also held a public conference call to discuss the Company's Q1 2021 results (the "May 6, 2021 Call"). On the May 6, 2021 Call, when asked about whether Aldeyra had a plan in case any of the reproxalap for DED trials did not turn out well, Brady assured investors that it did. Specifically, Brady stated,

> What can go wrong? Well, in a clinical trial business, those of us that have been around for decades have had lots go wrong. It is always possible for clinical trials to readout sideways and unexpected manners. In dry eye disease, there is considerable variability. This is why many companies developing drugs today for dry eye disease perform a number of Phase III trials, and Aldeyra is no different.
>
> ***One way to combat variability is numerous trials, and that's exactly what we've done with the RENEW trials, with the Phase IIb formulation trials that we believe will satisfy our requirements for symptom control over 12 weeks in dry eye disease, but also the TRANQUILITY trials 1 and 2, which are, we believe, conservatively powered, at least 90% powered to detect changes in ocular redness based on the activity we saw in the run-in cohort for TRANQUILITY….***

101.    Further, on the May 6, 2021 Call, Defendants reassured investors about the sufficiency of the CMC data in connection with the Reproxalap NDA submission and reassured investors about the timeline for NDA submission.  Specifically, stated,

> *Our registration batches are in excellent shape. And to date, we would expect a 24-month stability as is standard in NDA filings. So in conclusion, I don't think that there are any CMC roadblocks at all at this point.*
>
> *We have guided that NDAs are possible for dry eye disease [ ] by the end of this year or early next year. I think the gating factors for those NDA submissions more likely relate to the standard NDA safety studies, which in dry eye disease are 12 months long. Nonetheless, I still think that we're in a good position to meet the NDA submission time lines that I have mentioned.*

102.    On August 17, 2021, Aldeyra participated in the H.C. Wainwright Opthalmology Virtual Conference (the "Aug. 17, 2021 Conference").  At the Aug. 17, 2021 Conference, Defendants touted the progress of meeting the requirements for submission of the Reproxalap NDA.  Specifically, Brady stated at the Aug. 17, 2021 Conference,

> Reproxalap is going to yield two large Phase 3 results in dry eye disease in the next quarter those are the TRANQUILITY trials.  We have a Phase 2 [ ]  trial on dry eye disease that will be announced in the net quarter as well, that deals with RASP levels in dry disease and so forth.  Our end points in these trials are ocular redness, redness is a clinical sign of the dry eye disease.  *We believe we've finished more or less our safety—our symptom trials.  The FDA requires symptoms and signs.*
>
> *The symptoms trials, I think, we've put to bed, now it's about the clinical signs of dry eye disease.* Redness is great because it's the only clinical sign really that patients care about.  Patients aren't interested in Schirmer test or staining or tear film breakup time osmolarity or some of the other signs that you hear about in dry disease.

103.    At the Aug. 17, 2021 Conference, when asked about why investors should invest in Aldeyra, Brady answered,

> *So, with reproxalap, it's the three dry eye trials as I mentioned next quarter. That's the near-term reason to own our stock, I tell people. I think the intermediate reason to own our stock has to do with ADX-2191. Of all the reasons that we've discussed earlier today, really 2191 represents a platform approach for the treatment of rare retinal diseases. We have a known drug. We know that drug is active. We know the safety of the drug. We've received orphan*

*designations, one case Fast Track designation. So you'll hear much more about that as GUARD finishes up this year and data are announced next year. We'll have regulatory strategy announcements next year and so forth regarding 2191. So there's your intermediate.*

104.    On September 22, 2021, Aldeyra participated in the Oppenheimer Fall Healthcare Life Sciences and Medical Technology Summit (the "Sept. 22, 2021 Conference").  At the Sept. 22, 2021 Conference, Brady touted the upcoming Reproxalap NDA submission and reaffirmed that Aldeyra could submit the NDA by the end of the year.  Specifically, Brady stated,

*We've proven activity in symptoms previously, now we are attempting to prove activity in signs, our sign happens to be ocular redness, which by the way, as I like to say, is the only sign that matters to patients.* Patients don't care about any other physiologic sign in dry eye disease; Schirmer test, screening, osmolarity, tear film breakup, it'd go on forever….*I think we can beat your estimate Justin and have that next quarter for the street in terms of NDA timing[.]*

105.    On October 28, 2021, Aldeyra announced its Q3 2021 results in a press release and on a public conference call (the "Oct. 28, 2021 Call").  On the Oct. 28, 2021 Call, when asked about Aldeyra's progress towards meeting all the requirements for a successful Reproxalap NDA submission, Brady stated,

*As you know, the FDA requires symptoms and signs for NDA submission in dry eye disease. We believe we've completed our symptom requirements. Those data are prominently highlighted in our corporate deck of 2 12-week pivotal trials by using eye dryness as our symptom. The remaining trials, particularly the TRANQUILITY-1 and TRANQUILITY-2 trials are focused on the sign requirement for NDA submission.* And as we've discussed this morning, that sign is ocular redness, though we were also assessing RASP and Schirmer's test.

In addition to the efficacy requirements for NDA submission or safety requirements consistent with NDA submissions generally, there is a safety trial that must be part of the submitted package. As I said in my prepared comments this morning, we are currently running a 12-month safety trial to support the chronic use of reproxalap in dry eye disease. *I continue to believe that the 12-month safety trial will be the gating factor for us in terms of NDA submission timing.*

In addition, there are chemistry manufacturing and control requirements for NDA submission. *I believe that we are in excellent position with regard to our CMC requirements. And I think that rounds out the basic components of what we need to file in the NDA.*

31

106.    On November 2, 2021, Aldeyra announced the positive results of the Phase 2 Dry Eye Chamber Trial in a press release, stating that the trial had achieved statistically significant improvement on primary sign endpoint of ocular redness (the "Nov. 2, 2021 PR").  The Nov. 2, 2021 PR stated,

> ***Based on final enrollment and data from the run-in cohort of TRANQUILITY, Aldeyra's ongoing Phase 3 trial in dry eye disease, the Phase 2 trial exceeded 90% power to detect statistical significance in the primary endpoint of ocular redness over all time points in aggregate in the dry eye chamber.*** Ocular redness scores in the reproxalap group were observed to be statistically lower than those of vehicle (p = 0.016)….
>
> ***"Complementing our rapid and durable symptom control evidenced in three 12-week clinical trials, we are excited to announce achievement of statistical significance of an objective sign of dry eye disease in a well-controlled clinical trial,"*** stated Todd C. Brady, M.D., Ph.D., President and Chief Executive Officer of Aldeyra. ***"Ocular redness may be the only dry eye disease sign that is of importance to patients, and the reduction in redness observed in this trial following reproxalap treatment potentially represents a major advance for the chronic treatment of dry eye disease."***
>
> Two Phase 3 clinical trials of reproxalap in patients with dry eye disease, TRANQUILITY and TRANQUILITY-2, are ongoing. For each trial, the planned enrollment is 300 patients, and the primary endpoint is ocular redness. Pending confirmation of statistical powering and other analyses of the Phase 2 clinical trial results announced today, results from the TRANQUILITY trials are expected to be released by the end of the year.

107.    Aldeyra did not hold a public conference call to discuss the results touted in the Nov. 2, 2021 PR.  Though Defendants highlighted the results of the Phase 2 Dry Eye Chamber Trial in the Nov. 2, 2021 PR as meeting the primary sign endpoint of ocular redness, Defendants downplayed the fact that the trial had failed to achieve the secondary symptom endpoints.  Fierce Biotech published an article on November 2, 2021 following Aldeyra's positive announcement, entitled, "Aldeyra's dry eye drug helps with redness but misses other important phase 2 goals". The article stated in relevant part,

> Aldeyra Therapeutics' dry eye drug helped relieve ocular redness in a phase 2 trial but merely "approached statistical significance" on a secondary endpoint of wetness in the eye….The small biotech out of Lexington, Massachusetts pinned

its hopes on ocular diseases, specifically reproxalap, after halting the clinical development of two systemic disease programs in 2020. The company bet that throwing all resources into ocular would keep things going as cash reserves were drained.

***And the company has certainly gone all in: rather than wait for the results of the phase 2, Aldeyra already has two phase 3s underway in the same setting of the mixed bag mid-phase trial that's being reported today. Aldeyra narrowed the endpoint to eye redness rather than others key to dry eye disease for the remaining tests, even switching one of the late-stage tests to only focus on this measure.***

Now, Aldeyra is reporting that reproxalap met the main goal of the phase 2 trial, which was to improve eye redness based on a test after patients were placed in a dry eye chamber.

The FDA and other experts have questioned whether a dry eye chamber can truly replicate real-world conditions that patients experience with dry eye. The devices simulate minimal humidity, high airflow and forced visual tasking, according to Aldeyra, but are not standard in trials for dry eye disease.

Patients were given four doses the day before entering the chamber and then two doses during the 90-minute exposure in the chamber.

On the secondary endpoint, patients did not score high enough on a test that ranked eye wetness to reach statistical significance after the initial dose, but the results were "directionally in favor of reproxalap" compared to placebo.

The therapy also failed on other secondary symptomatic measures including eye dryness and discomfort, although patients who received the treatment reported lower scores than the placebo group, meaning they saw at least some relief. No new safety signals were observed in the trial.

"Complementing our rapid and durable symptom control evidenced in three 12-week clinical trials, we are excited to announce achievement of statistical significance of an objective sign of dry eye disease in a well-controlled clinical trial," said Aldeyra President and CEO Todd Brady, M.D., Ph.D. "Ocular redness may be the only dry eye disease sign that is of importance to patients, and the reduction in redness observed in this trial following reproxalap treatment potentially represents a major advance for the chronic treatment of dry eye disease."

Brady is suggesting here that signs of dry eye disease—which are lab-confirmed assessments—like ocular redness, are more important than symptoms, but there's been plenty of debate between signs versus symptoms in this condition and what is most important for patients.

Luckily, there's a study for that. A 2019 study published in the National Institutes of Health's library defined the needs of dry eye patients. Red eyes were noted as the "most burdensome eye appearance aspect" by 37% of patients, but 77% said eye discomfort and sensitivity were the most bothering symptom overall. Eye dryness was rated by 76% of patients as the most burdensome symptom.

Reproxalap previously posted a mixed bag of evidence in a phase 2a dry eye trial and also failed another midstage study in allergic conjunctivitis. Aldeyra has two phase 3 trials of reproxalap ongoing, which are looking at ocular redness. The results are expected to be released by the end of the year.

108.    On November 9, 2021, Aldeyra issued a press release entitled, "Aldeyra Therapeutics Announces Completion of Enrollment in Phase 3 TRANQUILITY Trial in Patients with Dry Eye Disease and Reiterates New Drug Application (NDA) Submission Guidance", (the "Nov. 9, 2021 PR"), which reiterated the Company's guidance for the Reproxalap NDA submission.   Although the Phase 2 Dry Eye Chamber had not met its secondary symptom endpoints, Aldeyra announced that the trial, along with either of the pending TRANQUILITY trials, could satisfy Aldeyra's pivotal sign trial requirements.   Specifically, the Nov. 9, 2021 PR touted the below corporate highlights as follows,

- Top-Line Results from TRANQUILITY Expected This Quarter
- *Together with Recently Completed Phase 2 Clinical Trial, Positive Ocular Redness Results from TRANQUILITY Could Satisfy NDA Submission Requirements as Pivotal Trials for Improvement in an Objective Sign of Dry Eye Disease*
- *Completed Phase 3 RENEW-Part 1 and Formulation Phase 2 Clinical Trials to be Submitted as Pivotal Trials in Satisfaction of NDA Symptom Requirements*
- *Anticipated NDA Submission Expected in Early 2022*

*"Following the recent announcement of top-line results from our Phase 2 clinical trial, which achieved the primary endpoint of ocular redness and which we intend to submit as a pivotal trial, completion of enrollment in TRANQUILITY is a significant milestone as we advance reproxalap toward an anticipated NDA submission early next year for the treatment of dry eye disease,"* stated Todd C. Brady, M.D., Ph.D., President and CEO of Aldeyra. *"If the primary endpoint of ocular redness in TRANQUILITY is achieved, and in conjunction with two previously announced clinical trials demonstrating improvement in ocular dryness symptoms, we believe that the efficacy requirements for NDA submission will have been met."* If successful, either

TRANQUILITY or TRANQUILITY-2 could complete NDA submission requirements for demonstration of improvement in an objective sign of dry eye disease.

Per draft U.S. Food and Drug Administration (FDA) guidance, to be considered for regulatory approval in the United States, a product candidate for the treatment of dry eye disease must demonstrate efficacy in an objective sign in at least two clinical trials and efficacy in a subjective symptom in at least two clinical trials. *For satisfaction of symptom efficacy requirements, Aldeyra intends to submit two previously completed adequate and well-controlled symptom trials that pre-specified patient-reported ocular dryness score as a primary endpoint, the RENEW-Part 1 Trial and the Formulation Phase 2 clinical trial. For satisfaction of the sign efficacy requirements, Aldeyra intends to submit the recently completed Phase 2 clinical trial and, if positive, either TRANQUILITY or TRANQUILITY-2, all of which pre-specify ocular redness as a primary endpoint.*

"With its safety and efficacy profile—demonstrated in clinical trials encompassing more than 1,300 patients in aggregate—reproxalap has the potential to provide relief to the estimated 34 million adults in the U.S. who suffer from persistently disturbing symptoms and ocular redness caused by dry eye disease," Dr. Brady stated."

109.    On November 18, 2021, Aldeyra participated in the Jefferies London Healthcare Virtual Conference (the "Nov. 18, 2021 Conference"). At the Nov. 18, 2021 Conference, when asked about the milestones achieved by Aldeyra in 2021 and the expected achievements over the next quarter to six months, Brady stated,

> *It's not every day that you take a company from idea all the way into Phase three hopefully done with Phase III shortly for reproxalap our lead asset, you don't see that very often.*
>
> So I think as a company sort of beginning with this idea that RASP are important and inflammatory diseases and hopefully winding up in a few years putting this drug in the hands of physicians and patients is really quite remarkable. *We are in an exciting phase to your question about upcoming milestones. Reproxalap we hope is ending the near--ending clinical development in the near term in Phase three trials for dry eye disease*….
>
> *The idea is that NDA filings are possible early next year and then with the standard review periods maybe launch a year after that.* So, an exciting time for reproxalap and reproxalap's cousin….and then the other thing we're working on as an immunology company at heart is retinal disease we have a product called ADX-2191, which is we think the world's only vitreous mimicking methotrexate formulation.

*We now have orphan designation for three different rare diseases that effect the retina, and we look forward to updating the street shortly as to our planning for not only subsequent clinical trials but completion of a Phase III trial that we have ongoing called the guard trial and proliferate vitreoretinopathy. As well as initiating some clinical work in a rare disease called retinitis pigmentosa which is really the third leg of the (inaudible) in terms of that three trials that we're -- we're working on. The other one being ocular lymphoma.* So a lot going on in the company between reproxalap, ADX 629 and ADX 2191.

110.    At the Nov. 18, 2021 Conference, when asked about what would happen if only

one of the Phase 3 TRANQUILITY Trials was successful, Brady stated:

As I mentioned earlier, *we really only need two positive sign trials, one of them is the Phase II enhanced pivotal and that's done, so that box is checked, we just need to check one more box that is we either need tranquility one to work or tranquility two to work.*

So what happens if tranquility one works. Well, certainly, we're in a position of prioritizing tranquility two, we really don't need tranquility two for the NDA submission. ***All we need is one more trial to achieve the primary endpoint of ocular redness and we believe we've met the efficacy requirements for NDA submission for dry eye disease.***

111.    At the Nov. 18, 2021 Conference, Brady assured that Aldeyra had more than one backup plan in place in the event that one of the Phase 3 TRANQUILITY Trials was unsuccessful, noting that the Company could "pool" the positive aspects of the two TRANQUILITY Trials together.  Specifically, Brady stated:

> It could be for whatever reason the tranquility one doesn't work, but at least, we'll have a lot of data upon which to power tranquility two, as you mentioned, I think tranquility one has just about as good a chance to work as any clinical trial based on the data we've generated to-date. ***But the good news is there's backup mechanism in case tranquility one goes sideways…. [T]here's even more flexibility than I've described by another well worn option with the FDA is if two trials don't work you could p[oo]l them together that counts as another trial.***
>
> ***So one I think remote possibility but possibility nonetheless, is that neither tranquility one or tranquility two works but pooled together they work and that would satisfy that other checkbox they would qualify as another positive trial. The odds of bolstering tranquility one and tranquility two failing I think are very low, but there is even a backup plan to the backup plan.***

112.    At the Nov. 18, 2021 Conference, when asked about the potential impact on the Reproxalap NDA submission that Aldeyra's failure to hit symptom endpoints in the Phase 2 Dry Eye Trial would have, Brady reassured investors about the strength of the Reproxalap NDA. Specifically, Brady stated,

> ***Well, it's always good to have secondary endpoints in your clinical trials and you can not just have primary endpoints. But then again there is a reason why we call them primary endpoints. They are the only endpoints that ultimately matter. They are the pre-specified success criterion for the trial and fortunately in Phase II we achieved the primary endpoint for ocular redness and dry eye disease and thus that trial because it is adequate and well controlled is now pivotal and will be submitted as part of our NDA.***
>
> We did put some other secondary endpoints for which the trial was not powered I have to stress that those include Schirmer test because we've seen some initial activity not only in allergy trial tearing but also in the run-in cohort of tranquility for improving Schirmer Test.
>
> We also put in symptoms, because typically when you run dry eye trial you assess those signs and symptoms but because in part the trial simply just wasn't powered for the secondary endpoints they were not achieved statistically and maybe those

endpoints will be hit in the tranquility trials, which as you know are larger. However, even the tranquility trials really aren't powered to detect changes in Schirmer and symptoms.

*I think the good news is both of those endpoints Schirmer symptoms are at best nice to have, they are really not at all critical for NDA submission or any other regulatory review process. They are really just there because it's good to have some secondary endpoints.*

It would be nice to show that we had some activity there and maybe we'll do so in the larger trials. But again, we really haven't powered any trial in this latest series Phase II or tranquility to achieve those endpoints.

### E.   On December 20, 2021, Aldeyra Discloses That The Phase 3 TRANQUILITY-1 Trial Failed To Meet Its Primary Endpoint And Extends The Expected Reproxalap NDA Submission To Mid-2022

113.    On December 20, 2021, after close of market, Aldeyra issued a press release entitled, "Aldeyra Therapeutics Announces Top-Line Results from the Phase 3 TRANQUILITY Trial in Dry Eye Disease" (the "Dec. 20, 2021 PR").  The Dec. 20, 2021 PR revealed that the Phase 3 TRANQUILITY trial had failed and that the Reproxalsap NDA submission was now expected in mid-2022.

114.    The Dec. 20, 2021 PR disclosed that "the primary endpoint of ocular redness was not met", but noted that the trial had met a secondary endpoint of Schirmer Test (which Aldeyra previously stated on November 18, 2021 that the trial was not "powered" to meet), and pursuant to a post-hoc assessment, achieved a Schirmer Test responders analysis of ≥10mm, noting "[t]he Schirmer test has been accepted by the U.S. Food and Drug Administration (FDA) as part of the approval of other dry eye disease products."

115.    The Dec. 20, 2021 PR further stated that despite the Phase 3 TRANQUILITY-1 Trial's failure to meet its primary endpoint, the Schirmer Test and Schirmer Test responders analysis results could still be used to meet Aldeyra's sign trial requirements.

The primary endpoint of the upcoming Phase 3 TRANQUILTIY-2 Trial has been modified such that the endpoint will have been met if either Schirmer test or ocular redness demonstrates statistical significance ….

"Following the achievement of statistical significance in ocular redness in our recent Phase 2 clinical trial, the achievement of statistical significance in TRANQUILITY may provide an additional option to satisfy the remaining objective sign requirement for dry eye disease submission," stated Todd C. Brayd, M.D., Ph.D., President and Chief Executive Officer of Aldeyra. "Subject to agreement with the FDA, we believe that the TRANQUILITY results allow for the possibility that, pending the outcome of TRANQUILITY-2, the NDA submission for reproxalap could represent the first time a dry eye disease drug will have qualified for the demonstration of activity for two objective signs."

…. *Pending discussion with the FDA and the results of TRANQUILITY-2, Aldeyra may submit two pivotal trials for either ocular redness (Phase 2 and TRANQUILITY-2) or Schirmer test (TRANQUILITY and TRANQUILITY-2), or two trials for both signs (Phase 2, TRANQUILITY, and TRANQUILITY-2) if ocular redness and Schirmer test are achieved in TRANQUILITY-2.* Phase 2 and Phase 3 clinical trials can be submitted as pivotal, provided that the trials are adequate and well-controlled.

*Pending enrollment of the ongoing 12-month safety trial in dry eye disease patients and the outcome of TRANQUILITY-2, the dry eye disease NDA (New Drug Application) submission is expected to occur mid-2022 ….*

"Notwithstanding the inherent variability of dry eye disease clinical trials, our investigational product candidate 0.25% *reproxalap has now demonstrated activity in four late-stage clinical trials with the intended commercial dosing regimen,"* Dr. Brady stated. *"We continue to advance reproxalap toward NDA submission as we focus on the completion of TRANQUILITY-2 and enrollment in the 12-month safety trial."*

116.    On that same day, Aldeyra held a conference call to discuss the developments disclosed in the December 20, 2021 Press Release (the "Dec. 20, 2021 Call"). On the Dec. 20, 2021 Call, Brady engaged in the following exchange with an analyst:

<Q - JUSTIN ALEXANDER KIM, ASSOCIATE, OPPENHEIMER & CO. INC., RESEARCH DIVISION>: Maybe just a few on Schirmer care test. In the scenario that Schirmer is positive for TRANQUILITY-2, do you expect to gain agreement with the agency on the acceptability of TRANQUILITY-1 demonstrating sort of improvement on Schirmer care test? Just wondering how much being a secondary plays a role with their thinking and whether you would be able to get some level of understanding as you think about changing the primary?

<A - TODD C. BRADY>: For sure. And thanks for the question, Justin. *I do expect that we'll be able to gain agreement with the agency regarding the use of TRANQUILITY in the event that we file on or submit on Schirmer test.* The

reason I say that is, first, I think there's a historical precedent for that. And the definitive result in Schirmer test that notwithstanding Schirmer test being a secondary endpoint, I think, helps those negotiations.

*Another approach is always to run other trials aside from TRANQUILITY-2 with Schirmer test. But frankly, I don't think we'll need to do that.* The good news is that Schirmer test is tested after 1 day of dosing, which means that clinical trials are efficient, they are fast. And I think we're in a really good position in discussing the applicability of TRANQUILITY in a Schirmer test submission situation.

117.    On the Dec. 20, 2021 Call, Brady further represented that the safety study was the

primary reason that the expected date of the Reproxalap NDA submission, stating,

*It is correct that we're nudging the NDA submission date out to mid-year. But that is primarily, as you point out, because of the safety trial.* And the difficulty with safety trials in dry eye disease and other chronic conditions is they're 12 months long.

So convincing patients to remain in the trial, convincing patients to sign up for trials, particularly in the COVID era that are 12 months in duration is challenging. I totally expect that we'll be able to reach our enrollment target. I expect we'll be able to file on -- or submit on 6 months of safety data. But that process is, again, challenging in today's environment.

118.    On this news, Aldeyra's share price dropped by $3.63 per share, or **50.9%,** to

close at $3.50, on December 21, 2021 on unusually heavy volume.

**F.    Defendants Continue To Tout Their Progress Towards FDA Approval Of The Reproxalap NDA And The ADX-2191 NDA**

119.    On March 17, 2022, Aldeyra filed with the SEC a Form 10-K for FY 2021 (the

"2021 Form 10-K"). The 2021 Form 10-K touted the progress of the Reproxalap NDA and

clinical trials done in connection therewith. Specifically, the 2021 Form 10-K stated,

Per draft FDA guidance, to be considered for regulatory approval in the United States, a product candidate for the treatment of DED must demonstrate efficacy in a subjective symptom (a patient-reported subjective measure of disease severity) in at least two adequate and well-controlled clinical trials, and efficacy in an objective sign (an independently assessed objective measure of disease severity) in at least two adequate and well controlled clinical trials. *We intend to submit the RENEW Part 1 and Phase 2 novel formulation trials to satisfy the symptom efficacy NDA requirements. Because either ocular redness or Schirmer test qualifies as a sign of DED, subject to a discussion with the FDA, we intend to*

*submit a combination of the Phase 2, TRANQUILITY, and TRANQUILITY-2 chamber trials to satisfy the NDA sign requirements, depending on whether ocular redness or Schirmer test is achieved in TRANQUILITY-2 or in subsequent clinical trials. If ocular redness and Schirmer test is statistically significant in TRANQUILITY-2, then we may elect to submit the NDA with two sign trials in addition to the symptom trials. Pending results from TRANQUILITY-2, a dry eye disease safety trial, and regulatory input, we believe that an NDA filing for reproxalap for the treatment of DED could occur mid-2022.*

120.    On March 17, 2022, Aldeyra also held a public conference call to discuss its Q4 2021 results (the "March 17, 2022 Call").  On the March 17, 2022 Call, Brady disclosed that although Aldeyra planned to submit the Reproxalap NDA after the completion of the Phase 3 TRANQUILITY-2 Trial,

*We've also initiated 2 additional trials, a crossover dry eye disease chamber trial and a 1-day Schirmer test trial either of which could serve as pivotal trials in support of an NDA submission…. [B]oth trials, i[f] successful, will support the NDA submission, though may not necessarily be needed for the NDA submission, pending the outcome of TRANQUILITY-2.*

121.    On the March 17, 2022 Call, Brady reiterated that the Reproxalap NDA requirements were on track and emphasized the breadth of the anticipated NDA.  Specifically, Brady stated,

*I'm thrilled to report that our CMC progress to our knowledge is superb. We've discussed CMC, specifically with the FDA. And at this point, I don't foresee any issues regarding CMC as it relates to commercial or registration batches, stability, et cetera.*

The safety trial is a significant undertaking for chronic drugs generally a 12-month safety trial is required per FDA dry disease guidance. As you know, 100 subjects are 100 patients are required to be exposed to the drug for 12 months at least. The NDA can be submitted prior to the completion of the safety trial, but by the -- generally, by the 120-day update, all the final safety data, that is the 12-month data for those 100 patients that needs to be submitted in addition. *I think at this point, we remain on track to be able to submit the NDA midyear for dry disease based on the current enrollment in the safety trial across the industry, not only in trial disease or in ocular diseases.* But broadly, we are experiencing some challenges in retaining patients in trials.

41

Enrollment has not been as difficult as we moved through various phases of COVID. But as is the case with COVID broadly, I think that many people are evaluating life choices differently than they have in the past and retention, again, across the biotech industry and the clinical trial industry broadly is a challenge. ***Notwithstanding those comments, I still believe we're on track for a midyear NDA submission.***

Your questions about the crossover and the 1-day Schirmer test trial are good wins. ***For sure, I think either trial could serve as a backup. But really, we're running those trials because they answer slightly different questions than what we've asked previously, in particular, the dry disease chamber crossover trial, which, as I mentioned … to our knowledge, has never been done before. As you know, the FDA considers the preponderance of evidence -- our position in submitting this NDA is that with reproxalap will come one of the most comprehensive NDA packages ever submitted for dry eye disease. The crossover trial, the Schirmer test trial are 2 examples of our efforts to expand the package to demonstrate the breadth of activity of the drug across not only a large number of patients, but different models and different trial designs.***

122.   On May 5, 2022, Aldeyra filed with the SEC a Form 10-Q (the "May 5, 2022 10-Q") and held a public conference call that same day to discuss the Company's Q1 2022 results (the "May 5, 2022 Call").   On the May 5, 2022 Call, Brady emphasized the Company's confidence in the Reproxalap NDA, stating,

***Based on our conversations with the agency, we're quite confident in the strength of our NDA submission package. In fact, I would say, arguably, the package we intend to submit is the most comprehensive dry eye disease package ever submitted….***

***The additional trials I mentioned, that is, the crossover chamber trial and the 1-day Schirmer test trial, are designed to back up TRANQUILITY-2. In the event that the data from TRANQUILITY-2 is for whatever reason, not clear, we will essentially have 2 more shots on goal to support the submission package. Broadly, as you know, Justin, the FDA considers the preponderance of evidence, and the stronger your package -- that is, the number of clinical trials, the number of patients tested and so forth -- the better your odds of approval. And I think Aldeyra is in the very fortunate position of being able to run rapid 1- or 2-day clinical trials with nominal cost to support our NDA submission package. And thus, I think running additional trials is a responsible and wise use of cash as we look to submit our dry eye disease package….***

***The safety trial remains on the critical path. The safety trial is the gating factor for the submission of the NDA.*** As you know, the FDA requires 100 subjects, or 100 patients, to have been exposed to your commercial formulation at your

commercially proposed dosing regimen for at least 12 months. We are masked as to how many patients are on drug versus vehicle, the safety trial is a 2:1 randomization, that is drug to vehicle. ***However, based on the information we have to date, we believe that we remain on track for a midyear submission of the NDA.***

123.    On the May 5, 2022 Call, Brady also engaged in the following exchange with an

analyst regarding commercialization of both reproxalap and ADX-2191:

<Q - ELAINE KIM;BERENBERG CAPITAL MARKETS;EQUITY RESEARCH ASSOCIATE:> We just wanted to ask, with the convenience of ADX-2191 as a specific injection formulation of methotrexate, we were wondering if that would be enough to compete with the growing support methotrexate itself is getting. And a follow-up is, have you gotten any feedback or conversations with KOLs or payers?

<A - TODD C. BRADY:> Thanks for focusing on 2191. It's a topic that I wish we had more time to discuss and more questions about. ***The answer to your last question about feedback from payers is an absolute yes. We have been discussing with payers, not only reproxalap but ADX-2191, which we believe could be near NDA submission, and we intend to update on the regulatory plans, particularly NDA submission plans for 2191, in the second half of this year.***

The convenience of a GMP product is one thing. I think the safety of a GMP product is another. Today, before methotrexate is injected in patients' eyes, save patients with proliferative vitreoretinopathy or patients with ocular lymphoma, the intravenous formulation of methotrexate has to be used. So, the vial of intravenous methotrexate is cracked open. A certain amount of the solution is drawn up into a syringe, and then that syringe is used to inject the eye. The problem with that process is that it allows for the introduction of contaminants, which when you're injecting into an eye, is potentially serious. There is a condition called endotheliitis, which is an infection of your inner eye that occasionally requires enucleation -- that is, removal of the eye -- for treatment. So obviously, very serious consequences for contamination, which is more likely to occur with non-GMP product; that is, compounded product.

Oh, you had also asked about -- I also appreciate your question about the use of methotrexate these days. It's interesting, because methotrexate is already the standard of care in ocular lymphoma. What's more interesting is that the use of methotrexate is growing for the treatment of PVR, which made our Phase III GUARD trial difficult to enroll. As you recall, the GUARD trial was a randomized trial, where subjects, or patients, were either randomized to receive methotrexate or nothing, which is technically standard of care. It was difficult to convince our clinical sites and surgeons to randomize patients to nothing because of the ongoing belief of investigators that methotrexate is active for PVR.

124.    On the May 5, 2022 Call, Brady described Aldeyra's Crossover Trial and 1-day Schirmer's Test Trial for the Reproxalap NDA essentially as a backup in case the results of the Phase 3 TRANQUILITY-2 Trial were insufficient.  Specifically, Brady stated:

> *[T]he idea is that if for whatever reason the data from TRANQUILITY-2 are not interpretable or ambiguous, then we will have 2 different trials reading out shortly afterwards that, in theory, would not impair our NDA submission timing, which we're reiterating is midyear this year.*

125.    On May 24, 2022, Aldeyra announced that it had changed the primary endpoint of the Phase 3 TRANQUILITY-2 Trial to the sign of Schirmer Test.  Defendants initially represented that, as a confirmatory trial, the trial's primary endpoint would be the same as that of the Phase 3 TRANQUILITY-1 Trial—the sign of ocular redness.  Defendants described in a press release the reason for the change was to allow Aldeyra to submit an even more expansive NDA.  Specifically, Defendants stated,

> The selection of Schirmer test as the primary endpoint for TRANQUILITY-2 followed Aldeyra's announcement last week of favorable results of post-hoc analyses from the completed Phase 3 TRANQUILITY and Phase 2 clinical trials of reproxalap in patients with dry eye disease. Using computer automated grading of digital photography, the analyses indicated that reproxalap demonstrated a statistically significant reduction in ocular redness.

> *"The opportunity to submit a New Drug Application for dry eye disease based on the achievement of two objective signs is significant,"* stated Todd C. Brady. *"Based on our discussions with opthalmologists, optometrists, and other key opinion leaders about the unmet medical needs in dry eye disease, ocular redness is a substantial concern for many patients, while Schirmer test has long been considered by many eyecare providers as the benchmark sign endpoint for regulatory approval."*

> *Pending the results from the TRANQUILITY-2 and discussion with the [FDA], Aldeyra intends to submit the Schirmer test results of both TRANQUILITY trials in support of its [NDA] submission….The acute increase in Schirmer test scores following administration of reproxalap observed in TRANQUILITY is consistent with symptomatic activity observed as soon as one week after dosing in the Phase 3 RENEW trial*….

> Top-line results from TRANQUILITY-2 are expected in the second quarter of 2022. *Pending discussion with the FDA and enrollment of the ongoing 12-*

*month safety trial of reproxalap in dry eye disease, NDA submission for dry eye disease is expected to occur mid-2022.*

126.    On June 8, 2022, Aldeyra announced in a press release that the Phase 3 TRANQUILITY-2 Trial had met its primary sign endpoint of ocular redness.  The press release was entitled "Aldeyra Therapeutics Achieves Primary Endpoint in Phase 3 TRANQUILITY-2 Trial and Intends to Submit New Drug Application for Symptoms and Three Sign Endpoints of Dry Eye Disease" (the "June 8, 2022 PR").  Aldeyra held a public conference call that same day to discuss the results of the Phase 3 TRANQUILITY-2 Trial (the "June 8, 2022 Call").  Brady touted the progress of the clinical trials conducted for submission with the Reproxalap NDA, stating,

> *Today marks a monumental and broadly significant milestone for Aldeyra as we announced this morning achievement of both primary endpoints of the Phase III TRANQUILITY-2 trial, which we expect to conclude the pivotal clinical development efficacy program of reproxalap for the treatment of dry eye disease. To our knowledge, the TRANQUILITY-2 results could facilitate the first new drug application in dry eye disease that includes pivotal trials for improvement in symptoms as well as 3 distinct objective signs, potentially representing the most comprehensive package submitted for this condition to date.*

> *The 5 late-stage adequate and well-controlled trials that we intend to submit to the NDA as pivotal offer an unparalleled assessment of both acute and chronic designs, suggesting rapid and sustained activity repeated across a number of clinical endpoints.* ….

> *While we believe that the data presented here may be sufficient to satisfy the efficacy requirements for dry eye disease NDA submission, which, with certain exceptions based on FDA draft guidance, requires 2 positive symptom trials and 2 positive sign trials, the secondary endpoint of Schirmer test after a single day of dosing in addition to a post-hoc Schirmer test responder analysis were also positive in the TRANQUILITY trial as is shown on Slide 4.* The Schirmer test, a measure of ocular tear production, is the most commonly utilized objective signed for FDA dry eye disease marketing approvals. And according to draft dry eye disease FDA guidance, the Schirmer test responder analysis of 10 millimeters or greater, if demonstrated in 2 adequate and well-controlled clinical trials, may be solely sufficient for demonstration of efficacy given that the responder analysis is a surrogate for clinically relevant symptomatic improvement.

> *Thus, on May 24 … we announced that we had changed the primary endpoint of TRANQUILITY-2 to focus exclusively on the Schirmer test. As a result,*

45

*positive data in TRANQUILITY-2 would then allow for a potential NDA submission of symptoms, redness, Schirmer test scores and possibly the Schirmer test responder analysis representing an unprecedented demonstration of drug activity that to our knowledge has not been previously submitted to a dry eye disease NDA….*

*With a comprehensive in what we believe to be a compelling package in hand, a type B pre-NDA meeting is expected to be held with the FDA in the third quarter of 2022 followed by a potential NDA submission soon thereafter. Aside from the 12-month safety trial, which remains on track relative to prior guidance, the only other active clinical trial for reproxalap in dry eye disease is a randomized, double-masked crossover dry eye chamber trial, where subjects receive both reproxalap and vehicle with a 2-week washout period in between treatments.*

*Enrollment is substantially complete in the crossover trial, which is intended to be adequate and well controlled and, if positive, is expected to be submitted to the potential NDA as a supportive trial.*

127.    On the June 8, 2022 Call, Brady engaged in the following exchange with an analyst regarding Aldeyra's upcoming pre-NDA meeting with the FDA in connection with the Reproxalap NDA, and the significance of the Crossover Trial:

<Q - YIGAL DOV NOCHOMOVITZ, DIRECTOR, CITIGROUP INC., RESEARCH DIVISION:> Congrats, Todd and team. Excellent achievement and very consistent with my 97% probability of success from my simulation. I just had 3 quick questions. The first one is, is there any difference in clinical interpretation between the basic Schirmer's test and then the Schirmer's responder proportion test or are those distinctions mainly in the purview of FDA for regulatory determination?

Second is regarding the pre-NDA meeting in the third quarter. Could you just help us understand what are the outstanding questions that you'd like clarity from at that meeting?

And then last, just quickly remind us why you still need to do that dry eye chamber crossover trials? Correct me if I'm wrong, but I thought that, that was just a backup trial in the very unlikely event that TRANQUILITY-2 didn't work.

<A - TODD C. BRADY:> …. We had never, before TRANQUILITY-2, demonstrated the achievement of Schirmer test as a primary endpoint. And the notion that we would achieve Schirmer test as a primary endpoint in TRANQUILITY-2 had been questioned. I think your simulation analysis put some of those questions to bed. We're appreciative, and you are absolutely right.

The question you had about difference between Schirmer test and Schirmer responder test is an excellent one. Some years ago, there was a paper published on the Schirmer test responder analysis, arguing that patients that responded with a 10-millimeter or more increase also demonstrated symptomatic improvement. And thus, that kind of change in Schirmer test is considered to be clinically relevant, which is why, according to draft dry eye disease guidance, the Schirmer test responder analysis on its own may be sufficient for demonstration of efficacy in a dry eye disease NDA….

The fact that we've now shown Schirmer and the responder analysis and redness and symptoms, I think, comprises a compelling NDA package that, as I said in my prepared comments, is absolutely unparalleled. The pre-NDA meeting is, in many cases, often perfunctory. Those meetings are designed to make sure that the content of the package to be submitted for the NDA is sufficient. And there are certain questions that are asked around the content of that package. I don't know that we have too many pressing issues along those lines. However, it's important to hold the meeting. It's important to make the FDA and the division aware of the content of the package that we're submitting. And honestly, I can't wait to have the meeting just given the package that we presented today.

***The crossover trial was indeed a trial performed, at least in part, as you said, Yigal, as an insurance policy. The reason for the crossover trial is that at least in allergen chambers we've shown remarkably consistent results with symptoms in ocular redness and other measures in allergy when patients are crossed over. The statistical advantage of crossing patients over, that is patients receive both drug and vehicle separated by a washout period, is that inter-subject variability is reduced….***

***Because the [Crossover] trial has substantially completed enrollment, we're in a position now where those data will be submitted to the NDA.*** NDA submissions require a disclosure of any clinical data that are -- have been generated or will soon be generated, and this crossover trial is no exception. As we mentioned in our press release, we expect to see the crossover data in Q3, I would even add, early Q3, consistent with the time frames that we've outlined and consistent with our prior guidance.

128.    On the June 8, 2022 Call, Brady further touted the breadth of evidence to be submitted in support of the Reproxalap NDA, stating,

***The first thing I'll say is that the FDA makes decisions by law based on the preponderance of evidence. As we have tried to make the point today in the press release and in the slides and in my prepared comments, we believe what we have to be the most comprehensive in terms of breadth NDA package ever for dry eye disease. And thus, preponderance of evidence arguments are much easier to make both from our standpoint and from the regulatory standpoint in theory.*** I mentioned that we have acute trials up to one day, as soon as one day. We have chronic trials as long as 12 weeks. We have a safety trial of 12 months.

So we're literally spanning the gamut duration of dosing from one day to a year. We have field-based studies that is diary-based studies where subjects or patients go home, take the drug, report their symptoms, come into the clinic, are assessed by investigators….

***The crossover trial is yet another kind of trial design that, I think, if positive in any way, would be highly supportive.*** In fact, it's difficult for me, having been in clinical development now for almost 30 years, to think of another way of testing this drug in terms of clinical trial design. ***So for us, the crossover trial was the final piece of the puzzle. As Yigal pointed out in his question, technically, the crossover trial is not needed. As of some weeks ago, we believe that we have met the efficacy requirements for NDA submission. As of today, we believe we have met NDA efficacy requirements for submission for symptoms and 3 different sign endpoints, and thus the outcome of the crossover trial we have deemed to be supportive.***

129.     On the June 8, 2022 Call, Brady further reassured investors about the progress of the safety study and the status of Aldeyra's CMC preparations in connection with the Reproxalap NDA.  Specifically, Brady engaged in the following exchange with an analyst:

***The classic chronic 12-week -- sorry, 12-month safety trial is what is specified in draft FDA guidance for dry eye disease. And as I mentioned in my prepared comments, the safety trial remains on track for an NDA sufficient along the timing of what I have suggested today, which is third quarter.*** We don't know exactly which patient is in which group, drug or vehicle. That trial is masked.

So by and large, I think we're on track with the safety trial. We do not have any outsized dropout rates. If anything, and this is based on our best guess of masked data, more subjects are dropping out in vehicle group than the drug group, and that's probably because many patients do not derive benefit from vehicle treatment.

But those data are to be determined and they will be subject to unmasking, of course. The CMC portion is important. And ***I think we have put together a gold-plated CMC package for the agency. The drug product is stable, and it is -- has been sufficiently packaged. All of that has been characterized. We've had a preliminary pre-NDA type meeting regarding CMC questions, which was, in our view, remarkably successful. And I don't see anything changing along those lines regarding the CMC.***

130.     On the June 8, 2022 Call, when asked about whether Aldeyra hit the secondary sign endpoint of ocular redness in the Phase 3 TRANQUILITY-2 Trial, Brady admitted the

secondary endpoints had not been achieved, but reassured investors about the strength and comprehensiveness of the Reproxalap NDA, stating:

> The secondary endpoints were not achieved in TRANQUILITY-2. ***The good news is we have now 2 positive symptom trials. We have 2 positive redness trials. We have 2 positive Schirmer test trials. We have 2 positive Schirmer test responder trials …. [T]his is the most comprehensive package, to our knowledge, ever submitted to a dry eye disease NDA. The preponderance of evidence, in our view, is absolutely overwhelming.*** And we're focused on the NDA submission, obviously, at this point.

131.    On the June 8, 2022 Call, when asked why Aldeyra had changed the primary endpoint of the Phase 3 TRANQUILITY-2 Trial, Brady stated,

> Let me talk about your second question, which is the designation of Schirmer test as a primary endpoint. Our decision matrix was pretty clear. ***We have hit 2 trials. We've achieved success in 2 trials with symptoms. We have achieved success in 2 trials for ocular redness. And the advantage of adding Schirmer test to that list was substantial for the reasons we've talked about today.***
>
> ***And thus, statistically -- from a statistical standpoint, it made perfect sense to allocate all of our statistical alpha to Schirmer test, which is a fancy way of saying the odds of getting Schirmer test to work are increased when you're only testing Schirmer test, which is why Schirmer test and the Schirmer test responder analysis were the exclusive members of the primary endpoint family. Fortunately, that paid off and both of those tests were positive which, as an upside, now allows us potentially to submit 2 more signs in our NDA and potentially, as I said in my prepared remarks, have at least 2 objective signs dry eye disease that are labeled.***

132.    On July 12, 2022, Aldeyra issued a press release and held a public conference call to report the topline results from the Crossover Trial of reproxalap for dry eye disease (the "July 12, 2022 Call"). Defendants announced that the Crossover Trial had been successful, and achieved its primary sign endpoints and also its secondary symptom endpoints.

133.    On the July 12, 2022 Call, Brady stated,

> The positive results announced today, achievement of the primary endpoints of ocular redness and Schirmer test, in addition to the achievement of secondary endpoints for all assessed symptoms demonstrate rapid and broad activity of reproxalap over approximately a 24-hour period of dosing.

49

Importantly, reproxalap also achieved multiplicity-controlled statistical superiority over vehicle for the greater than or equal to 10 millimeters Schirmer test responder analysis, which per published literature and per draft U.S. Food and Drug Administration guidance correlates with symptomatic improvement and is consistent with the symptomatic improvement demonstrated in this trial.

***Overall, in a single trial, we claim success for all 3 dry eye disease sign endpoints that we intend to submit as pivotal to a new drug application. And at least by extension of the responder analysis results, symptomatic improvement occurring as soon as a single day of drug administration. To our knowledge, the Crossover outcomes represent the first time that an adequate and well-controlled trial resulted in claims for success across 3 dry eye disease endpoints.*** In addition, to our knowledge, we've demonstrated for the first time the enhanced statistical power of a Crossover design in dry eye disease, at least for a drug candidate with a potentially rapid mechanism of action…. ***Based on previously completed Phase II and Phase III clinical trials, including the Phase III TRANQUILITY and TRANQUILITY-2 trials, we've disclosed that we intend to submit a dry eye disease new drug application or NDA, based on 2 trials each for symptomatic improvement and improvement in 3 objective signs of dry eye disease, ocular redness, Schirmer test and the Schirmer test responder analysis. All 3 endpoints are specifically noted in the draft FDA guidance for dry eye disease or have been successfully used as a basis for approval by other companies.***

***The Crossover trial … was designed to support the clinical data previously announced and also to be an adequate and well-controlled trial that could be submitted as pivotal for the 3 multiplicity-controlled dry eye disease objective signs that we intend to submit to the NDA.*** Inherent in dry eye disease is substantial patient-to-patient variability, meaning that one patient may respond to any therapy markedly differently than another patient possibly due to unmeasurable baseline differences in disease characteristics….

***[T]he Crossover trial allows for the claim of success for each of the 3 objective sign endpoints that we intend to submit as pivotal for the dry eye disease's NDA. Aside from achievement of the primary endpoints, the secondary endpoint of Schirmer test responder analysis and secondary endpoints for all symptoms assessed, a key learning from the Crossover trial is that the high degree of patient-to-patient variability in dry eye disease can be reduced with a Crossover design, which is feasible for drugs with a potentially rapid activity….***

Our regulatory guidance remains unchanged. We intend to submit the dry disease NDA this quarter following a pre-NDA meeting that has been scheduled. ***And as we've disclosed previously, we believe that the NDA clinical package is expected to encompass acute and chronic assessments as well as parallel group and Crossover clinical designs, offering what is expected to be an unprecedented***

*breadth and unparalleled analysis of rapid and sustained activity of reproxalap across a combination of challenge and field-based assessments.*

134.    On the July 12, 2022 Call, when asked about which trials would be designated as pivotal in connection with the Reproxalap NDA, Brady engaged in the following exchange with an analyst:

<Q - JUSTIN ALEXANDER KIM, ASSOCIATE, OPPENHEIMER & CO. INC., RESEARCH DIVISION:> Congratulations on the results, team. It looks like the last piece might have fallen into place. And so just kind of curious, across the broad array of studies in dry eye conducted, do you intend for TRANQUILITY and this Crossover trial to maybe serve as the frontrunner of the 2 pivotal design trials assessing Schirmer tear test or sort of maybe optionality with your TRANQUILITY-1 and Crossover for redness, perhaps? Just kind of can you walk us through like how you think about the styling strategy, to what extent is that really just going to be dictated by the agency, et cetera?

<A - TODD C. BRADY:> Well, thank you, Justin. We appreciate your support. I agree that, at least in my opinion, ***approvability has been put to bed. The notion that reproxalap is active and is safe across a variety of different trial designs, acute and chronic, chamber, field-based studies, et cetera, I think, is solid.*** How we highlight the Crossover trial in the actual submission will depend in part on the pre-NDA meeting that's been scheduled. However, I think ***we can all agree at this point that the Crossover results will be largely front and center for a couple of reasons.***

***Number one, the results are outstanding and I think definitive. Number two, the Crossover has in a sense demonstrated, at least in this case, that it can reduce the major problem in dry eye disease trials, which is variability from patient to patient.*** That one person's dry eye is apparently very different from another person's dry eye. And the way to get around that is to test each person with both test articles, that is drug and vehicle.

And I think the results today demonstrate a very tight, well-controlled and adequate trial that, to our knowledge, at least in terms of this particular design, has never been run before. I would suggest that the Schirmer test results, the redness results and the Schirmer test responder results would be submitted as pivotal. From TRANQUILITY-2, we had prespecified primaries that included Schirmer test and a Schirmer test responder analysis from the Phase II trial. The last year, we had a prespecified primary using ocular redness. So I think ***the combination of the Phase II trial, TRANQUILITY-2 and the Crossover results are more or less definitive for 3 different signs of dry eye disease. Added to that are the 2 12-week symptom trials that we've disclosed for some time now.***

51

135.    On the July 12, 2022 Call, when asked about the status of the 1-Day Schirmer's Test Trial, which Defendants had previously stated was not necessary but was being done as extra support for the Reproxalap NDA, Brady stated,

The one-day Schirmer trial that we've disclosed previously, I would say, is effectively on hold given the results that we announced today. *We certainly don't need that trial at this point. I think the plan is to hold the pre-NDA meeting, which is coming right up, discuss the data with the agency. I think, in the very unlikely situation that there are remaining questions about the clinical package, we'll be prepared to initiate that trial effectively immediately. But again, I don't see that as a realistic possibility given the strength of the data that we announced today.*

136.    On August 5, 2022, Aldeyra held a public conference call to discuss the Company's Q2 2022 earnings and corporate highlights (the "Aug. 5, 2022 Call"). On the Aug. 5, 2022 Call, Brady highlighted the progress of the Reproxalap NDA. Specifically, Brady stated,

In reflecting on our accomplishments so far in 2022, a couple of things stand out to me.

*The first is the exceptional progress our team has made in advancing our lead investigational new drug, reproxalap, to a planned new drug application submission in the second half of 2022. We've amassed what we believe is the most comprehensive regulatory package ever for a dry eye disease drug candidate and based primarily on what we believe to be an unparalleled rapid onset of action….*

*With the recent completion of the crossover and Phase III TRANQUILITY-2 trials, we believe we put ourselves in a position to submit a thorough and extensive NDA based on robust symptomatic improvement and the achievement of 3 objective sign endpoints of dry eye disease, ocular redness, Schirmer test and the Schirmer test greater than or equal to 10-millimeter responder analysis.*

*As I previously stated, the key outcome of the crossover trial is affirmation of the potential rapid onset of activity of reproxalap, which based on the results of the trial, included observed improvement within minutes in ocular redness, tear production and symptoms, including discomfort, dryness, burning and stinging….*

Looking ahead, we expect to submit our NDA in dry eye disease in the second half of the year following our Type B pre-NDA meeting with the U.S. Food and Drug Administration later this quarter.

*The other accomplishment that stands out is the progress of ADX-2191, our investigational new drug platform for rare but serious retinal diseases with no approved therapy. The development program of ADX-2191 encompasses 3 such conditions. Number one, primary vitreoretinal lymphoma, which is a near universally fatal cancer….*

*The FDA has granted orphan drug designation to ADX-2191 for each of these indications, and ADX-2191 is the first methotrexate formulation specifically designed to be compatible with a vitreous humor, the fluid in the back of the eye and therefore, represents what we believe to be a unique potential commercial opportunity for Aldeyra.*

Relative to primary vitreoretinal lymphoma, we plan to have a pre-NDA meeting with the FDA in the second half of this year to discuss the regulatory path forward for ADX-2191….

*I'd say in summary that we are full steam ahead on our programs in both anterior, ocular and rare retinal diseases, with a busy and quite remarkable regulatory calendar plan for the balance of 2022, featuring 2 pre-NDA meetings and 2 planned NDA submissions. And with 2 late-stage candidates in what we believe to be a clear strategic path to market, Aldeyra represents a real opportunity to positively affect patient care in both mass market and rare diseases.*

137.    On the Aug. 5, 2022 Call, Brady described the regulatory pathway for ADX-2191

for PVRL as follows,

The ADX-2191 program in ocular lymphoma is particularly interesting. *In that, the FDA has told us at least, in writing, that clinical trials are not required for NDA submission in ocular lymphoma. The reason for that is that the active ingredient of 2191, which is methotrexate has been used for years, decades as an intravitreal injection to treat ocular lymphoma. So there is a tremendous amount of efficacy data available in the literature, which would form the basis for the NDA submission.*

*What the FDA rightly wants to see is an appropriate amount of stability and safety data on ADX-2191, which is a particular preparation of methotrexate.* As I mentioned in my prepared remarks, 2191, that we're aware, is the only vitreous compatible formulation of methotrexate. Today, you can compound methotrexate, which principally involves taking the intravenous form of methotrexate and injecting into the eye. There are numerous challenges with that. First of all, the concentration is wrong, a high-volume injection must be used. As you know, Catherine, the eyeball is a confined space and does not have unlimited capacity for high-volume injections. Secondly, there's always the risk for infection.

*So I think the agency and physicians are interested in a GMP preparation of methotrexate. And that is exactly what ADX-2191 is designed to be, while at the*

*same time, mimicking the pH, the tonicity, the density and so forth of the vitreous.*

138.    On the Aug. 5, 2022 Call, Brady engaged in the following with an exchange with an analyst regarding the pre-NDA meeting for reproxalap for dry eye disease:

<Q - YIGAL DOV NOCHOMOVITZ, DIRECTOR, CITIGROUP INC., RESEARCH DIVISION:> On dry eye, I'm just curious regarding the pre-NDA meeting for dry eyes. How much of this meeting is purely administrative as you've characterized in the past? And how much of this meeting is actually needed to get answers from the agency to outstanding question to guide your filing strategy? And if so, what are those outstanding questions?

<A - TODD C. BRADY:> Yes. Thank you, Yigal. That question is top of mind for us. Obviously, that meeting is imminent. If you look at the regulations, the Type B pre-NDA meeting is designed primarily to be a meeting to discuss format, to discuss submission details and so forth, but we never waste opportunity to ask the agency interesting questions, and I think the agency is generally receptive to that.

*I think the primary question from our end is given what we've characterized as an unprecedented breadth of data, how does the FDA view our submission to fulfill the efficacy requirements? As I said in my prepared comments, as I said in the crossover data release, as I said in the TRANQUILITY-2 data release, we're submitting with a package that I think has really never been submitted in terms of symptoms plus 3 different signs.* We're obviously very eager to hear the agency's response to that question.

I would say they're very familiar with Schirmer test. If you look at the labels in dry disease that exists today, Schirmer test is on most of them, particularly the responder analysis. And I think the reason for that is the responder analysis is correlated with symptomatic improvement. So from the agency's perspective, the Schirmer test responder analysis is an all in one. It's a sign and a symptom at the same time or at least correlates with the symptom at the same time, and that's something they're going to be very interested in seeing. *But we've posed the question about the breadth of submission. Obviously, very eager to hear what they have to say along those lines.*

139.    On the Aug. 5, 2022 Call, Brady also reassured investors that the dry eye safety study remained on track for purposes of the Reproxalap NDA submission.  Specifically, Brady engaged in the following colloquy with an analyst:

<Q - JUSTIN ALEXANDER KIM:> Just any updates on the dry eye safety study and whether it remains on track for the sort of filing timelines and whether it's sort of on the critical path, let's say?

<A - TODD C. BRADY:> *The safety trial does remain on track.* One of the questions we'll be asking at the pre-NDA meeting is how does the agency want to see those data, in what format and so forth. *But at this point, prior to that meeting, we're quite thrilled actually with the progress of the safety trial. It's always good news when patients are on drug for 12 months, and they stay on drug.*

It's often difficult to keep patients on anything for 12 months, particularly with diseases like dry eye, which are episodic. As you know, dry eye gets better in the summer because it's more humid. It gets worse in the spring, and it gets worse in the fall to some extent in the winter. *But to our knowledge, we've been able to maintain a healthy number of patients on reproxalap for 12 months, which is always a very good sign. Safety aside, it's always a good sign. So we're pleased with the progress. And again, heading into the pre-NDA meeting, we think we're right on track with the safety trial.*

140.    On the Aug. 5, 2022 Call, Brady reiterated that the FDA would be focused mainly on safety results with respect to the ADX-2191 NDA.   Specifically, Brady engaged in the following exchange with an analyst:

<Q - I-EH JEN:> And the next question is probably a follow-up from the previous one, which is in [PVRL] discussion you will have with the FDA are mostly centered around the PK and the maybe PD to see the equivalency -- something of equivalency or something of that nature to decide what the sort of filing pathway or process may be?

<A - TODD C. BRADY:> Yale, I don't think it's a PK/PD question. I think it's more of a safety question. *We're well aware of the PK/PD of compounded methotrexate. The concentration is obviously different for ADX-2191, but the amount of drug should be roughly the same because we're injecting less volume at a higher concentration versus the intravenous compounding that's injected into the eye is more volume at a lower concentration. The net result is the same amount of drug on a weight basis. So I don't really think PK/PD is going to matter.*

*What I think will matter is safety. Because the formulation is novel in that, to our knowledge, methotrexate has never been formulated to mimic the vitreous. Now I would say the formulation doesn't have fancy bells and whistles that I think would raise eyebrows at the agency. At the same time, as I mentioned, the various characteristics of the vitreous that have been matched, pH being one, density being another, tenacity being another, that are important with regard to intravitreal injection. And my guess is the agency just wants to confirm the safety of that formulation.*

In my opinion, a priori, there should be no safety concerns with those kinds of changes, and in fact, if anything, such a formulation may have safety advantages. But nonetheless, the agency's job is to confirm safety, and I think that's what they'll focus on here, Yale.

141.    On September 14, 2022, Aldeyra issued a press release entitled, "Aldeyra Therapeutics Announces Positive Dry Eye Disease Pre-NDA Meeting with the FDA and Highlights Upcoming Corporate Milestones" (the "Sept. 14, 2022 PR"). The Sept. 14, 2022 PR highlighted the following corporate highlights:

o   *Dry Eye Disease NDA for Reproxalap Expected to be Submitted in the Fourth Quarter of 2022*

o   *Pre-NDA Meeting for ADX-2191 for the Treatment of Primary Vitreoretinal Lymphoma Scheduled for the Fourth Quarter of 2022*

o   *Results from Part 1 of the Phase 3 GUARD Trial of ADX-2191 in Proliferative Vitreoretinopathy Expected in the Third or Fourth Quarter of 2022*

142.    The Sept. 14, 2022 PR further stated,

[Aldeyra] today announced that, following the recent receipt of official minutes from its pre-NDA (New Drug Application) meeting with the U.S. Food and Drug Administration (FDA), the Company remains on schedule to submit an NDA in the fourth quarter of 2022 requesting marketing approval of the novel RASP modulator reproxalap, an investigational new drug, for the treatment of dry eye disease.

**"Based on the outcome of our pre-NDA meeting, we believe that we have aligned with the FDA on the content of the regulatory package that will support what we expect to be a uniquely comprehensive NDA submission for the treatment of dry eye disease, encompassing data demonstrating improvement that may occur within minutes of drug administration in symptoms and three different objective signs,"** stated Todd C. Brady, M.D., Ph.D., Aldeyra's President and Chief Executive Officer. "In contrast to currently available dry eye therapies that may require weeks of administration to achieve even modest benefit, the rapid onset of activity of reproxalap observed in clinical trials represents a potential paradigm shift in the treatment of dry eye disease."

**Consistent with prior guidance, with results from five adequate and well-controlled completed clinical trials, Aldeyra intends to submit the NDA with data for ocular dryness symptom score, ocular redness, Schirmer test, and Schirmer test ≥10 mm responder analysis. The NDA efficacy package is expected to include activity ranging from within minutes of drug administration to up to 12 weeks of treatment, crossover and parallel-group clinical trial designs, and assessment in dry eye chamber challenge and natural environment settings.**

143.    On November 10, 2022, Aldeyra issued a press release entitled, "Aldeyra Therapeutics Reports Third-Quarter 2022 Financial Results and Corporate Highlights" (the "Nov. 10, 2022 PR").   The Nov. 10, 2022 PR noted the following corporate highlights and stated,

> *"Now with two product candidates that could generate revenue as soon as next year, Aldeyra remains a leader in the development of systems-based therapeutic approaches for the treatment of diseases characterized by inflammation,"* stated Todd C. Brady, M.D., Ph.D., President and CEO of Aldeyra.

> **Recent Corporate Highlights**

> •   **Pre-NDA Meeting with the FDA for Reproxalap in Dry Eye Disease:** Following the receipt of official minutes from its pre-NDA meeting with the FDA, Aldeyra remains on schedule to submit an NDA requesting marketing approval of the novel RASP modulator reproxalap in the fourth quarter of 2022. *With results from five adequate and well-controlled completed clinical trials, Aldeyra intends to submit the NDA with data for ocular dryness symptom score, ocular redness, Schirmer test, and Schirmer test ≥10 mm responder analysis. The NDA efficacy package is expected to include activity ranging from within minutes of drug administration to up to 12 weeks of treatment, crossover and parallel-group clinical trial designs, and assessment in dry eye chamber challenge and natural environment settings.* In addition to efficacy data, Aldeyra plans to submit up to 12 months of reproxalap safety data. Topical ocular reproxalap has been studied in more than 2,000 patients with no observed clinically significant safety concerns; mild and transient instillation site irritation is the most commonly reported adverse event in clinical trials.

> **Additional Upcoming Planned Clinical and Regulatory Milestones**

> •   **Pre-NDA Meeting with the FDA for ADX-2191 in Primary Vitreoretinal Lymphoma:** Aldeyra has scheduled a pre-NDA meeting with the FDA in the fourth quarter of 2022 to discuss ADX-2191 for the treatment of primary vitreoretinal lymphoma. *Pending the results of the pre-NDA meeting, NDA submission may occur as soon as the end of 2022.*

144.    Also on November 10, 2022, Aldeyra held a public conference call to discuss the Company's Q3 2022 results (the "Nov. 10, 2022 Call").   On the Nov. 10, 2022 Call, Brady touted Aldeyra's progress towards commercialization for reproxalap for dry eye disease and ADX-2191.  Specifically, Brady stated,

Today, I'd like to share with you the progress we've made in advancing our lead precommercial product candidates, reproxalap and ADX-2191, toward regulatory approval. Individually, these products have the potential to provide us with unique revenue streams, while together, they represent an opportunity to build a formidable ocular franchise, encompassing both large and rare retinal diseases that are significantly underserved by currently available treatments. ***The success to date in developing reproxalap and ADX-2191 and the commercial potential of both product candidates serve as evidence of Aldeyra's position as a leader in the development of systems-based therapies for diseases characterized by inflammation.***

***Leading off with reproxalap. In September, we had a successful pre-NDA meeting with the U.S. Food and Drug Administration, gaining alignment on the key aspects of the planned NDA submission. In the fourth quarter of 2022, we plan to submit what we believe will be the most comprehensive regulatory package ever for a dry eye disease drug candidate. With results based on 5 adequate and well-controlled completed clinical trials, we intend to submit the NDA with data for ocular dryness symptom score, ocular redness, Schirmer test, and Schirmer test greater than or equal to 10 millimeter responder analysis.***

***The NDA efficacy package is expected to include activity ranging from within minutes of drug administration to up to 12 weeks of treatment, crossover and parallel group clinical trial designs and assessment in dry eye chamber challenge and natural environment settings***....

Moving to our clinical development programs, targeting diseases in the back of the eye. ***Several planned milestones are approaching for ADX-2191, our pre-commercial product candidate for rare retinal disease. ADX-2191 is the first sterile non-compounded formulation of methotrexate designed to meet the unique requirements of intravitreal administration.*** It is intended to be vitreous compatible and optimized for excipient composition, viscosity, density, tonicity, pH, active ingredient concentration and volume of administration.

Importantly, the volume of administration is less than that of compounded methotrexate, potentially resulting in an improved safety profile. Although compounded methotrexate is injected into the vitreous today, ADX-2191, if approved, would represent the first GMP manufactured methotrexate drug product for intravitreal administration.

***Our ADX-2191 platform is targeting 3 indications, all of which have received U.S. FDA orphan drug designation. Primary vitreoretinal lymphoma is a rare, aggressive and fatal cancer that is diagnosed in approximately 300 to 600 patients in the United States per year***....

***We've scheduled a pre-NDA meeting with the FDA in the fourth quarter of 2022 to discuss ADX-2191 for the treatment of primary vitreoretinal lymphoma.***

***Pending the results of the pre-NDA meeting, NDA submission may occur as soon as the end of 2022.***

145.    On the Nov. 10, 2022 Call, Brady engaged in the following exchange with an analyst regarding the ADX-2191 NDA and Reproxalap NDA:

<Q - JUSTIN ALEXANDER KIM, ASSOCIATE, OPPENHEIMER & CO. INC., RESEARCH DIVISION:> And maybe just 2 from us. When you think about the upcoming pre-NDA meeting for PV[R]L, what sort of are the broad topics and/or outcomes that you're looking to cover and get agreement on? And then secondly, just as a follow-up to a prior question, was curious whether the safety study for reproxalap has yet been sort of met from a requirement standpoint and sort of how that has been tracking.

<A - TODD C. BRADY:> Justin, I think typically for pre-NDA meetings, the main objective is to avoid any sort of misunderstandings between the sponsor and the agency in terms of what is required for submission, in particular, efficacy and safety data. Obviously, those questions about the adequacy of the package in terms of efficacy and safety are first and foremost. Other questions often involve what can we submit at the time of the submission versus what can we submit at the 120-day update which occurs post submission?

And typically, the FDA broadly across all divisions will accept certain things at the time of the first submission and other things at the time of the 120-day update. And that's something that we would intend to clarify as we did with the reproxalap pre-NDA meeting. ***Given that methotrexate is the standard of care in ocular lymphoma, given our discussions with the agency previously on ocular lymphoma, the material aspects of which we have already disclosed, I don't expect a vigorous discussion on the utility of methotrexate to treat lymphoma. Rather, I think the pre-NDA meeting will be focused on process and structure and to some extent the content.***

Your second question, the safety trial for reproxalap. Thank you for asking. ***As I said before on these calls, investors and analysts often forget that it's not just about efficacy for NDA submissions. It's also about safety and CMC. I think in this case, regarding the safety trial, we're very well positioned. The FDA guidance in dry eye disease is very clear as it relates to safety trials. 300 drug-treated subjects must complete 6 weeks of treatment, and approximately 100 drug-treated subjects must complete 12 months of treatment. Our safety trial is moving along nicely. I think it's safe to assume that the trial is practically complete, otherwise, we wouldn't be guiding a submission this quarter. All in all, I think our package is robust. I think it's in excellent shape, and I look forward to the submission.***

146.    On November 29, 2022, Aldeyra announced in a press release that it had finally submitted the Reproxalap NDA to the FDA (the "Nov. 29, 2022 PR").  The Nov. 29, 2022 PR stated,

> *The NDA submission is supported by safety and efficacy data from five adequate and well-controlled clinical trials encompassing data for ocular dryness symptom score, ocular redness, Schirmer test, and Schirmer test ≥10 mm responder analysis. The regulatory package includes activity ranging from within minutes of drug administration to up to 12 weeks of treatment, crossover and parallel-group clinical trial designs, and assessment in dry eye chamber challenge and natural environment settings…*

> *"The NDA submission for reproxalap is, to our knowledge, the most comprehensive regulatory package ever for a dry eye disease drug candidate,"* stated Todd C. Brady, M.D., Ph.D., Aldeyra's President and Chief Executive Officer. *"With data suggesting activity within minutes of administration, reproxalap could provide an important treatment option for the millions of dry eye patients who generally regard currently available therapies as inadequate."*

147.    On December 1, 2022, Aldeyra issued a press release entitled, *"Aldeyra Therapeutics Announces Positive Primary Vitreoretinal Lymphoma Pre-NDA Meeting with the FDA"* (the "Dec. 1, 2022 PR").  The Dec. 1, 2022 PR stated,

> *Primary Vitreoretinal Lymphoma New Drug Application (NDA) for ADX-2191 Expected to be Submitted as Soon as the End of 2022*

> *Company Intends to Request Priority Review Designation*

> *[F]ollowing the recent receipt of official minutes from its pre-NDA (New Drug Application) meeting with the U.S. Food and Drug Administration (FDA), the Company plans to submit an NDA as soon as the end of 2022 for marketing approval of the investigational drug candidate ADX-2191 for the treatment of primary vitreoretinal lymphoma….*

> ADX-2191, which has received FDA Orphan Drug Designation for the treatment of primary vitreoretinal lymphoma, is a novel, vitreous-compatible formulation of methotrexate. *The planned NDA submission is expected to include a combination of published literature on the safety and efficacy of methotrexate for the treatment of primary vitreoretinal lymphoma and safety data from the recently completed Phase 3 GUARD Trial of ADX-2191 in proliferative vitreoretinopathy. During the Phase 3 GUARD Trial, no safety signals were observed, and ADX-2191 was well tolerated….*

*Based on the pre-NDA meeting minutes, Aldeyra intends to request Priority Review designation, which reduces the review period in which the FDA aims to take action on an NDA to within 6 months* (compared to 10 months under standard review). The designation is intended to direct overall attention and resources to the evaluation of applications for drugs that, if approved, would represent significant improvements in the safety or effectiveness of the treatment, diagnosis, or prevention of serious conditions when compared to standard applications.

148.    On December 21, 2022, Aldeyra issued a press release entitled, "***Aldeyra Therapeutics Submits New Drug Application to the U.S. Food and Drug Administration for ADX-2191 for the Treatment of Primary Vitreoretinal Lymphoma***" (the "Dec. 21, 2022 PR").

The Dec. 21, 2022 PR stated,

(Aldeyra) today announced the submission of a New Drug Application (NDA) to the U.S. Food and Drug Administration (FDA) for ADX-2191 (methotrexate injection, USP), an investigational drug candidate, for the treatment of primary vitreoretinal lymphoma, a rare but potentially fatal cancer with no FDA-approved therapy.

*The NDA submission is supported by a combination of published literature on the safety and efficacy of methotrexate for the treatment of primary vitreoretinal lymphoma and safety data from the recently completed Phase 3 GUARD Trial of ADX-2191 for the prevention of proliferative vitreoretinopathy. During the Phase 3 GUARD Trial, no safety signals were observed, and ADX-2191 was well tolerated; there were no observed treatment-emergent serious adverse events.* The most common adverse event associated with ADX-2191 treatment was punctate keratitis, a frequently observed side effect of intravitreal methotrexate, that was most commonly mild in severity. In the Phase 3 GUARD Trial, the incidence of punctate keratitis with ADX-2191 administration was observed to be less than that previously reported with intravitreal injection of compounded methotrexate.

"Compounding methotrexate for intravitreal injection, the current standard of care for primary vitreoretinal lymphoma, poses several challenges for physicians and patients, including risk of infection and increased injection volume, potentially leading to ocular hypertension and corneal inflammation," stated Todd C. Brady, M.D., Ph.D., Aldeyra's President and Chief Executive Officer. *"ADX-2191 is a novel formulation of methotrexate that is designed to be vitreous-compatible and has the potential to be the first marketed drug for patients suffering from primary vitreoretinal lymphoma."*

ADX-2191 has received FDA Orphan Drug Designation for the treatment of primary vitreoretinal lymphoma. In addition, as part of the NDA submission, Aldeyra requested Priority Review Designation, which reduces the review period

during which the FDA aims to take action on an NDA to within 6 months, compared to 10 months under standard review.

149.    On February 7, 2023, Aldeyra issued a press release entitled, **"Aldeyra Therapeutics Announces FDA Acceptance of New Drug Application for Reproxalap for the Treatment of Dry Eye Disease"** (the "Feb. 7, 2023 PR").  The Feb. 7, 2023 PR stated,

> Aldeyra Therapeutics, Inc. (Nasdaq: ALDX) (Aldeyra) today announced that the U.S. Food and Drug Administration (FDA) has accepted the New Drug Application (NDA) for topical ocular reproxalap, a first-in-class investigational new drug candidate, for the treatment of the signs and symptoms of dry eye disease. The FDA assigned a Prescription Drug User Fee Act (PDUFA) date of November 23, 2023. The FDA noted that no potential filing review issues have been identified, and that an advisory committee meeting is not currently planned.

> **"NDA acceptance marks a critical regulatory milestone for Aldeyra as reproxalap continues to advance toward potential regulatory approval for the treatment of dry eye disease,"** stated Todd C. Brady, M.D., Ph.D., President and Chief Executive Officer of Aldeyra. **"Based on data from a number of late-stage clinical trials, we believe reproxalap has the potential to address the need for a rapid and durable ophthalmic therapy for the millions of dry eye disease patients who are dissatisfied with currently available therapies."**

> **The NDA is supported by previously announced safety and efficacy results from five adequate and well-controlled clinical trials encompassing data for ocular dryness symptom score, ocular redness, Schirmer test, and Schirmer test ≥10 mm responder analysis. The NDA includes activity ranging from within minutes of drug administration to up to 12 weeks of treatment, crossover and parallel-group clinical trial designs, and assessment in dry eye chamber challenge and natural environment settings.**

150.    On February 28, 2023, Aldeyra issued a press release entitled, "Aldeyra Therapeutics Announces Positive Top-Line Results from 12-Month Safety Clinical Trial of Reproxalap in Patients with Dry Eye Disease" (the "Feb. 28, 2023 PR").  The Feb. 28, 2023 PR stated,

> (Aldeyra) today announced top-line results from a 12-month, vehicle-controlled, multicenter, parallel-group safety clinical trial of reproxalap, an investigational new drug, in dry eye disease patients. The primary endpoints of treatment-related serious adverse events in ocular safety were not observed in any patient. Ocular safety events were similar across reproxalap and vehicle treatment groups. In a post-hoc analysis, reproxalap was statistically superior to vehicle in improvement from baseline in distance visual acuity, potentially representing the first

demonstration of improvement in distance visual acuity with a topically administered therapy.

*"The lack of treatment-related serious adverse events over 12 months confirms the safety profile of reproxalap observed in prior clinical trials, and the potentially landmark evidence of improvement in visual acuity may differentiate reproxalap, if approved for sale, from other therapeutic options for the treatment of dry eye disease,"* stated Todd C. Brady, M.D., Ph.D., President and Chief Executive Officer of Aldeyra.

151.    On March 2, 2023, Aldeyra issued a press release entitled "FDA Accepts for Priority Review ADX-2191 New Drug Application for the Treatment of Primary Vitoretinal Lymphoma" (the "March 2, 2023 PR").  Defendants stated the following in the March 2, 2023 Press Release:

[Aldeyra] today announced that the U.S. Food and Drug Administration (FDA) accepted for Priority Review the New Drug Application (NDA) for ADX-2191 (methotrexate injection, USP), an investigational drug candidate, for the treatment of primary vitreoretinal lymphoma.  *The FDA assigned a Prescription Drug User Fee Act (PDUFA) of June 21, 2023.  The FDA noted that no potential filing review issues have been identified.*

*"The FDA's decision to grant Priority Review with a PDUFA date four months from NDA acceptance underscores the significant need for an FDA-approved treatment of primary vitreoretinal lymphoma, a rare but potentially fatal cancer,"* stated Todd C. Brady, M.D., Ph.D., Aldeyra's President and Chief Executive Officer.  *"We are working closely with the FDA during the review process to bring ADX-2191 to patients as quickly as possible, and plan to launch ADX-2191 in the United States in the second half of this year, pending approval by the FDA."*

*The NDA submission is supported by a combination of more than three decades of published literature on the safety and efficacy of methotrexate, the active ingredient of ADX-2191, for the treatment of primary vitreoretinal lymphoma, in addition to safety data from the recently completed Phase 3 GUARD Trial of ADX-2191 in patients with proliferative vitreoretinopathy.*  During the Phase 3 GUARD Trial, no safety signals were observed, and ADX-2191 was well tolerated; there were no observed treatment-emergent serious adverse events ….

152.    On March 9, 2023, Aldeyra issued a press release entitled "Aldeyra Therapeutics Reports Full-Year 2022 Financial Results and Recent Corporate Highlights" (the "March 9, 2023 PR").  The March 9, 2023 PR stated,

*"Now with Priority Review Designation for the treatment of primary vitreoretinal lymphoma, ADX-2191 joins reproxalap as the second investigational drug candidate at Aldeyra under NDA review at the U.S. Food and Drug Administration,"* stated Todd C. Brady, M.D., Ph.D., President and Chief Executive Officer of Aldeyra. "In addition to potential approvals and supplemental NDA submissions, 2023 promises to be a catalyst-rich year for Aldeyra, as we continue to advance an industry-leading pipeline of novel RASP modulators for the treatment of systemic and retinal immune-mediated diseases."

### Recent Corporate Highlights

- **Priority Review Designation Granted for NDA of ADX-2191 for the Treatment of Primary Vitreoretinal Lymphoma:** *The New Drug Application (NDA) submission of ADX-2191 (methotrexate injection, USP), an investigational drug candidate, is supported by a combination of published literature on the safety and efficacy of intravitreal methotrexate for the treatment of primary vitreoretinal lymphoma and safety data from the recently completed Phase 3 GUARD Trial of ADX-2191 for the prevention of proliferative vitreoretinopathy. During the Phase 3 GUARD Trial, no safety signals were observed, and ADX-2191 was well tolerated*….. The U.S. Food and Drug Administration (FDA) assigned a Prescription Drug User Fee Act (PDUFA) date of June 21, 2023. The FDA noted that no potential filing review issues had been identified.

- **FDA Accepted for Review NDA of Reproxalap for the Treatment of Signs and Symptoms of Dry Eye Disease:** *The NDA submission of topical ocular reproxalap, a first-in-class investigational new drug candidate, is supported by previously announced safety and efficacy results from five adequate and well-controlled clinical trials encompassing data for ocular dryness symptom score, ocular redness, Schirmer test, and Schirmer test ≥10 mm responder analysis. The NDA includes activity ranging from within minutes of drug administration to up to 12 weeks of treatment, crossover and parallel-group clinical trial designs, and assessment in dry eye chamber challenge and natural environment settings.* The FDA assigned a PDUFA date of November 23, 2023. The FDA noted that no potential filing review issues had been identified, and that an advisory committee meeting was not currently planned.

- **Positive Top-Line Results Announced from the 12-Month Safety Clinical Trial of Reproxalap in Dry Eye Disease:** Treatment-related serious adverse events in ocular safety were not observed in any patient. Ocular safety events were similar across reproxalap and vehicle treatment groups. Consistent with prior experience with reproxalap and other topical ocular medications, the most common adverse event in reproxalap-treated patients was mild and transient instillation site irritation. In a post-hoc analysis, reproxalap was statistically superior to vehicle in improvement from baseline in distance

visual acuity, potentially representing the first demonstration of improvement in distance visual acuity with a topically administered therapy.

153.     On March 9, 2023, Aldeyra also held a public conference call to discuss the Company's Q4 2022 results (the "March 9, 2023 Call").   On the March 9, 2023 Call, Brady touted the Company's progress towards commercialization of ADX-2191 for PVRL and reproxalap for dry eye disease.  Specifically, Brady stated,

> Let me begin by recognizing the entire Aldeyra team as well as the clinical investigators and researchers and patients who have worked with us over the past year. The time and dedication you've invested to advance our strategic priorities in 2022 have resulted in 2 FDA accepted new drug applications, reproxalap for dry eye disease and ADX-2191, which was recently designated priority review for primary vitreoretinal lymphoma, a rare, aggressive, high-grade retinal cancer with no approved therapy….
>
> ***With regard to ADX-2191, last week, we were thrilled to announce that the FDA accepted for priority review our NDA for the treatment of primary vitreoretinal lymphoma, also known as ocular lymphoma. The FDA had assigned a PDUFA date of June 21, 2023, 4 months from the acceptance of the NDA for review. The NDA is supported by a combination of more than 30 years of published literature on the safety and efficacy of methotrexate, the active ingredient of ADX-2191 for the treatment of ocular lymphoma. The submission is further supported by safety data from the recently completed Phase III GUARD trial of ADX-2191 in patients with proliferative vitreoretinopathy.*** An estimated 300 to 600 patients in the United States are diagnosed with ocular lymphoma each year. And the median survival for newly diagnosed patients is less than 5 years. ***If approved, we expect to launch ADX-2191 in the United States in the second half of this year, which would make ADX-2191, the first FDA-approved drug available for patients suffering from ocular lymphoma….***
>
> ***With respect to reproxalap, the PDUFA date is November 23, 2023.*** We continue to engage in potential partnering discussions with multiple parties for reproxalap and are also preparing for commercialization internally. ***Our commercial preparations are designed to exploit the unparalleled rapid onset and breadth of activity observed in clinical trials of reproxalap in patients with dry eye disease. Last week, we reported top line results of the vehicle controlled 12-month safety clinical trial for reproxalap in dry eye disease patients.*** Ocular safety was similar across reproxalap and vehicle treatment groups, and no treatment-emergent serious adverse events deemed at least possibly related to treatment were identified.

154.     On the March 9, 2023 Call, Brady further touted the comprehensiveness of the Reproxalap NDA, stating,

*As you know, the reproxalap NDA for dry eye disease has been accepted and thus, to some extent, regulatory risk has been removed at least as it relates to the FDA's review of that FDA (sic) [NDA]. As we've said before, we believe the NDA submission is the most comprehensive ever for a dry eye disease drug with 3 different signs and a variety of clinical trials that feature acute and chronic administration up to 12 weeks for efficacy and now 12 months for safety.*

All in all, the data continue to suggest that reproxalap is the only drug in development that can work quickly. And I think that's a major commercial differentiator....

Therefore, I would think that there are many potential partners that are interested in reproxalap. I can tell you that our partnering conversations are robust and as I mentioned in my prepared comments, involve multiple parties across a wide array of terms. I do expect that partners would want to be involved with reproxalap prior to label negotiations, which, in our case, I would expect to occur in the September to October time frame.

155.     On the March 9, 2023 Call, Brady further engaged in the following exchange with

an analyst about the prospects for commercialization of Aldeyra's two lead drugs, ADX-2191 for

PVRL and reproxalap for dry eye disease:

<Q - JUSTIN ALEXANDER KIM, ASSOCIATE, OPPENHEIMER & CO. INC., RESEARCH DIVISION:> Congrats on all the progress. With reproxalap and 2191 sort of locked in for regulatory review over the course of the year, I just wanted to ask how you think about commercialization for these assets? How they sort of may differ? And how to think about the timeline for investment for commercialization as sort of the review process progresses?

<A - TODD C. BRADY:> Justin, thanks for the question. As Bruce mentioned in his prepared comments, we are well capitalized for initial launches for both compounds. There are certain synergies, particularly in the back office for launching both compounds. The sales efforts, though, are different. Reproxalap is obviously targeted towards optometrists and anterior segment ophthalmologists. ADX-2191 is targeted towards retinal surgeons, particularly those that treat the rare retinal diseases that relate to 2191.

I think that the breadth of sales activity and marketing activity regarding ADX-2191 is quite limited. And the reason I say that is because, a, retinal physicians are already using methotrexate to treat at least 2 of the diseases we've highlighted this morning. And b, there's a limited number of physicians that treat these diseases. I think there's something like 50 to 60 ocular oncologists in the United States. And therefore, I don't really consider ADX-21 to be a sales and marketing effort per se, but rather more of a market access effort, making physicians aware that compounding methotrexate, is no longer necessary and making physicians aware that ADX-2191 is in theory, clinically superior to compounded methotrexate

because the volume is lower, the volume for injection is lower, the density is higher, all of that designed to reduce the side effects that you typically see with methotrexate injection into the eye, which is something called punctate keratitis.

*As we announced last year, as a result of the Phase III GUARD trial in proliferative vitreoretinopathy, the adverse events of keratitis was significantly lower than what one would expect with compounded methotrexate at least as has been published in the scientific literature. So I'm really quite thrilled about the commercial prospects of ADX- 2191 for all those reasons, the advantages of the drug, combined with the fact that there's a targetable physician population, combined with the fact that there's no therapy approved for these indications.*

For reproxalap, one of the efforts we're pursuing internally is initial commercialization. You can expect that, that is a very thorough process that we will be prepared if necessary to launch internally. As I've said before, with mass market drugs, it's not always optimal for small companies to launch. But in the ocular space, it is certainly feasible.

We've seen it many times before. I think we're right on target to the extent that we need to do that, if we're unable to secure a partnering deal that's acceptable.

156.    On the March 9, 2023 Call, Brady described Aldeyra's regulatory strategy with respect to the ADX-2191 NDA as follows:

*Our regulatory strategy for ADX-2191 was quite intentional, and that is -- the idea is to get -- submit an NDA for ocular lymphoma first. The reason is that methotrexate, which is the active ingredient of 2191 is standard of care for treatment of ocular lymphoma. It's been injected in eyes for 30 years with acceptable safety and activity.*

*After that, subsequent NDA submissions or so-called supplemental NDAs, where the bar is somewhat lower because safety and the chemistry, manufacturing controls aspects of ADX-2191 have already been evaluated in the original NDA submission. That's why I highlighted this morning the safety results from the Phase III GUARD trial in proliferative vitreoretinopathy. Those are particularly important the lymphoma submission because the FDA always assesses not only activity but also safety. And in this case, we have a new formulation designed to be vitreous compatible with a lower volume and a higher density and so forth. And all that will be assessed from a safety standpoint as part of the lymphoma review.*

We were absolutely thrilled with the Phase III GUARD results in terms of safety. In terms of proliferative vitreoretinopathy, it appeared to be actually safer to administer methotrexate -- 2191 than it was not to administer 2191, which makes sense because methotrexate as a compound is anti-inflammatory and may mitigate some of the trauma associated with surgery. *So by and large, I think we have a*

***compelling submission for lymphoma based not only on the safety, but also on the activity from the scientific literature.***

157.    On June 9, 2023, Defendants conducted a presentation at the Jefferies Healthcare Conference in New York (the "June 9, 2023 Call").  On the June 9, 2023 Call, Defendants touted the progress of the reproxalap NDA, with Brady engaging in the following exchange with an analyst:

> <Q - KELLY SHI:> And so maybe we can talk about reproxalap first, which is the investor's key focus. We have a big product data coming by the end of the year. And also target a big market of dry eye. So maybe you can tell us how is the review process progressing so far? And have you had a mid-cycle review meeting? And if so, what is the outcome?

> <A - TODD BRADY:> …. Yes, reproxalap. Thrilled to talk about reproxalap. I usually say that Aldeyra is an immunology company. And our first all of out of the bottle is reproxalap. That's a homegrown drug that we discovered back in 2005 or 2006 or so.

> And it's nice when things work. We're now under NDA review for dry eye disease with our friends down in Washington. And ***I would say that NDA review is going very well.***

> I think what a lot of people don't know is that when you submit an NDA, which by the way, is thousands and thousands of pages of information, you start getting questions from the agency, which is great. And it's appropriate.  And it would be terrible if you didn't get any questions and then one day, you just got a decision. So it's really a very interactive process.

> Your question about mid-cycle review is interesting. There are numerous formal opportunities for the agency to speak to the sponsor during the NDA review. And the so-called mid-cycle meeting is a big one because, in theory, it's halfway through the review process. And if there are major issues, those issues are highlighted at that meeting.

> ***If there are major issues, often sponsors will have to disclose those issues. We have had no such disclosure, so you can assume there are no major issues. In fact, I can tell you that that meeting was eight minutes long. So I would say the mid-cycle review went very nicely. It is in the middle of the cycle and -- at the agency is very clear appropriately, so that everything is under review.***

158.    On the June 9, 2023 Call, Brady also touted the ability of reproxalap to address both the symptoms and signs of dry eye disease, noting the "comprehensive" NDA submitted by

Aldeyra, and further expressing confidence in a commercial partnership for reproxalap for dry eye. Specifically, Brady stated,

> ***Reproxalap is proven, at least based on clinical data that we've presented again and again, to work within minutes.***
>
> ***Within minutes, patients notice symptomatic improvement. We have submitted what we think is the broadest NDA ever, the most comprehensive NDA ever in dry eye disease, not only with symptoms, but with signs. Three different signs: redness, tear production, so forth.***

> So we have a unique drug relative to the competitors in this space that works quickly. I think a small company like us with no commercial products is generally not optimal to commercialize a product with the potential that reproxalap has. I really don't see any reason why a healthcare practitioner would write for something else.

> If you have a drug that works slowly and you have a drug that works quickly, you're generally going to write that drug that works quickly. What that means is the optimal marketing plan for reproxalap is probably better developed by a company that's commercially experienced. It's already in the market that already has a sales group and a marketing group and all the back office things that we need and to sell a single unit of drug. Those are already in place at other companies.

> And so my position on partnership has been very clear for a long time, which is, optimally, reproxalap is partnered, not only because it's difficult for small companies like Aldeyra without commercial products to get one to launch. But mostly because I think the potential reproxalap is tremendous. And that needs to be optimized by a company that's already in the space.

> People ask me about timing. When is this going to happen? When are you going to announce something? And I think that most companies that are interested in partnering any drug during NDA review want to be involved in label negotiations. The label is important. The label more or less dictates what you're able to market, what your sales and medical teams are able to say to prescribers more or less has to be in the label.

> And so, label negotiations typically occur one month before PDUFA date. Our PDUFA date, I believe, is November the 23rd. So sometime in October, September, I actually think that partnership discussions will accelerate, if there's not already a partnership announced by then. There may be some companies that want to wait the other 30 days and confirm that the drug is approved. ***But I would say, 2023 is our year for a partnership in reproxalap if it happens.***

**G.**    **On June 21, 2023, The Truth Partially Materializes When Aldeyra Discloses Receipt Of A CRL For The ADX-2191 NDA**

159.    On June 21, 2023, Aldeyra issued a press release announcing receipt of a Complete Response Letter from the FDA in connection with Aldeyra's NDA for ADX-2191 (the "June 21, 2023 PR").  The June 21, 2023 PR stated:

> *[T]he FDA stated that there was a "lack of substantial evidence of effectiveness" due to "a lack of adequate and well-controlled investigations" in the literature-based NDA submission.*  Based on prior discussions with the FDA, Aldeyra did not conduct any clinical trials of ADX-2191 in PVRL.
>
> *"While we appreciate the FDA's position with respect to providing evidence from*
> *adequate and controlled trials, we do not currently believe that randomized clinical trials of ADX-2191 in PVRL, a rare and fatal cancer with no approved therapy, are feasible,"* stated Todd C. Brady, M.D., Ph.D., President and Chief Executive Officer of Aldeyra Therapeutics. *"Given the current shortage of methotrexate, the lack of approved therapy for PVRL, and the desire to avoid potential safety risks associated with ocular injection of compounded formulations, we look forward to discussing with the FDA the potential for making ADX-2191 available to PVRL patients under an Expanded Access Program."*
>
> … Methotrexate, the compounded intravitreal injection of which is the standard of care for the treatment of PVRL, is currently in shortage, per the FDA Shortages database.  An Expanded Access Program allows for access to treatment options for serious diseases when other therapeutic options are not available.  Aldeyra plans to discuss ADX-2191 for the treatment of PVRL with the FDA, including the potential to make ADX-2191 accessible to PVRL patients under an Expanded Access Program protocol.

160.    The Company did not hold a conference call to discuss the CRL for the ADX-2191 NDA.  Investors were shocked as Aldeyra had repeatedly asserted that clinical trials would not be necessary to gain FDA approval of the ADX-2191 NDA.

161.    On this news, Aldeyra's stock price fell $2.92 per share, or ***27.44%,*** to close at $7.72 per share on June 21, 2023.

**H.**    **On October 16, 2023, The Truth Further Materializes When Aldeyra Discloses "Substantive Review Issues" With The Reproxalap NDA**

162.    On October 16, 2023, before market opened, Aldeyra filed a Form 8-K with the SEC, which disclosed:

On October 16, 2023, Aldeyra Therapeutics, Inc. ("Aldeyra" or the "Company") announced that it received minutes from a late-cycle review meeting (the "Minutes") with the U.S. Food and Drug Administration (the "FDA") relating to the new drug application ("NDA") for reproxalap for the treatment of the signs and symptoms of dry eye disease. *The Minutes identified substantive review issues in connection with the NDA for reproxalap. The FDA stated that "[i]t does not appear that you have data to support the clinical relevance of the ocular signs to support your dry eye indication."*

*In subsequent communications between Aldeyra and the FDA, Aldeyra has submitted responses to the FDA that Aldeyra believes to be sufficient to mitigate the identified issues, but the FDA has not directly opined on the sufficiency of the information submitted, has no legal obligation to review the information submitted by Aldeyra, and has indicated that Aldeyra needs to conduct an additional clinical trial to satisfy efficacy requirements.* As such, based on the time remaining in the NDA review cycle, the FDA may not be in the position to approve the NDA for reproxalap on or about the Prescription Drug User Fee Act ("PDUFA") target action date of November 23, 2023 or afterwards, and it may issue a Complete Response Letter and require that Aldeyra conduct additional clinical trials and submit the results of those clinical trials before the application will be reconsidered….

Aldeyra's ability to generate revenue will depend on the successful development, regulatory approval, and commercialization of reproxalap. Aldeyra submitted to the FDA an NDA for reproxalap for the treatment of the signs and symptoms of dry eye disease in December 2022. In February 2023, the FDA accepted the reproxalap NDA for filing and set a PDUFA target action date of November 23, 2023….For example, Aldeyra has received Minutes from a late-cycle review meeting with the FDA, which noted substantive review issues in connection with the NDA for reproxalap for the treatment of the signs and symptoms of dry eye disease. *In addition, during the review of the reproxalap NDA, the FDA has requested certain chemistry, manufacturing, and controls ("CMC") details. In subsequent communications between Aldeyra and the FDA, Aldeyra has submitted responses to the FDA that Aldeyra believes to be sufficient to mitigate the identified review issues and address the CMC requests, but the FDA has not directly opined on the sufficiency of the information submitted, has no legal obligation to review the information submitted by Aldeyra, and has indicated that Aldeyra needs to conduct an additional clinical trial to satisfy efficacy requirements.*

163.    On this news, Aldeyra's share price plummeted by $3.60, or *66.3%,* to close at $1.83 on October 16, 2023, on unusually heavy volume.

71

I.      **After The Class Period, The Risks Of Defendants' Fraudulent Scheme Continue To Materialize With Receipt Of A CRL For The Reproxalap NDA**

164.    On November 27, 2023, Aldeyra issued a press release titled "Aldeyra Therapeutics Receives Complete Response Letter from the U.S. Food and Drug Administration for the Reproxalap New Drug Application for the Treatment of Dry Eye Disease" (the "Nov. 27, 2023 PR").

165.    The Nov. 27, 2023 PR disclosed that Aldeyra had received a Complete Response Letter ("CRL") from the FDA for the reproxalap NDA.  Defendants disclosed that the FDA had stated that Aldeyra's NDA *"did not demonstrate efficacy in treating ocular symptoms associated with dry eyes"* and that *"at least one additional adequate and well-controlled study to demonstrate a positive effect on the treatment of ocular symptoms of dry eye" should be conducted.*

166.    Moreover, Defendants stated in the Nov. 27, 2023 PR,

*Per draft FDA dry eye disease guidance, efficacy in dry eye disease may be demonstrated with two symptom trials and two sign trials …. Aldeyra previously conducted two trials for ocular redness (a dry eye disease sign) as well as a dry eye disease symptom trial.  On November 16, 2023, Aldeyra submitted to the FDA a Special Protocol Assessment (SPA) for a dry eye disease chamber crossover clinical trial (the proposed trial)* similar to the crossover chamber trial from which Aldeyra announced results on July 12, 2022. The SPA review cycle is anticipated to be 45 days, and Aldeyra expects FDA feedback from the SPA in December of 2023.

*The potential NDA resubmission is anticipated in the first half of 2024, pending FDA SPA feedback and positive results from the proposed trial. Aldeyra intends to include in the potential NDA resubmission a draft label describing chronic and acute symptomatic benefit, in addition to acute reduction in ocular redness of reproxalap.* The review period for the potential NDA resubmission is expected to be six months.

167.    The Nov. 27, 2023 PR also quoted Brady as stating,

With $143 million in cash, cash equivalents, and marketable securities as of September 30, 2023, *we are well positioned to conduct another symptom trial of reproxalap in patients with dry eye disease, with a potential NDA resubmission in the first half of 2024[.]*

168.    On November 28, 2023, Defendants held a public conference call to provide an update on Aldeyra's regulatory progress for reproxalap in dry eye disease which was hosted by Burke and Brady (the "Nov. 28, 2023 Call"). On the Nov. 28, 2023 Call, Brady engaged in the following exchange with an analyst regarding the insufficiency of Aldeyra's prior reproxalap trials:

> <Q- YIGAL NOCHOMOVITZ:> So it seems like the FDA is making a very technical distinction here between what you've submitted with the original NDA and what they've now requested. I mean after all, you followed the recipe, basically to the (theme) in terms of two signs, two symptoms, albeit the second set of symptoms with secondary end points, and now they're basically saying, do another one, do another crossover trial with making some of those primary, which I think is this distinction, if I'm correct.
>
> So it would be helpful if you could elaborate a little bit on why that happened, especially given a transparent ophthalmology division, obviously always is. While chambers says do x, y, and z and the company does x, y and z, and then those studies work, then you're good. So it would be helpful if you could just elaborate a little bit on how the stance changed? And why this is (a mistake), obviously you followed the recipe as directed by the guidance.
>
> <A – TODD BRADY:>   Yes. Yigal, a couple of points I would make at the outset. *As you know, we submitted two 12-week field trials. One of those trials was the RENEW trial announced in 2019, I believe. The co-primary endpoint for that trial with symptoms and staining. Staining is a sign of dry eye disease. We hit symptoms and we missed staining.*
>
> *While the symptoms data were remarkably positive, in fact, in the RENEW trial, we hit every symptom, presenting, I think some of the largest effect sizes ever presented in dry eye disease in terms of symptomatic control. We technically didn't hit the primary itself because the primary was comprised of two endpoints that is symptoms and staining. Staining was not hit over 12 weeks.* It was hit over four weeks, but not over 12 weeks. So there is a technical distinction between achieving the primary endpoint of RENEW and not.
>
> *When a co-primary is in place for the trial to be successful "both primaries need to be achieved," which was not the case in RENEW. I think the division drew a distinction there for the RENEW data.*
>
> The data from the trial I've reviewed this morning, the crossover chamber trial announced in July of last year. *As you pointed out, those endpoints are secondary end points. So technically, what the division is asking for is a prospectively designed trial where symptoms are specified as the primary end*

73

***points and that trial would need to be successful to confirm activities and incentives.***

169.    On the Nov. 28, 2023 Call, Brady also engaged in the following exchange with an analyst, and effectively admitted the deficiencies in the symptom submission,

> <Q – CATHERINE NOVACK:> So I just kind of wanted to ask, there was so much focus in the prior studies on getting significance on signs with dry eye. Was there at any point when you questioned the strength of the data for symptoms? Then, was -- is there any indication whether the issue with the data is not just about Phase III RENEW, but also regarding data from the formulation Phase II, which you have mentioned with another study using -- you were using for ocular dryness?

> <A – TODD BRADY:> Right, Catherine, I think you've correctly summarized our position going into the NDA review, which is ***our symptom data appeared to be quite strong. We had the RENEW data, we have the formulation Phase II data that you just mentioned. We had the secondary symptom endpoints that I presented this morning. From a totality or preponderance standpoint, our assumption, again prior to the NDA review, was that our symptom data were quite strong. And we are quite eager to see where the FDA came out on the sign. I don't think that there were any review issues associated with the formulation Phase II.*** Those symptoms data were very strong, number one; and number two, the only primary endpoint of that trial with symptoms.

> ….I think it was simply a matter of prespecifying a single primary endpoint or primary endpoints associated with symptoms running that prospectively in a trial and achieving that endpoint.

**J.    Regulation S-K Required Defendants To Disclose The Truth About The Deficiencies In The Reproxalap And ADX-2191 NDAs**

**1.    Disclosure Requirements Under Regulation S-K Item 303**

170.    Item 303 of Regulation S-K imposes an affirmative duty on issuers to disclose "known trends or any known demands, commitments, events or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in a material way."  S.E.C. Release No. 6835, 1989 WL 1092885, at *4; *see also* 17 C.F.R. § 229.303(a). "Disclosure of known trends or uncertainties that the registrant reasonably expects will have a material impact on net sales, revenues, or income from continuing operations is also required."  *Id.*

171.    Pursuant to Item 303(a), for a fiscal year, a registrant thus has an affirmative duty to:

a.    Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which the income was so affected.

b.    Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.  If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

17 C.F.R. § 229.303(a)(3)(i)-(ii); *see also* S.E.C. Release No. 6835, 1989 WL 1092885, at *8 (May 18, 1989) ("Other non-recurring items should be discussed as unusual or infrequent events or transactions that materially affected the amount of reported income from continuing operations.") (citation and quotation omitted).

172.    Thus, even a one-time event, if "reasonably expect[ed]" to have a material impact on results, must be disclosed.  Examples of such required disclosures include: "[a] reduction in the registrant's product prices; erosion in the r[e]gistrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract."  S.E.C. Release No. 6835, 1989 WL 1092885, at *4 (May 18, 1989).

173.    Accordingly, as the SEC has repeatedly emphasized, the "specific provisions in Item 303 [as set forth above] require disclosure of forward-looking information."  *See* Mgmt.'s Discussion and Analysis of Fin. Condition and Results of Operation, S.E.C. Release No. 6835, 1989 WL 1092885, at *3 (May 18, 1989).  Indeed, the SEC has stated that disclosure requirements under Item 303 are "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company" and "a historical and prospective analysis of the registrant's financial condition . . . with particular emphasis on the registrant's prospects for the future."  *Id.* at *3, *17.  Thus, "material forward-looking information regarding known material trends and

uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects." *See* Comm'n Guidance Regarding Mgmt.'s Discussion and Analysis of Fin. Condition and Results of Operations, S.E.C. Release No. 8350, 2003 WL 22996757, at *11 (Dec. 19, 2003).

174.    Here, the ongoing and known deficiencies in Aldeyra's Reproxalap NDA and ADX-2191 NDA, the only two products for which Aldeyra was actively pursuing commercialization of during the Class Period, were known trends or uncertainties likely to have a material unfavorable impact on Aldeyra's business, sales, revenues, and prospects.  Throughout the Class Period, Defendants claimed in Aldeyra's SEC filings that they had met the FDA requirements to seek FDA approval of an NDA for dry eye disease (*e.g.,* by representing that they had achieved two positive symptom trials) and that they did not need to do any clinical trials to seek FDA approval of an NDA for ADX-2191 for PVRL.  Defendants knew or should have known of the trends or uncertainties likely to have a material adverse impact on Aldeyra's business presented by its deficient Reproxalap NDA and its deficient ADX-2191 NDA.  As such, Aldeyra was required to include specific disclosures regarding the same in its Class Period SEC filings.  It did not.

## 2.    Defendants' Disclosure Requirements Under Regulation S-K Item 105

175.    Item 105 of Regulation S-K requires that offering documents "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105(a).  Item 105 further requires the offering documents to "[c]oncisely explain how each risk affects the registrant or the securities being offered." 17 C.F.R. § 229.105(b).  The discussion of risk factors:

> must be specific to the particular company and its operations, and should explain how the risk affects the company and/or the securities being offered.  Generic or boilerplate discussions do not tell the investors how the risks may affect their investment.

Statement of the Comm'n Regarding Disclosure of Year 2000 Issues and Consequences by Pub. Cos., Inv. Advisers, Inv. Cos., & Mun. Sec. Issuers, 1998 WL 425894, at *14 (July 29, 1998).

176.    Here, in violation of Item 105, Aldeyra failed to adequately disclose, and in fact, did not disclose at all, in its Class Period SEC filings the risks to its business, operations, and prospects resulting from its deficiencies in its clinical trials and NDA submissions for reproxalap for dry eye disease and ADX-2191 for PVRL—it's sole lead product candidates.  These risks were some of the most significant factors that made an investment in Aldeyra speculative or risky.   Instead, Aldeyra's Class Period SEC filings contained boilerplate discussions of hypothetical, future risks, but failed to disclose that these risks had already materialized.

## V.    MATERIALLY FALSE AND MISLEADING STATEMENTS

### A.    Defendants' Misstatements From The Start Of The Class Period On January 7, 2021 Through The End Of 2021

177.    On January 7, 2021, Aldeyra issued a press release entitled, "Aldeyra Therapeutics Announces Positive Top-Line Symptom and Sign Results from Run-In Cohort of Phase 3 TRANQUILITY Trial in Dry Eye Disease".  That same day, Aldeyra held a conference call to further discuss the positive results of the run-in cohort of the Phase 3 TRANQUILITY Trial, on which Brady stated,

> [T]he run-in cohort of TRANQUILITY achieved statistical significance for a dry eye disease sign, ocular redness, as well as all symptoms assessed in a dry eye chamber as part of an FDA-sanctioned trial design.

> The changes in redness and a number of different symptoms were demonstrated acutely within minutes of drug administration, further supporting what we believe is first-line positioning among dry eye disease therapies, the current standard of care of which often requires weeks or months of therapy to generate even modest symptomatic improvement.

> We expect to initiate the main cohort of TRANQUILITY in February of this year, once tear RASP levels has been assessed and the trial design has been finalized.

> **[I]n December of 2019, we announced data [from the Phase 3 RENEW-Part 1 Trial] supporting the rapid onset of action of reproxalap in dry eye disease occurring as early as 1 week after initiation of therapy as well as the breadth of therapeutic activity, which includes a large number of symptomatic endpoints associated with dry eye disease.**

***

*[The results of the run-in cohort of the Phase 3 TRANQUILITY Trial showed that] reproxalap was statistically superior to vehicle for the visual analog or VAS dryness scale, the same endpoint used for RENEW 1 and the Phase II formulation trials that we intend to submit to a new drug application as pivotal trials for symptomatic improvement in dry eye disease ….*

\*\*\*

[O]ur upcoming milestones, [ ] include initiation of TRANQUILITY 2 this quarter. ***TRANQUILITY and TRANQUILITY 2 are expected to represent the 2 pivotal sign trials required for NDA filing.***

178.    The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that (a) because the Phase 3 RENEW Part 1 Trial failed to meet each of its co-primary endpoints, it would not suffice to fulfill any of the Reproxalap NDA requirements for efficacy; (b) the Reproxalap NDA would be deficient unless Aldeyra conducted an additional adequate and well controlled symptom trial in addition to the Phase 2 Formulation Trial; (c) Defendants planned to "pool" the favorable results of multiple trials together to make up for any deficiencies in fulfilling the Reproxalap NDA requirements, which, pursuant to FDA guidance, would not suffice to meet the NDA requirements for efficacy; (d) Aldeyra would not be able to submit its Reproxalap NDA to the FDA by the end of 2021 because it was attempting to gather sufficient positive data from other trials in an effort to make up for the shortcomings of its other trials, and because it was experiencing delays in enrollment of the safety trial, and; (e) as a result of the foregoing, the FDA would not approve the Reproxalap NDA for commercialization.

179.    On the Jan. 7, 2021 Call, Brady further stated,

The data announced this morning are quite spectacular in so many ways. The direct answer is absolutely yes. Disease signs and symptoms are all approvable in the eyes of the FDA. *I want to point out that we have, we believe, already achieved the symptom endpoints or the symptom trials required for NDA submission. We're quite focused on signs.*

*What's remarkable from today's results is that we were able to confirm the symptomatic effects, the symptomatic activity of reproxalap that we've already previously demonstrated over 12 weeks of therapy, and we were able to confirm symptomatic drug activity within minutes of dosing, which is completely unique.*

As I mentioned in my prepared comments, we believe this is the first drug for chronic administration in dry eye disease to demonstrate activity within minutes of dosing, which is quite important to patients and physicians, especially in a standard of care landscape today where drugs require weeks, at least, of therapy to demonstrate effects.  The ocular sign we described today, ocular redness, is an approvable sign endpoint.

I think one of the key take-home messages from our call today is that the run-in demonstrated that we have options regarding our signs.  We're not dependent on 1 sign or another now that we've demonstrated ocular redness changes acutely in dry eye patients, which is consistent with what we previously demonstrated in allergic conjunctivitis patients.  We believe now we have important options as it relates to FDA approvable signs.

180.    In addition, on the Jan. 7, 2021 Call, Aldeyra represented that commercialization was imminent and that the Company expected to submit its Reproxalap NDA by the end of 2021. Specifically, David B. McMullin, Aldeyra's Chief Business Offier stated,

As you know, it's been our strategy at Aldeyra to produce the best product profile possible with reproxalap as the first novel entrant in eye -- in dry eye disease in years, and we're very excited by the data that we've achieved to date.

***We've seen chronic efficacy and now we've seen, with reproxalap, acute efficacy.***  This is important in combination because the profile simplifies the journey that patients have to go through in order to manage their disease.  That's important because it affects the way that we'll be able to position the product in the marketplace.  We believe that we have a first-line potential with our profile, and we believe that payers will recognize the advantages of having 1 chronic treatment that can also address the signs and the symptoms of the disease acutely.

…. The pricing will be decided at a later date, but we have done payer research, and payers are very interested in the profile that they see with reproxalap.  We've gotten good feedback, and we're confident in the guidance we provided previously that we will price reproxalap in line with leading dry eye disease branded products.

Your question on the build-out.  ***As we've guided previously, we expect to be in a position to file our NDA at the end of this year.***

***So this is the year [] that we also will be looking at building out the organization in preparation for commercialization.***  In addition, we're committed to finding the best path forward for making this product a success and that includes partnering discussions, and we continue to have ongoing partnering discussions and keeping them up-to-date on the latest developments.

181.    The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that (a) because the Phase 3 RENEW Part 1 Trial failed to meet each of its co-primary endpoints, it would not suffice to fulfill any of the Reproxalap NDA requirements for efficacy; (b) the Reproxalap NDA would be deficient and would not gain FDA approval unless Aldeyra conducted an additional adequate and well controlled symptom trial in addition to the Phase 2 Formulation Trial; (c) Defendants planned to "pool" the favorable results of multiple trials together to make up for any deficiencies in fulfilling the Reproxalap NDA requirements, which, pursuant to FDA guidance, would not suffice to meet the NDA requirements for efficacy; (d) Defendants had no reasonable basis to represent that "we expect to be in a position to file our [Reproxalap] NDA at the end of this year", because Aldeyra was attempting to gather sufficient positive data in an effort to make up for the shortcomings of its other trials, and because Aldeyra was experiencing delays in enrollment of the safety trial, and; (e) as a result of the foregoing, the FDA would not approve the Reproxalap NDA for commercialization and Defendants knew that 2021 would not be "the year … that [Aldeyra] will be looking at building out the organization in preparation for commercialization."

182.    On the Jan. 7, 2021 Call, Brady touted the results of Aldeyra's prior symptom trials and compared those results to the run-in cohort of the Phase 3 TRANQUILITY-1 Trial, stating,

> The activity, the onset of activity is critical.  ***As I mentioned in my prepared comments, we had what we believed was industry-leading onset activity -- of activity at 1 week after initiation of therapy.  And that's the data we presented today from RENEW Part 1 that had disclosed previously….***
>
> ***The other way of thinking about the data, Julian, versus RENEW Part 1, which was a 12-week, a highly durable effect, is that the data from RENEW Part 1 is really a culmination of acute-acting or rapid-acting activity, both the symptom and the sign level of reproxalap.  And so in a sense, we have what we believe potentially the best of all worlds: an acute-acting drug that is able to sustain activity over a long period of time.  And in the case of RENEW 1 and the Phase II formulation trial, that was 12 weeks.***

183.    The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that (a) because the Phase 3 RENEW Part 1 Trial failed to meet each of its co-primary endpoints, it would not suffice to fulfill any of the Reproxalap NDA requirements; (b) Defendants planned to "pool" the favorable results of multiple trials together to meet the Reproxalap NDA requirements, which, pursuant to FDA guidance, would not be sufficient to meet the NDA requirements for efficacy; (c) Aldeyra would not be able to submit its Reproxalap NDA to the FDA by the end of 2021 because it was attempting to gather sufficient positive data in an effort to make up for the shortcomings of its other trials; (d) Aldeyra had not achieved the two requisite symptom trials for approval of the Reproxalap NDA, and; (e) as a result of the foregoing, the FDA would not approve the Reproxalap NDA for commercialization.

184.    In addition, when asked on the Jan. 7, 2021 Call about the remaining requirements for submission of the Reproxalap NDA, Brady stated,

> ***TRANQUILITY 1 and 2, as I mentioned in my prepared comments, will be the 2 pivotal sign trials.***  The safety study that Matt just asked about will be part -- a key part of the of the NDA submission.  Although, I will note that we have never, in over 1,100 patients, now almost 1,200 patients, seen any safety signals with subjects that were dosed up to 12 weeks and in some trials up to 8 times a day.
>
> ***So we feel very confident about the outcome of the safety trial in terms of data. And then finally, a large part of the NDA submission has to do with chemistry manufacturing controls, which means that your commercial process has to be clarified and qualified.***
>
> It means that the commercial batch, the commercial product needs to pass stability requirements and so forth.  So that's another major ongoing effort internally. ***I would say, between the completion of the TRANQUILITY trial and the safety study and the CMC requirements that I just mentioned, those would be the major components remaining for NDA submission.***

185.    The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that (a) because the Phase 3 RENEW Part 1 Trial failed to meet each of its co-primary endpoints, it would not suffice to fulfill any of the Reproxalap NDA requirements for efficacy; (b) the Reproxalap NDA would be deficient unless Aldeyra conducted an additional adequate and well controlled symptom trial; (c) Defendants planned to "pool" the

favorable results of multiple trials together to make up for any deficiencies in fulfilling the Reproxalap NDA requirements, which, pursuant to FDA guidance, would not suffice to meet the NDA requirements for efficacy; (d) Aldeyra was not on track to submit the Reproxalap NDA to the FDA by the end of 2021 because Aldeyra was attempting to gather sufficient positive data in an effort to make up for the shortcomings of its other trials, and; (e) as a result of the foregoing, "the completion of the TRANQUILITY trial and the safety study and CMC requirements" were not "the [only] major components remaining for NDA submission".

186.    On March 11, 2021, Aldeyra held a public conference call to discuss its FY 2020 results.  On the March 11, 2021 Call, Brady touted the Company's achievements, stating:

> ***Over the past several quarters, we have focused on 3 primary objectives. First, advance reproxalap into 2 Phase III trials in a clinically relevant sign of dry eye disease, ocular redness, augmenting the statistically significant symptom improvement we achieved in previous Phase II and Phase III trials and positioning our compound as a novel, rapidly acting potential first-line therapy.*** ...
>
> ***I'm pleased to report that we have succeeded on all fronts.***  In February, we finalized the design of our Phase III tranquility trial of reproxalap as the treatment of dry eye disease. As we have previously announced, the trial is expected to enroll approximately 150 patients per arm.    The primary endpoint of TRANQUILITY is ocular redness over 90 minutes in a dry eye chamber, with tier RASP levels, Schirmer's test and dry eye symptoms as secondary endpoints.  The protocol will replicate the 2-day dosing paradigm dry eye challenge design and enrollment criteria of the run-in cohort.
>
> Although in a relatively small number of dry eye disease patients in the run-in cohort, reproxalap achieved statistical significance in ocular redness, as well as all assessed symptoms in the chamber.  Symptom improvement was observed after a single day of dosing.  And in the dry eye chamber, as soon as 5 minutes after a single dose.  Likewise, improvement in redness also occurred within minutes following dosing.  Reproxalap was observed to act prophylactically preventing exacerbation of signs and symptoms as well as therapeutically reducing signs and symptoms following dosing in the middle of the dry eye chamber exposure.
>
> TRANQUILITY and the confirmatory Phase III TRANQUILITY 2 trial are on schedule to begin enrollment in the first half of this year, with top line results expected in the second half of the year. ***Based on demonstrated symptom control in clinical trials and differentiated mechanisms of action, reproxalap has the***

*potential to provide first-line ocular symptom control for dry eye disease patients.*

187.    The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that (a) because the Phase 3 RENEW Part 1 Trial failed to meet each of its co-primary endpoints, it would not suffice to fulfill any of the Reproxalap NDA requirements for efficacy and Aldeyra had not achieved "demonstrated symptom control in clinical trials"; (b) the Reproxalap NDA would be deficient unless Aldeyra conducted an additional adequate and well controlled symptom trial; (c) Defendants planned to "pool" the favorable results of multiple trials together to make up for any deficiencies in fulfilling the Reproxalap NDA requirements, which, pursuant to FDA guidance, would not suffice to meet the NDA requirements for efficacy; (d) Aldeyra was not on track to submit the Reproxalap NDA to the FDA by the end of 2021 because Aldeyra was attempting to gather sufficient positive data in an effort to make up for the shortcomings of its other trials, and; (e) as a result of the foregoing, Aldeyra had not "succeeded on all fronts" with respect to "advance[ing] reproxalap into 2 Phase III trials in a clinically relevant sign of dry eye disease, ocular redness, augmenting the statistically significant symptom improvement we achieved in previous Phase II and Phase III trials and positioning our compound as a novel, rapidly acting potential first-line therapy."

188.    On the March 11, 2021 Call, when asked about what other items Aldeyra was working on to get the Reproxalap NDA package ready for filing, Brady stated,

> *[T]here are many aspects of a successful new drug application submission, which you allude to, only one of them are -- is your efficacy trials. Obviously … we're very optimistic about TRANQUILITY based on the Phase II trials in allergy and the running cohort of TRANQUILITY, not to mention the prior trials in dry disease that have demonstrated activity of reproxalap [on] symptoms and signs.*

> The other components of NDA submission concern safety studies. Safety studies are a requirement for NDA submissions….We have now over 1,100 patients that have been exposed to reproxalap at concentrations higher than 0.25%, which is our concentration we intend to take forward or are taking forward. And at dosing frequencies that exceed the dosing frequencies that we are currently using, we have experienced or observed no safety events….I think it's remarkable that so

many subjects in clinical trials have been exposed to drug, and we have no reports of clinically relevant safety issues.

*The third aspect of NDA submission concerns chemistry manufacturing and controls as there, the FDA is primarily concerned with the manufacturing process, the commercial process, and the stability of the commercial batch. And I'm happy to say that we believe we're in very good shape with regard to all those standards as they relate to C&C.*

*The only thing I'll add is that the safety trial for dry eye disease is ongoing. The FDA requires that for NDA submission we have a certain number of patients with 6 months of exposure to drug. And we believe that we're on track to reach that milestone by the end of this year, Kelly.*

189.     The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that (a) because the Phase 3 RENEW Part 1 Trial failed to meet each of its co-primary endpoints, it would not suffice to fulfill any of the Reproxalap NDA requirements for efficacy; (b) the Reproxalap NDA would be deficient and would not gain FDA approval unless Aldeyra conducted an additional adequate and well controlled symptom trial; (c) Defendants planned to "pool" the favorable results of multiple trials together to "demonstrate[] the activity of reproxalap [on] symptoms and signs", which, pursuant to FDA guidance, would not suffice to meet the NDA requirements for efficacy; (d) Aldeyra was not "on track" to meet the "milestone" of completing the reproxalap safety study by the end of 2021 because Aldeyra was experiencing delays in patient enrollment due to limited clinical trial staffing at trial sites; (e) the Reproxalap NDA CMC data was not "in very good shape"; and, (f) as a result of the foregoing, Aldeyra would not be able to submit the Reproxalap NDA by the end of 2021.

190.     On March 11, 2021, Defendants also filed with the SEC Aldeyra's Form 10-K for FY 2020 (the "2020 10-K"). The 2020 10-K described the ADX-2191 NDA progress as follows:

Primary vitreoretinal lymphoma ("PVRL") is a rare, aggressive, high-grade cancer that arises in the vitreous and retina. An estimated 2,900 people in the United States suffer from PVRL, and approximately 600 new cases of PVRL are diagnosed in the United States per year. The median survival for newly diagnosed patients is less than five years. In January 2021, we received from the FDA preliminary written comments in preparation for a Pre-IND ("Investigational New Drug") Type B meeting regarding ADX-2191 for the treatment of PVRL. *We believe the comments indicated that submission of a New Drug Application*

**("NDA") for ADX-2191 for the treatment of PVRL may be possible without performing clinical trials. In the first quarter of 2021, we held a teleconference with the FDA to discuss the preliminary written comments and clarify the ADX-2191 NDA submission requirements for the treatment of PVRL. We applied for orphan designation for ADX-2191 for the treatment of PVRL in the first half of 2021. ADX-2191 has the potential to be the first drug approved to treat PVRL.**

191.    The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that (a) "without conducting clinical trials", the FDA would not approve the ADX-2191 NDA; (b) Aldeyra would have to provide bridging evidence to justify its reliance on prior studies showing the safety and efficacy of methotrexate in its FDA-approved iterations as sufficient to demonstrate the safety and efficacy of ADX-2191 to treat PVRL to gain FDA approval; (c) Aldeyra would not be able to gain FDA approval of the ADX-2191 NDA solely by relying on published literature; (d) ADX-2191 would not have "the potential to be the first drug approved to treat PVRL" unless Aldeyra gathered sufficient evidence of the drug's safety and efficacy, which Aldeyra did not have; and, (e) as a result of the foregoing, Aldeyra was far from achieving commercialization of ADX-2191.

192.    On May 6, 2021, Aldeyra issued a press release entitled, "Aldeyra Therapeutics Reports First-Quarter 2021 Financial Results and Recent Business Highlights", which quoted Brady saying,

**"We expect 2021 to be a catalyst-rich year for Aldeyra as we continue to advance reproxalap, our lead program, toward potential commercialization in anterior ocular inflammatory disease,"** stated President and CEO Todd C. Brady, M.D., Ph.D. "In addition, we remain on track to report top-line results in the second half of this year from the Phase 3 TRANQUILITY and TRANQUILITY-2 clinical trials of reproxalap in dry eye disease."

193.    On May 6, 2021, Aldeyra also held a public conference call to discuss the Company's Q1 2021 results.  On the May 6, 2021 Call, when asked what Aldeyra's thoughts were on what could go wrong and what it intended to do if something did not go as planned with respect to the reproxalap for DED trials, and Brady answered,

What can go wrong? Well, in a clinical trial business, those of us that have been around for decades have had lots go wrong. It is always possible for clinical trials to readout sideways and unexpected manners. In dry eye disease, there is

85

considerable variability. This is why many companies developing drugs today for dry eye disease perform a number of Phase III trials, and Aldeyra is no different.

> *One way to combat variability is numerous trials, and that's exactly what we've done with the RENEW trials, with the Phase IIb formulation trials that we believe will satisfy our requirements for symptom control over 12 weeks in dry eye disease, but also the TRANQUILITY trials 1 and 2, which are, we believe, conservatively powered, at least 90% powered to detect changes in ocular redness based on the activity we saw in the run-in cohort for TRANQUILITY and, as I mentioned in response to Kelly's question, also based on the activity in redness that we saw from INVIGORATE.*

194.    Further, on the May 6, 2021 Call, Defendants reassured investors about the sufficiency of Aldeyra's CMC data and reassured investors about the timeline for NDA submission in connection with the Reproxalap NDA submission.  Specifically, Brady stated,

> Regarding chemistry manufacturing and control, stability has not been a concern to date. *Our registration batches are in excellent shape. And to date, we would expect a 24-month stability as is standard in NDA filings. So in conclusion, I don't think that there are any CMC roadblocks at all at this point.*
>
> *We have guided that NDA[] [is] possible for dry eye disease … by the end of this year or early next year. I think the gating factors for th[e] NDA submission[] more likely relate to the standard NDA safety studies, which in dry eye disease are 12 months long. Nonetheless, I still think that we're in a good position to meet the NDA submission timeline[] that I have mentioned.*

195.    The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that (a) because the Phase 3 RENEW Part 1 Trial failed to meet each of its co-primary endpoints, it would not suffice to fulfill any of the Reproxalap NDA requirements for efficacy and Aldeyra had not met its symptom trial requirements; (b) the Reproxalap NDA would be deficient and would not gain FDA approval unless Aldeyra conducted an additional adequate and well controlled symptom trial; (c) Defendants planned to "pool" the favorable results of multiple trials together to "demonstrate[] the activity of reproxalap [on] symptoms and signs", which, pursuant to FDA guidance, would not suffice to meet the NDA requirements for efficacy; and, (d) Defendants were attempting to find ways to remedy known deficiencies in the Reproxalap NDA, such as their failure to achieve two positive symptom trials, and were conducting and planning additional clinical trials as one way to try to

remedy those deficineices, and (e) as a result of the foregoing, the "gating factors" related to the NDA submission would likely not relate only to "to the standard NDA safety studies" and Aldeyra was not "in a good position" to submit the Reproxalap NDA by the end of 2021.

196. On August 17, 2021, Aldeyra participated in the H.C. Wainwright Opthalmology Virtual Conference. At the Aug. 17, 2021 Conference, Defendants touted Aldeyra's progress towards meeting the FDA requirements for submission of the Reproxalap NDA. Specifically, Brady stated,

> Reproxalap is going to yield two large Phase 3 results in dry eye disease in the next quarter those are the TRANQUILITY trials. We have a Phase 2 [ ] trial on dry eye disease that will be announced in the net quarter as well, that deals with RASP levels in dry disease and so forth. Our end points in these trials are ocular redness, redness is a clinical sign of the dry eye disease. *We believe we've finished more or less our safety—our symptom trials. The FDA requires symptoms and signs.*
>
> *The symptoms trials, I think, we've put to bed, now it's about the clinical signs of dry eye disease.* Redness is great because it's the only clinical sign really that patients care about. Patients aren't interested in Schirmer test or staining or tear film breakup time osmolarity or some of the other signs that you hear about in dry disease.

197. The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that (a) because the Phase 3 RENEW Part 1 Trial failed to meet each of its co-primary endpoints, it would not suffice to fulfill any of the Reproxalap NDA requirements for efficacy and Aldeyra had not met its symptom trial requirements; (b) the Reproxalap NDA would be deficient and would not gain FDA approval unless Aldeyra conducted an additional adequate and well controlled symptom trial; and, (c) Defendants planned to "pool" the favorable results of multiple trials together to "demonstrate[] the activity of reproxalap [on] symptoms and signs", which, pursuant to FDA guidance, would not suffice to meet the NDA requirements for efficacy.

198. At the Aug. 17, 2021 Conference, when asked about why investors should invest in Aldeyra, Brady answered,

*So, with reproxalap, it's the three dry eye trials as I mentioned next quarter. That's the near-term reason to own our stock, I tell people. I think the intermediate reason to own our stock has to do with ADX-2191. Of all the reasons that we've discussed earlier today, really 2191 represents a platform approach for the treatment of rare retinal diseases. We have a known drug. We know that drug is active. We know the safety of the drug. We've received orphan designations, one case Fast Track designation. So you'll hear much more about that as GUARD finishes up this year and data are announced next year. We'll have regulatory strategy announcements next year and so forth regarding 2191.*

199.    The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that (a) because Aldeyra had not met the symptom trial requirements in connection with the Reproxalap NDA, the FDA would not approve the Reproxalap NDA; (b) ADX-2191 was not a "known drug" and Aldeyra did not "know the safety of [ADX-2191]" and as such, Aldeyra would not receive FDA approval of the ADX-2191 NDA without conducting clinical studies; and, (c) as a result of the foregoing, Aldeyra would not be able to commercialize reproxalap for DED or ADX-2191 for PVRL in the foreseeable future and thus, neither represented a "near-term reason" or an "intermediate reason to own [Aldeyra] stock".

200.    On September 22, 2021, Aldeyra participated in the Oppenheimer Fall Healthcare Life Sciences and Medical Technology Summit.  At the Sept. 22, 2021 Conference, Brady touted the upcoming Reproxalap NDA submission.  Specifically, Brady stated,

*We've proven activity in symptoms previously, now we are attempting to prove activity in signs, our sign happens to be ocular redness, which by the way, as I like to say, is the only sign that matters to patients.* Patients don't care about any other physiologic sign in dry eye disease; Schirmer test, screening, osmolarity, tear film breakup, it'd go on forever….*I think we can beat your estimate Justin and have that next quarter for the street in terms of NDA timing[.]*

201.    At the Sept. 22, 2021 Conference, when asked about why investors should stay with Aldeyra, Brady stated,

I think a large part of what biotech companies should be thinking about is how do we engage investors from short-term to long-term. *Simplistically in Aldeyra, the short-term is reproxalap. It's our most advanced product, its nearing the end of development and approaching commercialization, there are some key data readouts.  The second, I think intermediate term product is retina, which we're*

*thrilled about ADX-2191, the vitreous mimicking methotrexate that I've mentioned is a contender for NDA filing next year, that is a product that we will collaboratively launch ourselves because orphan retina is something that we can tackle as a small company and can be profitable for small companies*….So investors that invest today in Aldeyra will benefit I hope from near-term catalysts having to do with reproxalap, intermediate term catalysts having to do with a more or less defined launch of an orphan retina product and then long term catalysts that have to do with changing medicine along the lines that I mentioned.

202.    The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that (a) because Aldeyra had not met the symptom trial requirements in connection with the Reproxalap NDA, the FDA would not approve the Reproxalap NDA; (b) Aldeyra would not receive FDA approval of the ADX-2191 NDA without conducting clinical studies; (c) the safety study Aldeyra was conducting in connection with the Reproxalap NDA was experiencing delays in patient enrollment; (d) reproxalap for DED was not "nearing commercialization"; and, (e) Aldeyra would not be able to commercialize reproxalap for DED or ADX-2191 for PVRL in the foreseeable future and thus, neither represented a "near-term catalyst" or "intermediate catalysts" for Aldeyra's business.

203.    On October 28, 2021, Aldeyra announced its Q3 2021 results in a press release, and on a public conference call.  On the Oct. 28, 2021 Call, when asked about Aldeyra's progress towards meeting the requirements to submit the Reproxalap NDA, Brady stated,

*As you know, the FDA requires symptoms and signs for NDA submission in dry eye disease. We believe we've completed our symptom requirements. Those data are prominently highlighted in our corporate deck of 2 12-week pivotal trials by using eye dryness as our symptom. The remaining trials, particularly the TRANQUILITY-1 and TRANQUILITY-2 trials are focused on the sign requirement for NDA submission.* And as we've discussed this morning, that sign is ocular redness, though we were also assessing RASP and Schirmer's test.

*In addition to the efficacy requirements for NDA submission or safety requirements consistent with NDA submissions generally, there is a safety trial that must be part of the submitted package. As I said in my prepared comments this morning, we are currently running a 12-month safety trial to support the chronic use of reproxalap in dry eye disease. I continue to believe that the 12-month safety trial will be the gating factor for us in terms of NDA submission timing.*

In addition, there are chemistry manufacturing and control requirements for NDA submission. ***I believe that we are in excellent position with regard to our CMC requirements. And I think that rounds out the basic components of what we need to file in the NDA.***

204.    The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that (a) Aldeyra had not completed the symptom trial requirements needed for FDA approval of the Reproxalap NDA; (b) the Phase 3 RENEW Part 1 Trial had failed to meet each of its co-primary endpoints and thus would not satisfy one of the two symptom trial requirements for the Reproxalap NDA; (c) Aldeyra intended to pool the positive results of multiple trials to meet the requirements for the Reproxalap NDA, which would not be sufficient to satisfy the requirements to gain FDA approval; (d) the reproxalap for DED safety trial, which was required for NDA submission, was not on track and experiencing delays in patient enrollment due to limited clinical trial staffing at trial sites; (e) Aldeyra was not in an "excellent position" with respect to meeting CMC requirements; and, (f) the "remaining trials" Aldeyra was conducting for reproxalap for DED were not focused solely on meeting the Company's sign trial requirements but were also being conducted in the hope that their results would make up for deficiencies in the results of Aldeyra's other trials.

205.    On November 2, 2021, Aldeyra issued a press release entitled "Aldeyra Therapeutics Announces Achievement of Primary Endpoint of Ocular Redness in Randomized, Double-Masked, Vehicle-Controlled Phase 2 Clinical Trial in Dry Eye Disease". The Nov. 2, 2021 PR stated,

> Based on final enrollment and data from the run-in cohort of TRANQUILITY, Aldeyra's ongoing Phase 3 trial in dry eye disease, the Phase 2 trial exceeded 90% power to detect statistical significance in the primary endpoint of ocular redness over all time points in aggregate in the dry eye chamber. Ocular redness scores in the reproxalap group were observed to be statistically lower than those of vehicle (p = 0.016)…..
>
> ***"Complementing our rapid and durable symptom control evidenced in three 12-week clinical trials, we are excited to announce achievement of statistical significance of an objective sign of dry eye disease in a well-controlled clinical trial,"*** stated Todd C. Brady, M.D., Ph.D., President and Chief Executive Officer of Aldeyra. "Ocular redness may be the only dry eye disease sign that is of

importance to patients, and the reduction in redness observed in this trial following reproxalap treatment potentially represents a major advance for the chronic treatment of dry eye disease."

206.    The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that (a) Aldeyra had not completed the symptom trial requirements needed for FDA approval of the Reproxalap NDA; (b) the Phase 3 RENEW Part 1 Trial had failed to meet each of its co-primary endpoints and thus would not satisfy one of the two symptom trial requirements for the Reproxalap NDA; and, (c) Aldeyra intended to pool the positive results of multiple trials to meet the requirements for the Reproxalap NDA, which would not be sufficient to satisfy the requirements to gain FDA approval.

207.    On November 9, 2021, Aldeyra issued a press release entitled, "Aldeyra Therapeutics Announces Completion of Enrollment in Phase 3 TRANQUILITY Trial in Patients with Dry Eye Disease and Reiterates New Drug Application (NDA) Submission Guidance".  The Nov. 9, 2021 PR touted the below corporate highlights as follows,

- Top-Line Results from TRANQUILITY Expected This Quarter
- ***Together with Recently Completed Phase 2 Clinical Trial, Positive Ocular Redness Results from TRANQUILITY Could Satisfy NDA Submission Requirements as Pivotal Trials for Improvement in an Objective Sign of Dry Eye Disease***
- ***Completed Phase 3 RENEW-Part 1 and Formulation Phase 2 Clinical Trials to be Submitted as Pivotal Trials in Satisfaction of NDA Symptom Requirements***
- ***Anticipated NDA Submission Expected in Early 2022***

***"Following the recent announcement of top-line results from our Phase 2 clinical trial, which achieved the primary endpoint of ocular redness and which we intend to submit as a pivotal trial, completion of enrollment in TRANQUILITY is a significant milestone as we advance reproxalap toward an anticipated NDA submission early next year for the treatment of dry eye disease,"*** stated Todd C. Brady, M.D., Ph.D., President and CEO of Aldeyra. ***"If the primary endpoint of ocular redness in TRANQUILITY is achieved, and in conjunction with two previously announced clinical trials demonstrating improvement in ocular dryness symptoms, we believe that the efficacy requirements for NDA submission will have been met."*** If successful, either ***TRANQUILITY or TRANQUILITY-2 could complete NDA submission***

*requirements for demonstration of improvement in an objective sign of dry eye disease.*

Per draft U.S. Food and Drug Administration (FDA) guidance, to be considered for regulatory approval in the United States, a product candidate for the treatment of dry eye disease must demonstrate efficacy in an objective sign in at least two clinical trials and efficacy in a subjective symptom in at least two clinical trials. *For satisfaction of symptom efficacy requirements, Aldeyra intends to submit two previously completed adequate and well-controlled symptom trials that pre-specified patient-reported ocular dryness score as a primary endpoint, the RENEW-Part 1 Trial and the Formulation Phase 2 clinical trial. For satisfaction of the sign efficacy requirements, Aldeyra intends to submit the recently completed Phase 2 clinical trial and, if positive, either TRANQUILITY or TRANQUILITY-2, all of which pre-specify ocular redness as a primary endpoint.*

*"With its safety and efficacy profile—demonstrated in clinical trials encompassing more than 1,300 patients in aggregate—reproxalap has the potential to provide relief to the estimated 34 million adults in the U.S. who suffer from persistently disturbing symptoms and ocular redness caused by dry eye disease,"* Dr. Brady stated."

208.    The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that (a) Aldeyra had not completed the symptom trial requirements needed for FDA approval of the Reproxalap NDA; (b) the reproxalap for DED safety trial, which was required for submission of the Reproxalap NDA, was not on track and was experiencing delays in patient enrollment; (c) Aldeyra intended to pool the positive results of multiple trials to meet the requirements for the Reproxalap NDA, which would not be sufficient to demonstrate the safety and efficacy of reproxalap for DED needed for FDA approval; (d) Aldeyra's clinical trials had not demonstrated "the safety and efficacy" of reproxalap for DED; (e) the Phase 3 RENEW Part 1 Trial had failed to meet each of its co-primary endpoints and thus would not satisfy one of the two symptom trial requirements for the Reproxalap NDA; and, (f) as a result of the foregoing, Defendants had no reasonable basis to state that they could submit the Reproxalap NDA by early 2022.

209.    On November 18, 2021, Aldeyra participated in the Jefferies London Healthcare Virtual Conference.  At the Nov. 18, 2021 Conference, Brady touted the Company's progress towards commercialization of reproxalap for DED and ADX-2191, stating,

> It's not every day that you take a company from idea all the way into Phase three hopefully done with Phase III shortly for reproxalap our lead asset, you don't see that very often …. We are in an exciting phase to your question about upcoming milestones.  ***Reproxalap we hope is ending the near--ending clinical development in the near term in Phase three trials for dry eye disease*** ….
>
> ***The idea is that NDA filings are possible early next year and then with the standard review periods maybe launch a year after that. So, an exciting time for reproxalap …. then the other thing we're working on as an immunology company at heart is retinal disease we have a product called ADX-2191, which is we think the world's only vitreous mimicking methotrexate formulation.***
>
> ***We now have orphan designation for three different rare diseases that effect the retina, and we look forward to updating the street shortly as to our planning for not only subsequent clinical trials but completion of a Phase III trial that we have ongoing called the guard trial and proliferate vitreoretinopathy….***So a lot going on in the company between reproxalap … and ADX 2191.

210.    The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that (a) reproxalap for DED was not "near" "ending clinical development"; (b) Aldeyra had not completed the symptom trial requirements needed for FDA approval of the Reproxalap NDA; (c) the reproxalap for DED safety trial, which was required for submission of the Reproxalap NDA, was not on track and was experiencing delays in patient enrollment; (d) Aldeyra intended to pool the positive results of multiple trials to meet the requirements for the Reproxalap NDA, which would not be sufficient to demonstrate the safety and efficacy of reproxalap for DED needed for FDA approval; (e) as a result of the foregoing, Defendants had no reasonable basis to state that they could submit the Reproxalap NDA by early 2022 and commercially launch reproxalap in 2023, and; (f) the ADX-2191 NDA would not gain FDA approval because Defendants had decided, contrary to FDA guidance, not to conduct any clinical trials to demonstrate the safety and efficacy of ADX-2191 for PVRL.

211.    At the Nov. 18, 2021 Conference, Brady further described the progress of the Reproxalap NDA submission as follows:

The FDA as you know, requires symptoms and signs for approval and for marketing approval and dry eye disease two trials for each. So two positive symptom trials, two positive sign trials, they have to be the same symptom in the same sign for approval of marketing.

***Now some time ago, we completed our symptom trials. That's the renew[] part one and the Phase II formulation trials, both of those are highlighted in our corporate deck both with primary endpoints of ocular dryness score patient-reported ocular dryness score both achieved statistical significance, both were adequate and well-controlled and so forth and so on.***

***So our symptom requirements appear to have been met and with those two trials are what we intend to submit as pivotal for completion of our symptom requirements for the dry eye disease new drug application.***

For the sign trials now we're focused on ocular redness …. ***only one of the remaining tranquility trials needs to work for us to complete. Not only are sign requirements for the NDA we believe, but also all of the efficacy requirements.***

***As I mentioned earlier symptom requirements we believe were achieved some time ago. The first of our sign requirements was achieved with the Phase II trial that I just mentioned and hopefully, one of the two tranquility trials if positive will represent that final of the four checkboxes needed for NDA submission.***

212.    The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that (a) Aldeyra had not achieved the "symptom requirements some time ago" in connection with the Reproxalap NDA; (b) the Phase 3 RENEW Part 1 trial failed to meet each of its co-primary endpoints and thus failed to demonstrate clinical efficacy necessary for approval of the Reproxalap NDA; (c) "one of the two tranquility trials if positive" would not "represent that final of the four checkboxes needed for [the Reproxalap] NDA submission" because Aldeyra had not achieved the symptom trial requirements; (d) Aldeyra intended to pool the positive results of multiple trials to meet the requirements for the Reproxalap NDA, which would not be sufficient to demonstrate efficacy needed to win FDA approval; and, (e) the reproxalap for DED safety trial, which was required for submission of the Reproxalap NDA, was experiencing patient enrollment delays.

213.    At the Nov. 18, 2021 Conference, Brady further emphasized that the only box left to check to demonstrate efficacy of reproxalap for DED was for the Phase 3 TRANQUIILTY-1 Trial or the Phase 3 TRANQUILITY-2 Trial to be successful.  Specifically, Brady stated,

> As I mentioned earlier, we really only need two positive sign trials, one of them is the Phase II enhanced pivotal and that's done, so that box is checked, we just need to check one more box that is we either need tranquility one to work or tranquility two to work.

> So what happens if tranquility one works. Well, certainly, we're in a position of prioritizing tranquility two, we really don't need tranquility two for the NDA submission. ***All we need is one more trial to achieve the primary endpoint of ocular redness and we believe we've met the efficacy requirements for NDA submission for dry eye disease.***

214.    The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that (a) Aldeyra had not achieved the symptom requirements in connection with the Reproxalap NDA; (b) the Phase 3 RENEW Part 1 trial failed to meet each of its co-primary endpoints and thus failed to demonstrate clinical efficacy necessary for approval of the Reproxalap NDA; and, (c) "one more" successful sign trial would not satisfy "the efficacy requirements for NDA submission for dry eye disease".

215.    At the Nov. 18, 2021 Conference, Brady assured investors that Aldeyra had backup plans in place in the event that one of the Phase 3 TRANQUILITY Trials for the signs of DED was unsuccessful, noting that the Company could "pool" the positive aspects of the two TRANQUILITY Trials together.  Specifically, Brady stated:

> It could be for whatever reason the tranquility one doesn't work, but at least, we'll have a lot of data upon which to power tranquility two, as you mentioned, I think tranquility one has just about as good a chance to work as any clinical trial based on the data we've generated to-date. ***But the good news is there's backup mechanism in case tranquility one goes sideways…. [T]here's even more flexibility than I've described by another well worn option with the FDA is if two trials don't work you could p[oo]l them together that counts as another trial.***

> ***So one I think remote possibility but possibility nonetheless, is that neither tranquility one or tranquility two works but pooled together they work and that would satisfy that other checkbox they would qualify as another positive trial.***

*The odds of bolstering tranquility one and tranquility two failing I think are very low, but there is even a backup plan to the backup plan.*

216.    The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that (a) pursuant to FDA guidance, Aldeyra could not pool the results of multiple clinical trials in order to satisfy the efficacy requirements for FDA approval of the Reproxalap NDA; (b) Aldeyra had no "backup" plan that would make up for Aldeyra's failure to meet the symptom trial requirements; (c) Aldeyra had not achieved the symptom requirements in connection with the Reproxalap NDA because the Phase 3 RENEW Part 1 trial failed to meet each of its co-primary endpoints, and (d) Aldeyra was planning to conduct additional clinical trials to attempt to remedy the known deficiencies in the Reproxalap NDA.

217.    On December 20, 2021, after close of market, Aldeyra issued a press release entitled, "Aldeyra Therapeutics Announces Top-Line Results from the Phase 3 TRANQUILITY Trial in Dry Eye Disease".  The Dec. 20, 2021 PR revealed that the Phase 3 TRANQUILITY-1 Trial had failed to achieve its primary sign endpoint of ocular redness and the Reproxalap NDA submission was now expected in mid-2022.  The Dec. 20, 2021 PR further stated,

"Following the achievement of statistical significance in ocular redness in our recent Phase 2 clinical trial, the achievement of statistical significance in TRANQUILITY may provide an additional option to satisfy the remaining objective sign requirement for dry eye disease submission," stated Todd C. Brayd, M.D., Ph.D., President and Chief Executive Officer of Aldeyra.  "Subject to agreement with the FDA, we believe that the TRANQUILITY results allow for the possibility that, pending the outcome of TRANQUILITY-2, the NDA submission for reproxalap could represent the first time a dry eye disease drug will have qualified for the demonstration of activity for two objective signs."

Per draft FDA guidance, to be considered for regulatory approval in the United States, a product candidate for the treatment of dry eye disease must demonstrate efficacy in an objective sign in at least two clinical trials and efficacy in a subjective symptom in at least two clinical trials.  *To satisfy the symptom efficacy requirements, Aldeyra intends to submit two previously completed 12-week adequate and well-controlled symptom trials that pre-specified patient-reported ocular dryness score as a primary endpoint, the Phase 3 RENEW-Part 1 Trial and the Formulation Phase 2 clinical trial.*  Aldeyra's recently completed Phase 2 clinical trial achieved the primary endpoint of ocular redness, an approvable

sign of dry eye disease. ***Pending discussion with the FDA and the results of TRANQUILITY-2, Aldeyra may submit two pivotal trials for either ocular redness (Phase 2 and TRANQUILITY-2) or Schirmer test (TRANQUILITY and TRANQUILITY-2), or two trials for both signs (Phase 2, TRANQUILITY, and TRANQUILITY-2) if ocular redness and Schirmer test are achieved in TRANQUILITY-2.*** Phase 2 and Phase 3 clinical trials can be submitted as pivotal, provided that the trials are adequate and well-controlled.

***Pending enrollment of the ongoing 12-month safety trial in dry eye disease patients and the outcome of TRANQUILITY-2, the dry eye disease NDA (New Drug Application) submission is expected to occur mid-2022 ….***

"Notwithstanding the inherent variability of dry eye disease clinical trials, our investigational product candidate 0.25% ***reproxalap has now demonstrated activity in four late-stage clinical trials with the intended commercial dosing regimen,*** " Dr. Brady stated. ***"We continue to advance reproxalap toward NDA submission as we focus on the completion of TRANQUILITY-2 and enrollment in the 12-month safety trial."***

218.    The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that (a) Aldeyra had not satisfied the symptom trial requirements to submit the Reproxalap NDA; (b) the Phase 3 RENEW Part 1 Trial failed to meet each of its co-primary endpoints, and thus, would not satisfy one of Aldeyra's symptom trial requirements; (c) Aldeyra could not pool the positive results from the failed Phase 3 TRANQUILITY-1 Trial with the results of the Phase 3 TRANQUILITY-2 Trial, or any other trial, in order to meet the FDA efficacy requirements; (d) the reproxalap for DED safety trial, which was required for submission of the Reproxalap NDA, was not on track and was experiencing delays in patient enrollment; (e) by meeting a secondary endpoint of Schirmer Test, the Phase 3 TRANQUILITY-1 Trial would not meet one of Aldeyra's sign trial requirements pursuant to FDA guidance; (f) as a result of the foregoing, Aldeyra would not be able to submit the Reproxalap NDA for submission by mid-2022 and the FDA would not approve the Reproxalap NDA.

219.    On December 20, 2021, Aldeyra also held a public conference call to discuss the Phase 3 TRANQUILITY-1 Trial results.  On the Dec. 20, 2021 Call, Brady reassured investors

that **"*Schirmer test has been achieved in this trial, and now we have 2 options for signs for NDA efficacy requirements.*"**

220.    The foregoing statements were materially false and/or misleading because (a) the Schirmer test had not been "achieved" in the Phase 3 TRANQUILITY-1 Trial, such to allow Aldeyra "2 options for signs for NDA efficacy requirements"; (b) Aldeyra could not pool the results of the Phase 3 TRANQUILITY-1 Trial, or any of its other trials, to meet the efficacy requirements pursuant to FDA guidance; and, (c) Aldeyra had not achieved its symptom trial requirements.

221.    On the Dec. 20, 2021 Call, Brady represented that the safety study was the primary reason that the expected date of the Reproxalap NDA submission had been extended. Specifically, Brady stated,

> *It is correct that we're nudging the NDA submission date out to mid-year.  But that is primarily, as you point out, because of the safety trial.*  And the difficulty with safety trials in dry eye disease and other chronic conditions is they're 12 months long.
>
> *So convincing patients to remain in the trial, convincing patients to sign up for trials, particularly in the COVID era that are 12 months in duration is challenging. I totally expect that we'll be able to reach our enrollment target.  I expect we'll be able to file on -- or submit on 6 months of safety data.  But that process is, again, challenging in today's environment.*

222.    The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that (a) the safety trial was not on track for a mid-2022 NDA submission as it was experiencing delays in patient enrollment due to limited clinical trial staffing at trial sites; and, (b) the anticipated submission date of the Reproxalap NDA had been extended in material part to allow Defendants more time to conduct additional studies in an attempt to remedy known deficiencies in the NDA package.

### B.    Defendants' Misstatements Throughout 2022

223.    On March 17, 2022, Aldeyra filed with the SEC a Form 10-K for FY 2021.  The 2021 Form 10-K touted the progress of the Reproxalap NDA and clinical trials done in connection therewith.  Specifically, the 2021 Form 10-K stated,

Per draft FDA guidance, to be considered for regulatory approval in the United States, a product candidate for the treatment of DED must demonstrate efficacy in a subjective symptom (a patient-reported subjective measure of disease severity) in at least two adequate and well-controlled clinical trials, and efficacy in an objective sign (an independently assessed objective measure of disease severity) in at least two adequate and well controlled clinical trials. ***We intend to submit the RENEW Part 1 and Phase 2 novel formulation trials to satisfy the symptom efficacy NDA requirements. Because either ocular redness or Schirmer test qualifies as a sign of DED, subject to a discussion with the FDA, we intend to submit a combination of the Phase 2, TRANQUILITY, and TRANQUILITY-2 chamber trials to satisfy the NDA sign requirements, depending on whether ocular redness or Schirmer test is achieved in TRANQUILITY-2 or in subsequent clinical trials. If ocular redness and Schirmer test is statistically significant in TRANQUILITY-2, then we may elect to submit the NDA with two sign trials in addition to the symptom trials. Pending results from TRANQUILITY-2, a dry eye disease safety trial, and regulatory input, we believe that an NDA filing for reproxalap for the treatment of DED could occur mid-2022.***

224.    The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that (a) Aldeyra had not satisfied the symptom trial requirements to submit the Reproxalap NDA; (b) the Phase 3 RENEW Part 1 Trial failed to meet each of its co-primary endpoints, and thus, would not satisfy one of Aldeyra's symptom trial requirements; (c) Aldeyra could not pool the positive results from the failed Phase 3 TRANQUILITY-1 Trial with the results of the Phase 3 TRANQUILITY-2 Trial, or any other trial, in order to meet the FDA efficacy requirements; (d) the reproxalap for DED safety trial, which was required for submission of the Reproxalap NDA, was not on track and was experiencing delays in patient enrollment due to limited clinical trial staffing at trial sites; (e) by meeting a secondary endpoint of Schirmer Test, the Phase 3 TRANQUILITY-1 Trial would not meet one of Aldeyra's sign trial requirements pursuant to FDA guidance; (f) as a result of the foregoing, Aldeyra would not be able to submit the Reproxalap NDA for submission by mid-2022 and the FDA would not approve the Reproxalap NDA.

225.    The 2021 10-K also described several "hypothetical" risks to Aldeyra's business and prospects, including:

o Our business is dependent in large part on the successful development and commercialization of a single product candidate, reproxalap, for which we are researching multiple indications. We cannot be certain that we will be able to obtain regulatory approval for, or successfully commercialize, reproxalap.

o To generate revenue, we will depend on FDA approval and successful commercialization of our lead product candidate, reproxalap, for the treatment of dry eye disease. *If we are unable to successfully conduct the TRANQUILITY-2 trial, prepare and timely submit the planned NDA, and obtain FDA approval, our ability to generate revenue will be significantly delayed.*

<div align="center">***</div>

*Our business is dependent in large part on the successful development and commercialization of a single product candidate, reproxalap, for which we are researching multiple indications. We cannot be certain that we will be able to obtain regulatory approval for, or successfully commercialize, reproxalap.*

*Our product candidates, including reproxalap, will require additional preclinical studies, substantial clinical development and testing, and regulatory approval prior to commercialization.* We have not yet completed development of any product candidate….We are dependent in large part on successful continued development and ultimate regulatory approval and successful commercialization of reproxalap for our future business success. Any negative results or perceived negative results in clinical trials for one indication may have an adverse effect on our ability to develop and potentially commercialize reproxalap for the treatment of another indication….The future regulatory and commercial success of our product candidates is subject to a number of risks, including the following:

- *we may not be able to provide sufficient evidence of safety and efficacy to continue a development program or obtain regulatory approval;*

- *the results of our clinical trials may not meet the endpoints, or level of statistical or clinical significance required by the FDA, or comparable foreign regulatory bodies, for marketing approval;*

- the safety and efficacy results of our later phase or larger clinical trials may not confirm the results of our earlier trials;

- the initial parts of adaptive clinical trials are not designed to be pivotal or definitive, and as such we may not satisfy the designated endpoints and also may need to revise the design or endpoints to achieve success in later parts of the trial or potentially abandon the trial;

- we may not be able to timely or adequately finalize the design or formulation of any product candidate or demonstrate that a formulation of our product candidate will be stable for commercially reasonable time periods;

<div align="center">100</div>

- the FDA, or comparable foreign bodies, may require clinical data in addition to the clinical trial programs we expect or may require changes to the designs and endpoints of the subsequent clinical trials;

*We are currently planning to submit an NDA to the FDA for reproxalap in DED in mid-2022, pending results from TRANQUILITY-2, a dry eye disease safety trial, and regulatory input. Even if our trials are successful, we can provide no assurances that the FDA will accept our NDA for review. Moreover, even if the FDA does accept our NDA for review, there can be no assurance that the FDA will agree with our interpretation of the data, that the FDA will not require us to conduct additional clinical trials or provide additional data, or that the FDA will approve our NDA in a timely fashion, or at all.*

\*\*\*

*To generate revenue, we will depend on FDA approval and successful commercialization of our lead product candidate, reproxalap, for the treatment of dry eye disease. If we are unable to successfully conduct the TRANQUILITY-2 trial, prepare and timely submit the planned NDA, and obtain FDA approval, our ability to generate revenue will be significantly delayed.*

Our ability to generate revenue will depend on the successful development, regulatory approval and commercialization of reproxalap. *Based on our discussions with and our interpretation of feedback from the FDA, as well as data from our previously completed clinical trials in dry eye disease and the TRANQUILITY-2 trial, we currently plan to submit an NDA to the FDA for reproxalap for the potential treatment of dry eye disease in mid-2022, subject to positive clinical trial results, including results from a dry eye disease safety trial. There can be no assurance that we can prepare and submit an NDA in a timely manner or at all.*

226.    The foregoing statements were materially false and/or misleading because they couched such risks as "hypothetical" when, instead, such risks had already materialized.

227.    The 2021 10-K described the progress of the ADX-2191 NDA as follows:

In January 2021, we received from the FDA preliminary written comments in preparation for a Pre-IND ("Investigational New Drug") Type B meeting regarding ADX-2191 for the treatment of PVRL. *We believe the comments indicated that submission of a New Drug Application (NDA) for ADX-2191 for the treatment of PVRL may be possible without performing clinical trials. In the first quarter of 2021, we held a teleconference with the FDA to discuss the preliminary written comments and clarify the ADX-2191 NDA submission requirements for the treatment of PVRL. In July 2021, ADX-2191 received*

101

***orphan drug designation from the FDA for the treatment of PVRL. ADX-2191
has the potential to be the first drug approved to treat PVRL.***

228.    The foregoing statements were materially false and/or misleading because they
misrepresented or failed to disclose that (a) FDA approval of the ADX-2191 NDA could not be
obtained "without performing clinical trials"; (b) unlike an abbreviated new drug application
("ANDA"), where a generic manufacturer need not conduct clinical trials to demonstrate safety
and efficacy, and instead, need only show that a drug is pharmaceutically equivalent to the
reference-listed drug and that the generic version is bioequivalent to the reference-listed drug,
FDA approval of the ADX-2191 NDA required Aldeyra to demonstrate sufficient safety *and*
efficacy of ADX-2191 for PVRL; (c) Aldeyra did not have appropriate bridging studies to
provide an adequate basis for reliance upon the published literature it would submit to
demonstrate efficacy in connection with the ADX-2191 NDA, and; (d) as a result of the
foregoing, the ADX-2191 NDA would not gain FDA approval.

229.    On March 17, 2022, Aldeyra also held a public conference call to discuss its Q4
2021 results.  On the March 17, 2022 Call, Brady touted the Company's business and prospects,
stating,

> Our next set of catalysts relates to reproxalap, a first-in-class RASP modulator for
> the treatment of dry eye disease and what we believe has the potential to be the
> next novel entrant in the dry eye disease marketplace. Results from the Phase III
> TRANQUILITY-2 trial of reproxalap in dry disease are expected during the
> middle of this year. ***Pending the outcome of TRANQUILITY-2 and enrollment
> in the 12-month safety trial of reproxalap in dry eye disease patients. We plan to
> submit an NDA for reproxalap and dry disease after the completion of
> TRANQUILITY- 2.***
>
> The endpoint of the TRANQUILITY-2 trial will be met if either Schirmer test or
> ocular redness demonstrates statistical significance in favor of reproxalap over
> vehicle. ***We've also initiated 2 additional trials, a crossover dry eye disease
> chamber trial and a 1-day Schirmer test trial either of which could serve as
> pivotal trials in support of an NDA submission…***.

230.    On the March 17, 2022 Call, Brady touted the progress of Reproxalap NDA
submission and reiterated the breadth of the anticipated Reproxalap NDA submission, especially
in light of the two extra clinical trials Aldeyra had decided to conduct, stating,

*I'm thrilled to report that our CMC progress to our knowledge is superb. We've discussed CMC, specifically with the FDA. And at this point, I don't foresee any issues regarding CMC as it relates to commercial or registration batches, stability, et cetera.*

The safety trial is a significant undertaking for chronic drugs generally a 12-month safety trial is required per FDA dry disease guidance. As you know, 100 subjects are 100 patients are required to be exposed to the drug for 12 months at least. *The NDA can be submitted prior to the completion of the safety trial, but by the -- generally, by the 120-day update, all the final safety data, that is the 12-month data for those 100 patients that needs to be submitted in addition. I think at this point, we remain on track to be able to submit the NDA midyear for dry disease based on the current enrollment in the safety trial across the industry, not only in trial disease or in ocular diseases.* But broadly, we are experiencing some challenges in retaining patients in trials.

Enrollment has not been as difficult as we moved through various phases of COVID. *But as is the case with COVID broadly, I think that many people are evaluating life choices differently than they have in the past and retention, again, across the biotech industry and the clinical trial industry broadly is a challenge. Notwithstanding those comments, I still believe we're on track for a midyear NDA submission.*

Your questions about the crossover and the 1-day Schirmer test trial are good wins. *For sure, I think either trial could serve as a backup. But really, we're running those trials because they answer slightly different questions than what we've asked previously, in particular, the dry disease chamber crossover trial, which, as I mentioned … to our knowledge, has never been done before. As you know, the FDA considers the preponderance of evidence -- our position in submitting this NDA is that with reproxalap will come one of the most comprehensive NDA packages ever submitted for dry eye disease. The crossover trial, the Schirmer test trial are 2 examples of our efforts to expand the package to demonstrate the breadth of activity of the drug across not only a large number of patients, but different models and different trial designs.*

231.    The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that (a) the reproxalap for DED safety trial, which was required for submission of Reproxalap NDA, had been experiencing delays as a result of limited clinical trial staffing at trial sites; (b) the CMC data in connection with the Reproxalap NDA was deficient; (c) Aldeyra had initiated two additional clinical trials, the 1-day Schirmer Test Trial and the Crossover Trial, in the hopes that they could make up for known deficiencies in the

Reproxalap NDA, such as Aldeyra's failure to meet the symptom trials requirement; and, (d) as a result of the foregoing, Aldeyra was not "on track" to submit the Reproxalap NDA by mid-2022.

232.    On April 5, 2022, Aldeyra issued a press release entitled, "Aldeyra Therapeutics Announces Completion of Enrollment in Phase 3 TRANQUILITY-2 Trial in Patients with Dry Eye Disease". The April 5, 2022 PR stated,

> Per draft U.S. Food and Drug Administration (FDA) guidance, to be considered for regulatory approval in the United States, a product candidate for the treatment of dry eye disease must demonstrate efficacy in an objective sign in at least two clinical trials and efficacy in a subjective symptom in at least two clinical trials. ***To satisfy the symptom efficacy requirements, Aldeyra intends to submit two previously completed 12-week adequate and well-controlled symptom trials that pre-specified patient-reported ocular dryness score as a primary endpoint, the Phase 3 RENEW-Part 1 Trial and the Formulation Phase 2 clinical trial.***

> Aldeyra's previously announced Phase 2 clinical trial achieved the primary endpoint of ocular redness, an approvable sign of dry eye disease. ***Pending discussion with the FDA and the results of TRANQUILITY-2, Aldeyra may submit two pivotal trials for either ocular redness (Phase 2 and TRANQUILITY-2) or Schirmer test (TRANQUILITY and TRANQUILITY-2), or two trials for both signs (Phase 2, TRANQUILITY, and TRANQUILITY-2) if ocular redness and Schirmer test are achieved in TRANQUILITY-2.*** Either Phase 2 or Phase 3 clinical trials can be submitted as pivotal, provided that the trials are adequate and well-controlled.

> ***Pending enrollment of the ongoing 12-month safety trial of reproxalap in dry eye disease patients and the outcome of TRANQUILITY-2, Aldeyra's dry eye disease NDA submission is expected to occur mid-2022.***

233.    The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that (a) the reproxalap for DED safety trial, which was required for submission of Reproxalap NDA, had been experiencing delays as a result of limited clinical trial staffing at trial sites; (b) Aldeyra had not met the symptom efficacy trial requirements; (c) the Phase 3 RENEW Part 1 Trial had failed to meet each of its co-primary endpoints, and thus would not satisfy as a symptom trial required for FDA approval of the Reproxalap NDA; (d) Aldeyra had initiated two additional clinical trials, the 1-day Schirmer Test Trial and the Crossover Trial, in the hopes that they could make up for known deficiencies in the

Reproxalap NDA, such as Aldeyra's failure to meet the symptom trials requirement; and, (d) as a result of the foregoing, Aldeyra would not be able to submit the Reproxalap NDA by mid-2022.

234.    On May 5, 2022, Aldeyra filed with the SEC a Form 10-Q and held a public conference call that same day to discuss the Company's Q1 2022 results.  The May 5, 2022 10-Q repeated the same "hypothetical" risks to Aldeyra's business, revenue and prospects as provided by Aldeyra's 2021 10-K, which were materially false and/or misleading because though couched as "hypothetical", these risks had already materialized at the time of Defendants' statements.

235.    On the May 5, 2022 Call, when asked about Aldeyra's confidence its anticipated Reproxalap NDA submission, Brady stated,

> **Based on our conversations with the agency, we're quite confident in the strength of our NDA submission package. In fact, I would say, arguably, the package we intend to submit is the most comprehensive dry eye disease package ever submitted….**
>
> **The additional trials I mentioned, that is, the crossover chamber trial and the 1-day Schirmer test trial, are designed to back up TRANQUILITY-2. In the event that the data from TRANQUILITY-2 is for whatever reason, not clear, we will essentially have 2 more shots on goal to support the submission package. Broadly, as you know, Justin, the FDA considers the preponderance of evidence, and the stronger your package -- that is, the number of clinical trials, the number of patients tested and so forth -- the better your odds of approval.** And I think Aldeyra is in the very fortunate position of being able to run rapid 1- or 2-day clinical trials with nominal cost to support our NDA submission package. **And thus, I think running additional trials is a responsible and wise use of cash as we look to submit our dry eye disease package.**

236.    The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that (a) Aldeyra had not met the symptom efficacy trial requirements; (b) the Phase 3 RENEW Part 1 Trial had failed to meet each of its co-primary endpoints, and thus would not satisfy as a symptom trial required for FDA approval of the Reproxalap NDA; (c) Aldeyra had initiated two additional clinical trials, the 1-day Schirmer Test Trial and the Crossover Trial, in the hopes that they could make up for known deficiencies in the Reproxalap NDA, such as Aldeyra's failure to meet the symptom trials requirement; (d) Aldeyra intended to pool the results of multiple clinical trials, which pursuant to FDA guidance, would be

insufficient to demonstrate efficacy; and, (e) as a result of the foregoing, the Reproxalap NDA would not satisfy "the preponderance of the evidence" necessary to gain FDA approval.

237.    Further, on the May 5, 2022 Call, Brady stated that with respect to the Reproxalap NDA,

> *The safety trial remains on the critical path. The safety trial is the gating factor for the submission of the NDA.* As you know, the FDA requires 100 subjects, or 100 patients, to have been exposed to your commercial formulation at your commercially proposed dosing regimen for at least 12 months. We are masked as to how many patients are on drug versus vehicle, the safety trial is a 2:1 randomization, that is drug to vehicle. *However, based on the information we have to date, we believe that we remain on track for a midyear submission of the NDA.*

238.    The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that (a) the safety trial had been experiencing delays in patient enrollment due to limited clinical trial staffing at trial sites; (b) the safety trial was not "the gating factor for the submission of the NDA"; (c) Aldeyra had initiated two additional clinical trials in the hopes that they would make up for known deficiencies in the Reproxalap NDA, such as Aldeyra's failure to meet the symptom trials requirement; (d) as a result of the foregoing, Aldeyra was not "on track for a midyear submission of the NDA" for reproxalap for DED.

239.    On the May 5, 2022 Call, Brady also engaged in the following exchange with an analyst regarding commercialization of both reproxalap and ADX-2191:

> <Q - ELAINE KIM;BERENBERG CAPITAL MARKETS;EQUITY RESEARCH ASSOCIATE:> We just wanted to ask, with the convenience of ADX-2191 as a specific injection formulation of methotrexate, we were wondering if that would be enough to compete with the growing support methotrexate itself is getting. And a follow-up is, have you gotten any feedback or conversations with KOLs or payers?

> <A - TODD C. BRADY:> Thanks for focusing on 2191. It's a topic that I wish we had more time to discuss and more questions about. *The answer to your last question about feedback from payers is an absolute yes. We have been discussing with payers, not only reproxalap but ADX-2191, which we believe could be near NDA submission, and we intend to update on the regulatory*

**plans, particularly NDA submission plans for 2191, in the second half of this year.**

The convenience of a GMP product is one thing. I think the safety of a GMP product is another. Today, before methotrexate is injected in patients' eyes, save patients with proliferative vitreoretinopathy or patients with ocular lymphoma, the intravenous formulation of methotrexate has to be used. So, the vial of intravenous methotrexate is cracked open. A certain amount of the solution is drawn up into a syringe, and then that syringe is used to inject the eye. The problem with that process is that it allows for the introduction of contaminants, which when you're injecting into an eye, is potentially serious….So obviously, very serious consequences for contamination, which is more likely to occur with non-GMP product; that is, compounded product.

Oh, you had also asked about -- I also appreciate your question about the use of methotrexate these days. It's interesting, because methotrexate is already the standard of care in ocular lymphoma. ***What's more interesting is that the use of methotrexate is growing for the treatment of PVR, which made our Phase III GUARD trial difficult to enroll.*** As you recall, the GUARD trial was a randomized trial, where subjects, or patients, were either randomized to receive methotrexate or nothing, which is technically standard of care. ***It was difficult to convince our clinical sites and surgeons to randomize patients to nothing because of the ongoing belief of investigators that methotrexate is active for PVR.***

240.    The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that (a) the Phase 3 GUARD Safety Trial experienced delays in patient enrollment due to the COVID-19 pandemic, and due to limited clinical trial staffing at trial sites, and some patients electing to delay surgery; (b) the ADX-2191 NDA would not gain FDA approval without Aldeyra conducting clinical trials and Aldeyra had no plans to conduct any clinical trials of ADX-2191 to treat PVRL; (c) the ADX-2191 NDA could not gain FDA approval based on published literature; (d) that methotrexate had been recognized as the standard of care for PVRL for years was not sufficient to demonstrate the safety and efficacy of the ADX-2191 NDA needed for FDA approval.

241.    On May 18, 2022, Aldeyra issued a press release entitled, "Aldeyra Therapeutics Announces that Post-Hoc Analysis Using Computer Automated Grading of Phase 3 TRANQUILITY Trial Digital Photography Demonstrated Statistical Significance in Favor of

Reproxalap Over Vehicle for Primary Endpoint of Ocular Redness". The May 18, 2022 PR stated,

> *For satisfaction of symptom efficacy requirements, Aldeyra intends to submit two previously completed adequate and well-controlled 12-week symptom trials that pre-specified patient-reported ocular dryness score as a primary endpoint, the Phase 3 RENEW-Part 1 and Formulation Phase 2 clinical trials. Pending discussion with the FDA, for satisfaction of the sign efficacy requirements, Aldeyra intends to submit the ocular redness results from the Phase 3 TRANQUILITY and Phase 2 dry eye chamber trials. If the primary endpoint of Schirmer test is achieved in the Phase 3 TRANQUILITY-2 trial, and pending discussion with the FDA, Aldeyra intends to submit Schirmer test results from both TRANQUILITY trials as evidence for achievement of an additional objective sign of dry eye disease….*

> *Pending discussion with the FDA and enrollment of the ongoing 12-month safety trial in dry eye disease patients, NDA submission for dry eye disease is expected to occur mid-2022.*

242.    The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that (a) the reproxalap for DED safety trial, which was required for submission of Reproxalap NDA, had been experiencing delays as a result of limited clinical trial staffing at trial sites; (b) Aldeyra had not met the symptom efficacy trial requirements; (c) the Phase 3 RENEW Part 1 Trial had failed to meet each of its co-primary endpoints, and thus would not satisfy as a symptom trial required for FDA approval of the Reproxalap NDA; (d) Aldeyra had initiated two additional clinical trials, the 1-day Schirmer Test Trial and the Crossover Trial, in the hopes that they could make up for known deficiencies in the Reproxalap NDA, such as Aldeyra's failure to meet the symptom trials requirement; (e) Aldeyra could not pool the results from multiple clinical trials to meet its efficacy requirements for FDA approval of the Reproxalap NDA; and, (f) as a result of the foregoing, Aldeyra would not be able to submit the Reproxalap NDA by mid-2022.

243.    On June 8, 2022, Aldeyra issued a press release entitled "Aldeyra Therapeutics Achieves Primary Endpoint in Phase 3 TRANQUILITY-2 Trial and Intends to Submit New Drug Application for Symptoms and Three Sign Endpoints of Dry Eye Disease" and held a public conference call to discuss the results of the Phase 3 TRANQUILITY-2 Trial. On the June

8, 2022 Call, Brady touted the progress of the clinical trials conducted for submission with the

Reproxalap NDA, stating,

> ***Today marks a monumental and broadly significant milestone for Aldeyra as we announced this morning achievement of both primary endpoints of the Phase III TRANQUILITY-2 trial, which we expect to conclude the pivotal clinical development efficacy program of reproxalap for the treatment of dry eye disease. To our knowledge, the TRANQUILITY-2 results could facilitate the first new drug application in dry eye disease that includes pivotal trials for improvement in symptoms as well as 3 distinct objective signs, potentially representing the most comprehensive package submitted for this condition to date.***

> ***The 5 late-stage adequate and well-controlled trials that we intend to submit to the NDA as pivotal offer an unparalleled assessment of both acute and chronic designs, suggesting rapid and sustained activity repeated across a number of clinical endpoints.*** We remain impressed with the activity of reproxalap in ocular inflammation demonstrated to date….

> ***While we believe that the data presented here may be sufficient to satisfy the efficacy requirements for dry eye disease NDA submission, which, with certain exceptions based on FDA draft guidance, requires 2 positive symptom trials and 2 positive sign trials, the secondary endpoint of Schirmer test after a single day of dosing in addition to a post-hoc Schirmer test responder analysis were also positive in the TRANQUILITY trial as is shown on Slide 4.*** The Schirmer test, a measure of ocular tear production, is the most commonly utilized objective sign for FDA dry eye disease marketing approvals. And according to draft dry eye disease FDA guidance, the Schirmer test responder analysis of 10 millimeters or greater, if demonstrated in 2 adequate and well-controlled clinical trials, may be solely sufficient for demonstration of efficacy given that the responder analysis is a surrogate for clinically relevant symptomatic improvement.

> ***Thus, on May 24 … we announced that we had changed the primary endpoint of TRANQUILITY-2 to focus exclusively on the Schirmer test. As a result, positive data in TRANQUILITY-2 would then allow for a potential NDA submission of symptoms, redness, Schirmer test scores and possibly the Schirmer test responder analysis representing an unprecedented demonstration of drug activity that to our knowledge has not been previously submitted to a dry eye disease NDA….***

> ***With the positive results of TRANQUILITY-2, we believe that the clinical efficacy requirements for a potential dry eye disease NDA submission have been met. As is summarized on Slide 7, we intend to submit an NDA covering symptoms, ocular dryness and 3 signed endpoints, ocular redness, Schirmer test and Schirmer test responder analysis, across 5 adequate and well-controlled clinical trials.*** The submitted clinical data is expected to encompass acute as soon

as a single day of dosing and chronic up to 12-week assessments, potentially offering unparalleled analysis of rapid and sustained activity across a combination of challenge and field-based assessments.

If approved, reproxalap has the potential to be the first dry eye disease drug with at least two labeled objective signs. ***With a comprehensive in what we believe to be a compelling package in hand, a type B pre-NDA meeting is expected to be held with the FDA in the third quarter of 2022 followed by a potential NDA submission soon thereafter. Aside from the 12-month safety trial, which remains on track relative to prior guidance, the only other active clinical trial for reproxalap in dry eye disease is a randomized, double-masked crossover dry eye chamber trial, where subjects receive both reproxalap and vehicle with a 2-week washout period in between treatments.***

***Enrollment is substantially complete in the crossover trial, which is intended to be adequate and well controlled and, if positive, is expected to be submitted to the potential NDA as a supportive trial.***

244.    The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that (a) Aldeyra's data was not "sufficient" to meet the "clinical efficacy requirements" for the Reproxalap NDA submission; (b) the Phase 3 RENEW Part 1 Trial, which Aldeyra intended to submit with the Reproxalap NDA as a symptom trial had failed to meet each of its co-primary endpoints and thus would not fulfill one of Aldeyra's symptom trial requirements; (c) Aldeyra had initiated two additional trials, the 1-Day Schirmer Test Trial and the Crossover Trial, not merely for "supportive" purposes, and, instead, Aldeyra had initiated the trials in the hopes that their results might make up for deficiencies in the Reproxalap NDA, such as Aldeyra's failure to achieve 2 adequate and well-controlled symptom trials; (f) the results of the Phase 3 TRANQUILITY-2 Trial did not "conclude the pivotal clinical development efficacy program of reproxalap for the treatment of dry eye disease[,]" because Aldeyra needed to achieve at least one more adequate and well-controlled positive symptom trial; (g) the reproxalap for DED safety trial had been experiencing delays in patient enrollment due to limited clinical trial staffing at trial sites; (h) Aldeyra had changed the primary endpoint of the Phase 3 TRANQUILITY-2 Trial to Schirmer Test in the hope that if met, the FDA would consider the trial as a both a symptom trial and a sign trial and would overlook the deficiencies in the Reproxalap NDA; and, (i) as a result of the foregoing, the "5 late-stage adequate and well-

controlled trials" that Aldeyra intended to submit as "pivotal" in connection with the Reproxalap NDA would not be sufficient to gain FDA approval.

245.    On the June 8, 2022 Call, Brady engaged in the following exchange with an analyst regarding Aldeyra's upcoming pre-NDA meeting with the FDA in connection with the Reproxalap NDA, and the significance of the Crossover Trial:

> <Q - YIGAL DOV NOCHOMOVITZ, DIRECTOR, CITIGROUP INC., RESEARCH DIVISION:> I just had 3 quick questions. The first one is, is there any difference in clinical interpretation between the basic Schirmer's test and then the Schirmer's responder proportion test or are those distinctions mainly in the purview of FDA for regulatory determination?
>
> Second is regarding the pre-NDA meeting in the third quarter. Could you just help us understand what are the outstanding questions that you'd like clarity from at that meeting?
>
> And then last, just quickly remind us why you still need to do that dry eye chamber crossover trials? Correct me if I'm wrong, but I thought that, that was just a backup trial in the very unlikely event that TRANQUILITY-2 didn't work.
>
> <A - TODD C. BRADY:> …. We had never, before TRANQUILITY-2, demonstrated the achievement of Schirmer test as a primary endpoint. And the notion that we would achieve Schirmer test as a primary endpoint in TRANQUILITY-2 had been questioned. I think your simulation analysis put some of those questions to bed. We're appreciative, and you are absolutely right.
>
> The question you had about difference between Schirmer test and Schirmer responder test is an excellent one. Some years ago, there was a paper published on the Schirmer test responder analysis, arguing that patients that responded with a 10-millimeter or more increase also demonstrated symptomatic improvement. And thus, that kind of change in Schirmer test is considered to be clinically relevant, which is why, according to draft dry eye disease guidance, the Schirmer test responder analysis on its own may be sufficient for demonstration of efficacy in a dry eye disease NDA….
>
> ***The fact that we've now shown Schirmer and the responder analysis and redness and symptoms, I think, comprises a compelling NDA package that, as I said in my prepared comments, is absolutely unparalleled….***
>
> ***The crossover trial was indeed a trial performed, at least in part, as you said, Yigal, as an insurance policy. The reason for the crossover trial is that at least in allergen chambers we've shown remarkably consistent results with symptoms in ocular redness and other measures in allergy when patients are crossed over. The statistical advantage of crossing patients over, that is patients receive both***

*drug and vehicle separated by a washout period, is that inter-subject variability is reduced….*

***Because the trial has substantially completed enrollment, we're in a position now where those data will be submitted to the NDA. NDA submissions require a disclosure of any clinical data that are -- have been generated or will soon be generated, and this crossover trial is no exception.*** As we mentioned in our press release, we expect to see the crossover data in Q3, I would even add, early Q3, consistent with the time frames that we've outlined and consistent with our prior guidance.

246.    On the June 8, 2022 Call, Brady further stated,

***…[T]he FDA makes decisions by law based on the preponderance of evidence. As we have tried to make the point today in the press release and in the slides and in my prepared comments, we believe what we have to be the most comprehensive in terms of breadth NDA package ever for dry eye disease. And thus, preponderance of evidence arguments are much easier to make both from our standpoint and from the regulatory standpoint in theory.*** I mentioned that we have acute trials up to one day, as soon as one day. We have chronic trials as long as 12 weeks. We have a safety trial of 12 months. So we're literally spanning the gamut duration of dosing from one day to a year. We have field-based studies that is diary-based studies where subjects or patients go home, take the drug, report their symptoms, come into the clinic, are assessed by investigators.

And we also have challenge-based studies. These are the dry eye chamber studies where patients are exposed to a noxious high air flow, low or no humidity environment. ***The crossover trial is yet another kind of trial design that, I think, if positive in any way, would be highly supportive.*** In fact, it's difficult for me, having been in clinical development now for almost 30 years, to think of another way of testing this drug in terms of clinical trial design. ***So for us, the crossover trial was the final piece of the puzzle. As Yigal pointed out in his question, technically, the crossover trial is not needed. As of some weeks ago, we believe that we have met the efficacy requirements for NDA submission. As of today, we believe we have met NDA efficacy requirements for submission for symptoms and 3 different sign endpoints, and thus the outcome of the crossover trial we have deemed to be supportive.***

247.    The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that (a) Aldeyra had not "met the efficacy requirements for NDA submission"; (b) Aldeyra needed to conduct at least one additional adequate and well-controlled positive symptom trial to gain FDA approval of the Reproxalap NDA; (c) the

Crossover Trial had been conducted not as an "insurance policy" to support an already-adequate NDA, but instead, had been conducted in the hopes that if successful, it would make up for other known deficiencies in the NDA, including Aldeyra's failure to conduct two positive symptom trials; (d) Aldeyra could not satisfy its efficacy requirements by pooling data from multiple clinical trials together; (e) Aldeyra had changed the primary endpoint of the Phase 3 TRANQUILITY-2 Trial to Schirmer Test in the hope that if positive, the trial would help remedy deficiencies in Aldeyra's other sign and symptom trials, and, (e) as a result of the foregoing, Aldeyra would not be able to submit evidence sufficient to satisfy the "[t]he preponderance of evidence" required for FDA approval of the Reproxalap NDA.

248.    On the June 8, 2022 Call, Brady further reassured investors about the progress of the safety study and the status of Aldeyra's CMC preparations in connection with the Reproxalap NDA.  Specifically, Brady stated,

> As I said before, I think many investors forget about safety trials and CMC preparations, which are obviously critical to regulatory authorities and to NDA submissions and to marketing approval. ***The classic chronic 12-week -- sorry, 12-month safety trial is what is specified in draft FDA guidance for dry eye disease. And as I mentioned in my prepared comments, the safety trial remains on track for an NDA sufficient along the timing of what I have suggested today, which is third quarter.*** We don't know exactly which patient is in which group, drug or vehicle. That trial is masked.
>
> So by and large, I think we're on track with the safety trial. We do not have any outsized dropout rates. If anything, and this is based on our best guess of masked data, more subjects are dropping out in vehicle group than the drug group, and that's probably because many patients do not derive benefit from vehicle treatment.
>
> But those data are to be determined and they will be subject to unmasking, of course. The CMC portion is important. And ***I think we have put together a gold-plated CMC package for the agency. The drug product is stable, and it is -- has been sufficiently packaged. All of that has been characterized. We've had a preliminary pre-NDA type meeting regarding CMC questions, which was, in our view, remarkably successful. And I don't see anything changing along those lines regarding the CMC.***

249.    The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that (a) Aldeyra's CMC package was deficient and not

"gold-plated", and (b) the safety study was not on track and had been experiencing delays in patient enrollment due to limited clinical trial staffing at trial sites.

250.    On the June 8, 2022 Call, when asked about whether Aldeyra hit the secondary sign endpoint of ocular redness in the Phase 3 TRANQUILITY-2 Trial, Brady admitted the secondary endpoints had not been achieved, but reassured investors about the strength and comprehensiveness of the Reproxalap NDA, stating:

> The secondary endpoints were not achieved in TRANQUILITY-2. *The good news is we have now 2 positive symptom trials. We have 2 positive redness trials. We have 2 positive Schirmer test trials. We have 2 positive Schirmer test responder trials …. [T]his is the most comprehensive package, to our knowledge, ever submitted to a dry eye disease NDA. The preponderance of evidence, in our view, is absolutely overwhelming.* And we're focused on the NDA submission, obviously, at this point.

251.    The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that (a) Aldeyra did not have "2 positive symptom trials"; (b) to the extent Aldeyra had achieved "2 positive redness trials", "2 positive Schirmer test trials" and "2 positive Schirmer test responder trials", this claim was based on a pooled data where such signs were set as secondary endpoints and included post-hoc analyses; (c) Aldeyra would not gain FDA approval of the Reproxalap NDA without conducting an additional positive adequate and well-controlled symptom trial; (d) Aldeyra could not satisfy its efficacy requirements by pooling data from multiple clinical trials; and, (e) as a result of the foregoing, Aldeyra would not be able to submit evidence sufficient to satisfy the "[t]he preponderance of evidence" required for FDA approval of the Reproxalap NDA.

252.    On July 12, 2022, Aldeyra issued a press release and also held a public conference call to report the topline results from the Crossover Trial of reproxalap for dry eye disease.  On the July 12, 2022 Call, Brady touted the results of the Crossover Trial, stating,

> Overall, in a single trial, we claim success for all 3 dry eye disease sign endpoints that we intend to submit as pivotal to a new drug application. And at least by extension of the responder analysis results, symptomatic improvement occurring as soon as a single day of drug administration. To our knowledge, the Crossover outcomes represent the first time that an adequate and well-controlled trial

resulted in claims for success across 3 dry eye disease endpoints. In addition, to our knowledge, we've demonstrated for the first time the enhanced statistical power of a Crossover design in dry eye disease, at least for a drug candidate with a potentially rapid mechanism of action…. ***Based on previously completed Phase II and Phase III clinical trials, including the Phase III TRANQUILITY and TRANQUILITY-2 trials, we've disclosed that we intend to submit a dry eye disease new drug application or NDA, based on 2 trials each for symptomatic improvement and improvement in 3 objective signs of dry eye disease, ocular redness, Schirmer test and the Schirmer test responder analysis.*** All 3 endpoints are specifically noted in the draft FDA guidance for dry eye disease or have been successfully used as a basis for approval by other companies.

***The Crossover trial … was designed to support the clinical data previously announced and also to be an adequate and well-controlled trial that could be submitted as pivotal for the 3 multiplicity-controlled dry eye disease objective signs that we intend to submit to the NDA.*** Inherent in dry eye disease is substantial patient-to-patient variability, meaning that one patient may respond to any therapy markedly differently than another patient possibly due to unmeasurable baseline differences in disease characteristics….

Our regulatory guidance remains unchanged. We intend to submit the dry disease NDA this quarter following a pre-NDA meeting that has been scheduled. ***And as we've disclosed previously, we believe that the NDA clinical package is expected to encompass acute and chronic assessments as well as parallel group and Crossover clinical designs, offering what is expected to be an unprecedented breadth and unparalleled analysis of rapid and sustained activity of reproxalap across a combination of challenge and field-based assessments.***

253.    On the July 12, 2022 Call, Brady further touted the results of the Crossover Trial, stating,

I agree that, at least in my opinion, ***approvability has been put to bed. The notion that reproxalap is active and is safe across a variety of different trial designs, acute and chronic, chamber, field-based studies, et cetera, I think, is solid.*** How we highlight the Crossover trial in the actual submission will depend in part on the pre-NDA meeting that's been scheduled. However, I think we can all agree at this point that the Crossover results will be largely front and center….

I would suggest that the Schirmer test results, the redness results and the Schirmer test responder results would be submitted as pivotal. From TRANQUILITY-2, we had prespecified primaries that included Schirmer test and a Schirmer test responder analysis from the Phase II trial. The last year, we had a prespecified primary using ocular redness. So I think ***the combination of the Phase II trial, TRANQUILITY-2 and the Crossover results are more or less definitive for 3 different signs of dry eye disease. Added to that are the 2 12-week symptom trials that we've disclosed for some time now.***

115

254.    The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that (a) "the five adequate and well-controlled clinical trials" that Aldeyra intended to submit in support of the Reproxalap NDA were insufficient to demonstrate efficacy, because, inter alia, Aldeyra had only achieved one of the two required symptom trials; (b) Aldeyra would need to conduct at least one additional adequate and well-controlled trial demonstrating reproxalap's improvement on the symptoms of DED to gain FDA approval of reproxalap for DED; (c) the pooled results from multiple clinical trials would not satisfy the FDA's efficacy requirements; and, (d) the Crossover Trial had been conducted and would be submitted as one of the five pivotal trials supporting the Reproxalap NDA, in the hopes that it would make up for known deficiencies in the submission, including that the Phase 3 RENEW Part 1 Trial had failed to meet each of its co-primary endpoints; and (e) as a result of the foregoing, Defendants had no reasonable basis to claim that "approvability has been put to bed."

255.    On August 5, 2022, Aldeyra held a public conference call to discuss the Company's Q2 2022 earnings and corporate highlights.    On the Aug. 5, 2022 Call, Brady engaged in the following exchange with an analyst about the ADX-2191 NDA:

> <Q - CATHERINE CLARE NOVACK:> For 2191 in PVRL, can you clarify FDA's feedback on the NDA submission without performing clinical trials? And what additional post-marketing requirements you might anticipate should you be able to submit the NDA?
>
> <A - TODD C. BRADY:> For sure. The ADX-2191 program in ocular lymphoma is particularly interesting. ***In that, the FDA has told us at least, in writing, that clinical trials are not required for NDA submission in ocular lymphoma. The reason for that is that the active ingredient of 2191, which is methotrexate has been used for years, decades as an intravitreal injection to treat ocular lymphoma. So there is a tremendous amount of efficacy data available in the literature, which would form the basis for the NDA submission.***
>
> ***What the FDA rightly wants to see is an appropriate amount of stability and safety data on ADX-2191, which is a particular preparation of methotrexate.*** As I mentioned in my prepared remarks, 2191, that we're aware, is the only vitreous compatible formulation of methotrexate. Today, you can compound methotrexate, which principally involves taking the intravenous form of methotrexate and

injecting into the eye. There are numerous challenges with that. First of all, the concentration is wrong, a high-volume injection must be used. As you know, Catherine, the eyeball is a confined space and does not have unlimited capacity for high-volume injections. Secondly, there's always the risk for infection.

So I think the agency and physicians are interested in a GMP preparation of methotrexate. And that is exactly what ADX-2191 is designed to be, while at the same time, mimicking the pH, the tonicity, the density and so forth of the vitreous.

256.    On the Aug. 5, 2022 Call, Brady engaged in the following exchange with an analyst regarding what Aldeyra anticipated the FDA would be most focused on with respect to the ADX-2191 NDA:

> <Q - I-EH JEN:> And the next question is probably a follow-up from the previous one, which is in [PVRL] discussion you will have with the FDA are mostly centered around the PK and the maybe PD to see the equivalency -- something of equivalency or something of that nature to decide what the sort of filing pathway or process may be?
>
> <A - TODD C. BRADY:> Yale, I don't think it's a PK/PD question. I think it's more of a safety question. ***We're well aware of the PK/PD of compounded methotrexate. The concentration is obviously different for ADX-2191, but the amount of drug should be roughly the same because we're injecting less volume at a higher concentration versus the intravenous compounding that's injected into the eye is more volume at a lower concentration. The net result is the same amount of drug on a weight basis. So I don't really think PK/PD is going to matter.***
>
> ***What I think will matter is safety. Because the formulation is novel in that, to our knowledge, methotrexate has never been formulated to mimic the vitreous.*** Now I would say the formulation doesn't have fancy bells and whistles that I think would raise eyebrows at the agency. At the same time, as I mentioned, the various characteristics of the vitreous that have been matched, pH being one, density being another, tenacity being another, that are important with regard to intravitreal injection. ***And my guess is the agency just wants to confirm the safety of that formulation.***

257.    The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that (a) Aldeyra could only rely on published literature to the extent that FDA-approved forms of methotrexate and ADX-2191 for PVRL were the same—to the extent that FDA-approved methotrexate and ADX-2191 for PVRL differed, and the two

drugs differed in material aspects, such as in formulation and concentration—Aldeyra would have to provide sufficient bridging data to justify its reliance on published literature, which it did not have; (b) unlike an abbreviated new drug application ("ANDA"), where a generic manufacturer need not conduct clinical trials to demonstrate safety and efficacy, and instead, need only show that a drug is pharmaceutically equivalent to the reference-listed drug and that the generic version is bioequivalent to the reference-listed drug, FDA approval of the ADX-2191 NDA required Aldeyra to demonstrate sufficient safety and efficacy of ADX-2191 for PVRL, and; (c) as a result of the foregoing, the FDA would not approve the ADX-2191 NDA until Aldeyra conducted clinical studies demonstrating the safety and efficacy of ADX-2191 for PVRL.

258.    On the Aug. 5, 2022 Call, Brady also reassured investors that the dry eye safety study remained on track for purposes of the Reproxalap NDA submission.  Specifically, Brady stated,

> ***The safety trial does remain on track.*** One of the questions we'll be asking at the pre-NDA meeting is how does the agency want to see those data, in what format and so forth. But at this point, prior to that meeting, we're quite thrilled actually with the progress of the safety trial. It's always good news when patients are on drug for 12 months, and they stay on drug.
>
> It's often difficult to keep patients on anything for 12 months, particularly with diseases like dry eye, which are episodic. As you know, dry eye gets better in the summer because it's more humid. It gets worse in the spring, and it gets worse in the fall to some extent in the winter. ***But to our knowledge, we've been able to maintain a healthy number of patients on reproxalap for 12 months, which is always a very good sign. Safety aside, it's always a good sign. So we're pleased with the progress. And again, heading into the pre-NDA meeting, we think we're right on track with the safety trial.***

259.    The foregoing statements were materially false and/or misleading because the safety trial was not "on track" and had been experiencing delays in patient enrollment due to limited clinical trial staffing at trial sites, and thus, Aldeyra would not be able to submit the Reproxalap NDA in accordance with its stated timeline.

260.    On September 14, 2022, Aldeyra issued a press release entitled, "Aldeyra Therapeutics Announces Positive Dry Eye Disease Pre-NDA Meeting with the FDA and Highlights Upcoming Corporate Milestones".  The Sept. 14, 2022 PR highlighted the following corporate highlights:

261.    The Sept. 14, 2022 PR further stated,

[Aldeyra] today announced that, following the recent receipt of official minutes from its pre-NDA (New Drug Application) meeting with the U.S. Food and Drug Administration (FDA), the Company remains on schedule to submit an NDA in the fourth quarter of 2022 requesting marketing approval of the novel RASP modulator reproxalap, an investigational new drug, for the treatment of dry eye disease.

*"Based on the outcome of our pre-NDA meeting, we believe that we have aligned with the FDA on the content of the regulatory package that will support what we expect to be a uniquely comprehensive NDA submission for the treatment of dry eye disease, encompassing data demonstrating improvement that may occur within minutes of drug administration in symptoms and three different objective signs,"* stated Todd C. Brady, M.D., Ph.D., Aldeyra's President and Chief Executive Officer….

*Consistent with prior guidance, with results from five adequate and well-controlled completed clinical trials, Aldeyra intends to submit the NDA with data for ocular dryness symptom score, ocular redness, Schirmer test, and Schirmer test ≥10 mm responder analysis. The NDA efficacy package is expected to include activity ranging from within minutes of drug administration to up to 12 weeks of treatment, crossover and parallel-group clinical trial designs, and assessment in dry eye chamber challenge and natural environment settings.*

262.    The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that (a) "the five adequate and well-controlled clinical trials" that Aldeyra intended to submit in support of the Reproxalap NDA were insufficient to demonstrate efficacy, because, inter alia, Aldeyra had only achieved one of the two required symptom trials; (b) Aldeyra would need to conduct at least one additional adequate and well-controlled trial demonstrating reproxalap's improvement on the symptoms of DED to gain FDA approval of reproxalap for DED; and, (c) the pooled results from multiple clinical trials would not satisfy the FDA's efficacy requirements.

263.    On November 10, 2022, Aldeyra issued a press release entitled, "Aldeyra Therapeutics Reports Third-Quarter 2022 Financial Results and Corporate Highlights".   The Nov. 10, 2022 PR noted the following corporate highlights and stated,

> *"Now with two product candidates[,] [reproxalap for DED and ADX-2191 for PVRL,] that could generate revenue as soon as next year, Aldeyra remains a leader in the development of systems-based therapeutic approaches for the treatment of diseases characterized by inflammation,"* stated Todd C. Brady, M.D., Ph.D., President and CEO of Aldeyra.

> **Recent Corporate Highlights**

> • **Pre-NDA Meeting with the FDA for Reproxalap in Dry Eye Disease:** Following the receipt of official minutes from its pre-NDA meeting with the FDA, Aldeyra remains on schedule to submit an NDA requesting marketing approval of the novel RASP modulator reproxalap in the fourth quarter of 2022. *With results from five adequate and well-controlled completed clinical trials, Aldeyra intends to submit the NDA with data for ocular dryness symptom score, ocular redness, Schirmer test, and Schirmer test ≥10 mm responder analysis. The NDA efficacy package is expected to include activity ranging from within minutes of drug administration to up to 12 weeks of treatment, crossover and parallel-group clinical trial designs, and assessment in dry eye chamber challenge and natural environment settings.* In addition to efficacy data, Aldeyra plans to submit up to 12 months of reproxalap safety data….

264.    Also on November 10, 2022, Aldeyra held a public conference call to discuss the Company's Q3 2022 results.   On the Nov. 10, 2022 Call, Brady touted Aldeyra's progress towards commercialization for reproxalap for dry eye disease and ADX-2191.   Specifically, Brady stated,

> *Today, I'd like to share with you the progress we've made in advancing our lead precommercial product candidates, reproxalap and ADX-2191, toward regulatory approval.* Individually, these products have the potential to provide us with unique revenue streams, while together, they represent an opportunity to build a formidable ocular franchise, encompassing both large and rare retinal diseases that are significantly underserved by currently available treatments. The success to date in developing reproxalap and ADX-2191 and the commercial potential of both product candidates serve as evidence of Aldeyra's position as a leader in the development of systems-based therapies for diseases characterized by inflammation.

Leading off with reproxalap. In September, we had a successful pre-NDA meeting with the U.S. Food and Drug Administration, gaining alignment on the key aspects of the planned NDA submission. ***In the fourth quarter of 2022, we plan to submit what we believe will be the most comprehensive regulatory package ever for a dry eye disease drug candidate. With results based on 5 adequate and well-controlled completed clinical trials, we intend to submit the NDA with data for ocular dryness symptom score, ocular redness, Schirmer test, and Schirmer test greater than or equal to 10 millimeter responder analysis.***

***The NDA efficacy package is expected to include activity ranging from within minutes of drug administration to up to 12 weeks of treatment, crossover and parallel group clinical trial designs and assessment in dry eye chamber challenge and natural environment settings***….

***Several planned milestones are approaching for ADX-2191, our pre-commercial product candidate for rare retinal disease. ADX-2191 is the first sterile non-compounded formulation of methotrexate designed to meet the unique requirements of intravitreal administration.*** It is intended to be vitreous compatible and optimized for excipient composition, viscosity, density, tonicity, pH, active ingredient concentration and volume of administration….

***Our ADX-2191 platform is targeting 3 indications, all of which have received U.S. FDA orphan drug designation. Primary vitreoretinal lymphoma is a rare, aggressive and fatal cancer that is diagnosed in approximately 300 to 600 patients in the United States per year.*** Proliferative vitreoretinopathy, or PVR, is a sight-threatening condition and the leading cause of failure of retinal reattachment surgery that affects approximately 4,000 patients in the U.S. per year. And retinitis pigmentosa is a group of rare genetic eye diseases characterized by cell death and loss of vision, affecting an estimated 82,000 individuals in the United States and approximately 1 in 4,000 people worldwide.

We've scheduled a pre-NDA meeting with the FDA in the fourth quarter of 2022 to discuss ADX-2191 for the treatment of primary vitreoretinal lymphoma. Pending the results of the pre-NDA meeting, NDA submission may occur as soon as the end of 2022.

265.   The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that (a) "the five adequate and well-controlled clinical trials" that Aldeyra intended to submit in support of the Reproxalap NDA were insufficient to demonstrate efficacy, because, inter alia, Aldeyra had only achieved one of the two required symptom trials; (b) Aldeyra would need to conduct at least one additional adequate and well-controlled trial demonstrating reproxalap's improvement on the symptoms of DED to gain FDA

approval of reproxalap for DED; (c) the pooled results from multiple clinical trials would not satisfy the FDA's efficacy requirements; (d) Aldeyra expected to submit the ADX-2191 NDA as early as the end of 2022 because it would not be conducting any clinical trials, which it was required to do in order to demonstrate the safety and efficacy of ADX-2191 for PVRL needed for FDA approval; and, (e) as a result of the foregoing, Aldeyra did not have "two product candidates that could generate revenue as soon as next year," and Aldeyra was not "advancing [its] lead precommercial product candidates, reproxalap and ADX-2191, toward regulatory approval."

266.    On November 29, 2022, Aldeyra issued a press release entitled "Aldeyra Therapeutics Submits New Drug Application to the U.S. Food and Drug Administration for the Treatment of Signs and Symptoms of Dry Eye Disease".  The Nov. 29, 2022 PR stated,

> (Aldeyra) today announced the submission of a New Drug Application (NDA) to the U.S. Food and Drug Administration (FDA) for topical ocular reproxalap, an investigational new drug candidate, for the treatment of signs and symptoms of dry eye disease.
>
> ***The NDA submission is supported by safety and efficacy data from five adequate and well-controlled clinical trials encompassing data for ocular dryness symptom score, ocular redness, Schirmer test, and Schirmer test ≥10 mm responder analysis. The regulatory package includes activity ranging from within minutes of drug administration to up to 12 weeks of treatment, crossover and parallel-group clinical trial designs, and assessment in dry eye chamber challenge and natural environment settings….***
>
> ***"The NDA submission for reproxalap is, to our knowledge, the most comprehensive regulatory package ever for a dry eye disease drug candidate,"*** stated Todd C. Brady, M.D., Ph.D., Aldeyra's President and Chief Executive Officer. "With data suggesting activity within minutes of administration, reproxalap could provide an important treatment option for the millions of dry eye patients who generally regard currently available therapies as inadequate."

267.    The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that (a) "the five adequate and well-controlled clinical trials" supporting the Reproxalap NDA were insufficient to demonstrate efficacy, because, inter alia, the Phase 3 RENEW Part 1 Trial, which Aldeyra had submitted as one of its symptom trials,

failed to meet each of its co-primary endpoints, and the Crossover Trial, which Aldeyra also submitted as one of the five pivotal trials in support of the Reproxalap NDA, would not count as one of the required symptom trials because it had set symptoms solely as a secondary endpoint; (b) Aldeyra would need to conduct at least one additional adequate and well-controlled trial demonstrating reproxalap's improvement on the symptoms of DED to gain FDA approval of reproxalap for DED; and, (c) the pooled results from multiple clinical trials would not satisfy the FDA's efficacy requirements.

268.    On December 1, 2022, Aldeyra issued a press release entitled, "Aldeyra Therapeutics Announces Positive Primary Vitreoretinal Lymphoma Pre-NDA Meeting with the FDA". The Dec. 1, 2022 PR noted the following corporate highlights,

> [F]ollowing the recent receipt of official minutes from its pre-NDA (New Drug Application) meeting with the U.S. Food and Drug Administration (FDA), the Company plans to submit an NDA as soon as the end of 2022 for marketing approval of the investigational drug candidate ADX-2191 for the treatment of primary vitreoretinal lymphoma….
>
> ADX-2191, which has received FDA Orphan Drug Designation for the treatment of primary vitreoretinal lymphoma, is a novel, vitreous-compatible formulation of methotrexate. ***The planned NDA submission is expected to include a combination of published literature on the safety and efficacy of methotrexate for the treatment of primary vitreoretinal lymphoma and safety data from the recently completed Phase 3 GUARD Trial of ADX-2191 in proliferative vitreoretinopathy. During the Phase 3 GUARD Trial, no safety signals were observed, and ADX-2191 was well tolerated***….
>
> Based on the pre-NDA meeting minutes, Aldeyra intends to request Priority Review designation, which reduces the review period in which the FDA aims to take action on an NDA to within 6 months (compared to 10 months under standard review). The designation is intended to direct overall attention and resources to the evaluation of applications for drugs that, if approved, would represent significant improvements in the safety or effectiveness of the treatment, diagnosis, or prevention of serious conditions when compared to standard applications.

269.    On December 21, 2022, Aldeyra issued a press release entitled, "Aldeyra Therapeutics Submits New Drug Application to the U.S. Food and Drug Administration for

ADX-2191 for the Treatment of Primary Vitreoretinal Lymphoma". The Dec. 21, 2022 PR stated,

> (Aldeyra) today announced the submission of a New Drug Application (NDA) to the U.S. Food and Drug Administration (FDA) for ADX-2191 (methotrexate injection, USP), an investigational drug candidate, for the treatment of primary vitreoretinal lymphoma, a rare but potentially fatal cancer with no FDA-approved therapy.
>
> ***The NDA submission is supported by a combination of published literature on the safety and efficacy of methotrexate for the treatment of primary vitreoretinal lymphoma and safety data from the recently completed Phase 3 GUARD Trial of ADX-2191 for the prevention of proliferative vitreoretinopathy.*** During the Phase 3 GUARD Trial, no safety signals were observed, and ADX-2191 was well tolerated; there were no observed treatment-emergent serious adverse events....

270. The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that (a) Aldeyra could only rely on published literature to the extent that FDA-approved forms of methotrexate and ADX-2191 for PVRL were the same—to the extent that FDA-approved methotrexate and ADX-2191 for PVRL differed, and the two drugs differed in material aspects, such as in formulation and concentration—Aldeyra would have to provide sufficient bridging data to justify its reliance on published literature, which it did not have; (b) unlike an abbreviated new drug application ("ANDA"), where a generic manufacturer need not conduct clinical trials to demonstrate safety and efficacy, and instead, need only show that a drug is pharmaceutically equivalent to the reference-listed drug and that the generic version is bioequivalent to the reference-listed drug, FDA approval of the ADX-2191 NDA required Aldeyra to demonstrate sufficient safety and efficacy of ADX-2191 for PVRL, and; (c) as a result of the foregoing, the FDA would not approve the ADX-2191 NDA until Aldeyra conducted clinical studies demonstrating the safety and efficacy of ADX-2191 for PVRL.

C.    **Defendants' Misstatements Throughout 2023**

271.    On February 7, 2023, Aldeyra issued a press release entitled, "Aldeyra Therapeutics Announces FDA Acceptance of New Drug Application for Reproxalap for the Treatment of Dry Eye Disease".  The Feb. 7, 2023 PR stated,

> Aldeyra Therapeutics, Inc. (Nasdaq: ALDX) (Aldeyra) today announced that the U.S. Food and Drug Administration (FDA) has accepted the New Drug Application (NDA) for topical ocular reproxalap, a first-in-class investigational new drug candidate, for the treatment of the signs and symptoms of dry eye disease. The FDA assigned a Prescription Drug User Fee Act (PDUFA) date of November 23, 2023. The FDA noted that no potential filing review issues have been identified, and that an advisory committee meeting is not currently planned.

> *"NDA acceptance marks a critical regulatory milestone for Aldeyra as reproxalap continues to advance toward potential regulatory approval for the treatment of dry eye disease,"* stated Todd C. Brady, M.D., Ph.D., President and Chief Executive Officer of Aldeyra. *"Based on data from a number of late-stage clinical trials, we believe reproxalap has the potential to address the need for a rapid and durable ophthalmic therapy for the millions of dry eye disease patients who are dissatisfied with currently available therapies."*

> *The NDA is supported by previously announced safety and efficacy results from five adequate and well-controlled clinical trials encompassing data for ocular dryness symptom score, ocular redness, Schirmer test, and Schirmer test ≥10 mm responder analysis. The NDA includes activity ranging from within minutes of drug administration to up to 12 weeks of treatment, crossover and parallel-group clinical trial designs, and assessment in dry eye chamber challenge and natural environment settings.*

272.    The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that (a) "the five adequate and well-controlled clinical trials" supporting the Reproxalap NDA were insufficient to demonstrate efficacy, because, inter alia, the Phase 3 RENEW Part 1 Trial, which Aldeyra had submitted as one of its symptom trials, failed to meet each of its co-primary endpoints, and the Crossover Trial, which Aldeyra also submitted as one of the five pivotal trials in support of the Reproxalap NDA, would not count as one of the required symptom trials because it had set symptoms solely as a secondary endpoint; (b) Aldeyra would need to conduct at least one additional adequate and well-controlled trial demonstrating improvement on the symptoms of DED to gain FDA approval of reproxalap for

DED; (c) the pooled results from multiple clinical trials would not satisfy the FDA's efficacy requirements; (d) as a result of the foregoing, reproxalap for DED was not "advanc[ing] toward potential regulatory approval."

273.    On March 2, 2023, Aldeyra issued a press release entitled "FDA Accepts for Priority Review ADX-2191 New Drug Application for the Treatment of Primary Vitoretinal Lymphoma".  Defendants stated the following in the March 2, 2023 PR:

> [Aldeyra] today announced that the U.S. Food and Drug Administration (FDA) accepted for Priority Review the New Drug Application (NDA) for ADX-2191 (methotrexate injection, USP), an investigational drug candidate, for the treatment of primary vitreoretinal lymphoma.  The FDA assigned a Prescription Drug User Fee Act (PDUFA) of June 21, 2023.  The FDA noted that no potential filing review issues have been identified.
>
> **"The FDA's decision to grant Priority Review with a PDUFA date four months from NDA acceptance underscores the significant need for an FDA-approved treatment of primary vitreoretinal lymphoma, a rare but potentially fatal cancer,"** stated Todd C. Brady, M.D., Ph.D., Aldeyra's President and Chief Executive Officer.  **"We are working closely with the FDA during the review process to bring ADX-2191 to patients as quickly as possible, and plan to launch ADX-2191 in the United States in the second half of this year, pending approval by the FDA."**
>
> **The NDA submission is supported by a combination of more than three decades of published literature on the safety and efficacy of methotrexate, the active ingredient of ADX-2191, for the treatment of primary vitreoretinal lymphoma, in addition to safety data from the recently completed Phase 3 GUARD Trial of ADX-2191 in patients with proliferative vitreoretinopathy.**  During the Phase 3 GUARD Trial, no safety signals were observed, and ADX-2191 was well tolerated; there were no observed treatment-emergent serious adverse events ….

274.    The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that (a) the ADX-2191 NDA would not gain FDA approval without Aldeyra conducting clinical trials of ADX-2191 to treat PVRL, which Aldeyra had no plans to do; (b) Aldeyra could only rely on published literature to the extent that FDA-approved forms of methotrexate and ADX-2191 for PVRL were the same—to the extent that FDA-approved methotrexate and ADX-2191 for PVRL differed, and the two drugs differed in material aspects, such as in formulation and concentration—Aldeyra would have to provide sufficient

bridging data to justify its reliance on published literature, which it did not have; (c) that methotrexate has been FDA approved for "more than three decades" was not sufficient to demonstrate the safety and efficacy needed for FDA approval of Alderya's novel formulation of methotrexate of ADX-2191 for PVRL; (d) unlike an abbreviated new drug application ("ANDA"), where a generic manufacturer need not conduct clinical trials to demonstrate safety and efficacy, and instead, need only show that a drug is pharmaceutically equivalent to the reference-listed drug and that the generic version is bioequivalent to the reference-listed drug, FDA approval of the ADX-2191 NDA required Aldeyra to demonstrate sufficient safety and efficacy of ADX-2191 for PVRL, and; (e) as a result of the foregoing, Aldeyra had no reasonable basis to project a commercial launch of ADX-2191 for PVRL "in the second half of this year".

275.    On March 9, 2023, Aldeyra issued a press release entitled "Aldeyra Therapeutics Reports Full-Year 2022 Financial Results and Recent Corporate Highlights".  The March 9, 2023 PR stated,

*Recent Corporate Highlights*

- **Priority Review Designation Granted for NDA of ADX-2191 for the Treatment of Primary Vitreoretinal Lymphoma:** *The New Drug Application (NDA) submission of ADX-2191 (methotrexate injection, USP), an investigational drug candidate, is supported by a combination of published literature on the safety and efficacy of intravitreal methotrexate for the treatment of primary vitreoretinal lymphoma and safety data from the recently completed Phase 3 GUARD Trial of ADX-2191 for the prevention of proliferative vitreoretinopathy. During the Phase 3 GUARD Trial, no safety signals were observed, and ADX-2191 was well tolerated*….. The U.S. Food and Drug Administration (FDA) assigned a Prescription Drug User Fee Act (PDUFA) date of June 21, 2023. The FDA noted that no potential filing review issues had been identified.

- **FDA Accepted for Review NDA of Reproxalap for the Treatment of Signs and Symptoms of Dry Eye Disease:** *The NDA submission of topical ocular reproxalap, a first-in-class investigational new drug candidate, is supported by previously announced safety and efficacy results from five adequate and well-controlled clinical trials encompassing data for ocular dryness symptom score, ocular redness, Schirmer test, and Schirmer test ≥10 mm responder analysis. The NDA includes activity ranging from within minutes*

*of drug administration to up to 12 weeks of treatment, crossover and parallel-group clinical trial designs, and assessment in dry eye chamber challenge and natural environment settings.* The FDA assigned a PDUFA date of November 23, 2023. The FDA noted that no potential filing review issues had been identified, and that an advisory committee meeting was not currently planned.

276.    The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that (a) the ADX-2191 NDA would not gain FDA approval without Aldeyra conducting clinical trials of ADX-2191 to treat PVRL, which Aldeyra had no plans to do; (b) Aldeyra could only rely on published literature to the extent that FDA-approved forms of methotrexate and ADX-2191 for PVRL were the same—to the extent that FDA-approved methotrexate and ADX-2191 for PVRL differed, and the two drugs differed in material aspects, such as in formulation and concentration—Aldeyra would have to provide sufficient bridging data to justify its reliance on published literature, which it did not have; (c) "the five adequate and well-controlled clinical trials" supporting the Reproxalap NDA were insufficient to demonstrate efficacy, because, inter alia, the RENEW Part 1 Trial, which Aldeyra had submitted as one of its symptom trials, failed to meet each of its co-primary endpoints, and the Crossover Trial, which Aldeyra also submitted as one of the five pivotal trials in support of the Reproxalap NDA, would not count as one of the required symptom trials either because it had set symptoms solely as a secondary endpoint; and, (d) as a result of the foregoing, Aldeyra would not gain FDA approval of the Reproxalap NDA or the ADX-2191 NDA.

277.    On March 9, 2023, Aldeyra held a public conference call to discuss the Company's Q4 2022 results.  On the March 9, 2023 Call, Brady touted the Company's progress towards commercialization of ADX-2191 for PVRL.  Specifically, Brady stated,

With regard to ADX-2191, last week, we were thrilled to announce that the FDA accepted for priority review our NDA for the treatment of primary vitreoretinal lymphoma, also known as ocular lymphoma. The FDA had assigned a PDUFA date of June 21, 2023, 4 months from the acceptance of the NDA for review. *The NDA is supported by a combination of more than 30 years of published literature on the safety and efficacy of methotrexate, the active ingredient of ADX-2191 for the treatment of ocular lymphoma. The submission is further supported by safety data from the recently completed Phase III GUARD trial of*

> ***ADX-2191 in patients with proliferative vitreoretinopathy.*** An estimated 300 to 600 patients in the United States are diagnosed with ocular lymphoma each year. And the median survival for newly diagnosed patients is less than 5 years. ***If approved, we expect to launch ADX-2191 in the United States in the second half of this year, which would make ADX-2191, the first FDA-approved drug available for patients suffering from ocular lymphoma….***

278.    The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that (a) the ADX-2191 NDA would not gain FDA approval without Aldeyra conducting clinical trials of ADX-2191 to treat PVRL, which Aldeyra had no plans to do; (b) Aldeyra could only rely on published literature to the extent that FDA-approved forms of methotrexate and ADX-2191 for PVRL were the same—to the extent that FDA-approved methotrexate and ADX-2191 for PVRL differed, and the two drugs differed in material aspects, such as in formulation and concentration—Aldeyra would have to provide sufficient bridging data to justify its reliance on published literature, which it did not have; (c) the ADX-2191 NDA could not gain FDA approval based only on published literature and the Phase 3 GUARD Safety Trial for proliferative vitreoretinopathy; (d) the fact that methotrexate in compounded form has been recognized as the standard of care for PVRL for decades was not sufficient to demonstrate the safety and efficacy needed for FDA approval of Alderya's novel formulation of methotrexate of ADX-2191 for PVRL; and, (e) unlike an abbreviated new drug application ("ANDA"), where a generic manufacturer need not conduct clinical trials to demonstrate safety and efficacy, and instead, need only show that a drug is pharmaceutically equivalent to the reference-listed drug and that the generic version is bioequivalent to the reference-listed drug, FDA approval of the ADX-2191 NDA required Aldeyra to demonstrate sufficient safety and efficacy of ADX-2191 for PVRL.

279.    On the March 9, 2023 Call, when asked about Aldeyra's regulatory strategy with respect to the ADX-2191 NDA, Brady stated,

> ***Our regulatory strategy for ADX-2191 was quite intentional, and that is -- the idea is to get -- submit an NDA for ocular lymphoma first. The reason is that methotrexate, which is the active ingredient of 2191 is standard of care for treatment of ocular lymphoma. It's been injected in eyes for 30 years with acceptable safety and activity.***

After that, subsequent NDA submissions or so-called supplemental NDAs, where the bar is somewhat lower because safety and the chemistry, manufacturing controls aspects of ADX-2191 have already been evaluated in the original NDA submission. ***That's why I highlighted this morning the safety results from the Phase III GUARD trial in proliferative vitreoretinopathy. Those are particularly important the lymphoma submission because the FDA always assesses not only activity but also safety.*** And in this case, we have a new formulation designed to be vitreous compatible with a lower volume and a higher density and so forth. And all that will be assessed from a safety standpoint as part of the lymphoma review.

We were absolutely thrilled with the Phase III GUARD results in terms of safety. In terms of proliferative vitreoretinopathy, it appeared to be actually safer to administer methotrexate -- 2191 than it was not to administer 2191, which makes sense because methotrexate as a compound is anti-inflammatory and may mitigate some of the trauma associated with surgery. ***So by and large, I think we have a compelling submission for lymphoma based not only on the safety, but also on the activity from the scientific literature.***

280.    The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that (a) the ADX-2191 NDA would not gain FDA approval without Aldeyra conducting clinical trials of ADX-2191 to treat PVRL, which Aldeyra had no plans to do; (b) Aldeyra could only rely on published literature to the extent that FDA-approved forms of methotrexate and ADX-2191 for PVRL were the same—to the extent that FDA-approved methotrexate and ADX-2191 for PVRL differed, and the two drugs differed in material aspects, such as in formulation and concentration—Aldeyra would have to provide sufficient bridging data to justify its reliance on published literature, which it did not have; (c) the ADX-2191 NDA could not gain FDA approval based only on published literature and the Phase 3 GUARD Safety Trial for proliferative vitreoretinopathy; (d) the fact that methotrexate in compounded form has been recognized as the standard of care for PVRL for decades was not sufficient to demonstrate the safety and efficacy needed for FDA approval of Alderya's novel formulation of methotrexate of ADX-2191 for PVRL; and, (e) unlike an abbreviated new drug application ("ANDA"), where a generic manufacturer need not conduct clinical trials to demonstrate safety and efficacy, and instead, need only show that a drug is pharmaceutically equivalent to the reference-listed drug and that the generic version is bioequivalent to the

reference-listed drug, FDA approval of the ADX-2191 NDA required Aldeyra to demonstrate sufficient safety and efficacy of ADX-2191 for PVRL.

281.    On October 16, 2023, before market opened, Aldeyra filed a Form 8-K with the SEC, which disclosed:

On October 16, 2023, Aldeyra Therapeutics, Inc. ("Aldeyra" or the "Company") announced that it received minutes from a late-cycle review meeting (the "Minutes") with the U.S. Food and Drug Administration (the "FDA") relating to the new drug application ("NDA") for reproxalap for the treatment of the signs and symptoms of dry eye disease. ***The Minutes identified substantive review issues in connection with the NDA for reproxalap. The FDA stated that "[i]t does not appear that you have data to support the clinical relevance of the ocular signs to support your dry eye indication."***

***In subsequent communications between Aldeyra and the FDA, Aldeyra has submitted responses to the FDA that Aldeyra believes to be sufficient to mitigate the identified issues, but the FDA has not directly opined on the sufficiency of the information submitted, has no legal obligation to review the information submitted by Aldeyra, and has indicated that Aldeyra needs to conduct an additional clinical trial to satisfy efficacy requirements.*** As such, ***based on the time remaining in the NDA review cycle, the FDA may not be in the position to approve the NDA for reproxalap on or about the Prescription Drug User Fee Act ("PDUFA") target action date of November 23, 2023 or afterwards, and it may issue a Complete Response Letter and require that Aldeyra conduct additional clinical trials and submit the results of those clinical trials before the application will be reconsidered***….

***In addition, during the review of the reproxalap NDA, the FDA has requested certain chemistry, manufacturing, and controls ("CMC") details. In subsequent communications between Aldeyra and the FDA, Aldeyra has submitted responses to the FDA that Aldeyra believes to be sufficient to mitigate the identified review issues and address the CMC requests, but the FDA has not directly opined on the sufficiency of the information submitted, has no legal obligation to review the information submitted by Aldeyra, and has indicated that Aldeyra needs to conduct an additional clinical trial to satisfy efficacy requirements.*** As such, based on the time remaining in the NDA review cycle, the FDA may not be in the position to approve the NDA for reproxalap on or about the PDUFA target action date of November 23, 2023 or afterwards, which could result in the Company receiving a Complete Response Letter or the FDA notifying the Company of an extension in the PDUFA target action date. ***The FDA could require that Aldeyra conduct additional CMC studies or clinical trials and submit the results of those studies or clinical trials before the application will be reconsidered, which would require Aldeyra to expend more***

*resources than Aldeyra planned or that are available to Aldeyra, and could substantially delay approval, if any, of Aldeyra's NDA.*

282.   The foregoing statements were materially false and/or misleading because they misrepresented or failed to disclose that (a) Aldeyra had failed to comply with the FDA requirement to submit two adequate and well-controlled symptom trials; (b) the Phase 3 RENEW Part 1 Trial, which Aldeyra had submitted as one of its pivotal symptom trials, had failed to meet each of its co-primary endpoints and thus, would not meet one the symptom trial requirements; (c) pursuant to FDA guidance, Aldeyra could not pool the results of multiple trials to satisfy efficacy requirements; and, (d) as a result of the foregoing, Aldeyra would need to conduct at least one additional adequate and well-controlled trial demonstrating statistically significant improvement in the symptoms of DED in order to gain FDA approval of reproxalap for DED.

## VI.   ADDITIONAL SCIENTER ALLEGATIONS

### A.   Aldeyra Was Reliant On Fundraising To Remain A Going Concern

283.   Since Aldeyra's inception in 2004, the Company has incurred net losses, has generated no revenue from sales, has racked up numerous debts, and has been reliant on fundraising to remain a going concern.  Aldeyra has no sources of income from sales as none of its drug candidates have gained regulatory approval despite many years of research, development, and costly clinical trials.  By the start of the Class Period, Aldeyra had an accumulated deficit of $236.9 million, and had net losses of $37.6 million for the fiscal year ended December 30, 2020.  As Defendants stated in Aldeyra's November 3, 2023 Form 10-Q,

> We have funded our operations primarily from the sale of equity securities and convertible equity securities and borrowings under credit facilities.  Since inception, we have incurred operating losses and negative cash flows from operating activities and have devoted substantially all our efforts to research and development ….  We expect to generate operating losses for the foreseeable future.

284.   Accordingly, Defendants were motivated to defraud investors to artificially inflate the price of Aldeyra's securities and raise much-needed cash to continue to operate the business as a going concern.  Indeed, following misleadingly positive announcements about the progress

of the Reproxalap NDA and the ADX-2191 NDA, Defendants announced public offerings of Aldeyra common shares, which were extremely successful for the Company.  For example, on January 7, 2021, Aldeyra announced the positive results of the run-in cohort of the reproxalap Phase 3 TRANQUILITY-1 Trial, and on January 14, 2021, Aldeyra announced that in light of preliminary written comments from the FDA in preparation for a pre-investigational new drug meeting regarding ADX-2191 for the treatment of PVRL, the Company believed that submission of the ADX-2191 NDA would be possible without performing any clinical trials and had applied for and expected to receive orphan designation for ADX-2191.  Without the need to perform any clinical trials, commercialization of ADX-2191 would be possible on a much more expedited timeframe and receipt of orphan designation would provide numerous financial benefits to Aldeyra even though PVRL is a rare disease that impacts a relatively small number of people each year in the United States.  In the midst of these positive announcements, Aldeyra announced a public offering of its common shares which closed on January 20, 2021, resulting in gross proceeds of $74.7 million.  Further, Aldeyra raised an additional $125 million in gross proceeds in a follow-on public offering in late April, which closed on May 6, 2021.

285.   Defendants were also motivated to make materially false and/or misleading statements about the Reproxalap NDA in the hopes of winning a lucrative commercial partnership with a larger, more established company.  On October 31, 2023, Aldeyra entered into an Option Agreement with AbbVie, pursuant to which Aldeyra granted AbbVie the option to obtain (a) a co-exclusive license in the United States to facilitate a collaboration with the Company to develop, manufacture, and commercialize reproxalap in the U.S., (b) an exclusive license to develop, manufacture, and commercialize reproxalap outside the U.S., (c) a right of first negotiation for compounds that are owned or otherwise controlled by Aldeyra in the field of ophthalmology relating to treating conditions of the ocular surface and (d) a right to review data for any other compounds that are owned or otherwise controlled by Aldeyra in the fields of ophthalmology and immunology before such data is shared with any other third party.

286.    Under the AbbVie Option Agreement, AbbVie agreed to pay Aldeyra $1 million no later than 30 days after the Option Agreement Effective Date; the Option Extension Fee was $5 million.  Upon AbbVie's delivery of the Agreement Execution Notice and the parties entering into a Collaboration Agreement, AbbVie would pay Aldeyra $100 million upfront in cash, less the Option Payment and the Option Extension Fee, if any.  Further, Aldeyra was eligible to receive up to approximately $300 million in regulatory and commercial milestone payments, inclusive of a $100 million milestone payment payable if the FDA Decision on the reproxalap NDA was received prior to or after the execution of the Collaboration Agreement.

287.    Pursuant to the AbbVie Option Agreement, AbbVie may exercise the Option at any time until: (i) if Aldeyra receives the FDA Decision for reproxalap in dry eye disease before December 15, 2023, then the 10th business day after the FDA Decision Date, (ii) if the FDA Decision Date does not occur before December 15, 2023, AbbVie has not exercised its Option prior thereto, and AbbVie pays Aldeyra the Option Extension Fee, then the earlier of (a) the 10th business day after the FDA Decision Date and (b) the date that is 18 months after the Option Agreement Effective Date; and (iii) if the FDA Decision Date does not occur before December 15, 2023, AbbVie has not delivered the Option Exercise Notice and AbbVie does not pay the Option Extension Fee, then December 23, 2023.  In the U.S., Aldeyra and AbbVie would share profits and losses from the commercialization of reproxalap, with Aldeyra responsible for 40% and AbbVie for 60%.  Outside the U.S., Aldeyra would be eligible to receive tiered royalties on net sales of reproxalap.  Defendants stated in Aldeyra's November 3, 2023 Form 10-Q that "[i]f the Option is not exercised, we will be responsible for funding further development and commercialization of reproxalap, and may be unable to raise the additional capital required to further develop and commercialize reproxalap or enter into a collaboration agreement with another pharmaceutical company with equivalent or comparable terms, or at all."

288.    Aldeyra was also subject to numerous financial obligations.  For example, in connection with Aldeyra's 2019 acquisition of Helio Vision, the Company assumed the rights obligations under an Exclusive License Agreement with Massachusetts Eye and Ear Infirmary to

develop and commercialize ADX-2191.  Under the MEII Agreement, Helio Vision was required to pay $15,000 of license maintenance fees to MEII on the second and third anniversaries of the Agreement, $25,000 on the fourth and fifth anniversaries of the Agreement, and $35,000 on the sixth and each subsequent anniversary of the Agreement.  Under the MEII Agreement, Helio Vision was also obligated to make future sales-dependent milestone payments to MEII of up to the low seven figures and royalty payments to MEII.

289.    In March 2019, Aldeyra entered into an agreement with Hercules Credit Facility, which provided for a term loan of up to $60 million, $15 million of which had been drawn-down as of June 30, 2023.  Aldeyra's agreement with Hercules Credit Facility was amended in December 2022, to, among other things,  (i) extend the expiration of the period in which interest-only payments on borrowings from May 1, 2023 to May 1, 2024; (ii) extend the Maturity Date from October 1, 2023 to October 1, 2024; and (iii) extend the availability of the $20.0 million draw-down from May 2023 to May 2024, subject to the satisfaction of certain conditions contained therein.  The Hercules Credit Facility agreement contained affirmative covenants, which included, among others, covenants requiring the Company to maintain its legal existence and governmental approvals, deliver certain financial reports, and maintain insurance coverage. Negative covenants included, among others, restrictions on transferring any part of Aldeyra's business or intellectual property, incurring additional indebtedness, engaging in mergers and acquisitions, paying dividends or making other distributions, making investments, and creating other liens on Aldeyra's assets.

290.    As of December 31, 2022, $15 million was outstanding under the Hercules Credit Facility.  Aldeyra's agreement with the Hercules Credit Facility accrues interest from its date of issuance at a variable annual interest rate equal to the greater of 8.6% of the prime rate and the prime rate plus 3.10%.

**B.    <u>Defendants Were Motivated To Defraud Investors For Personal Gain</u>**

291.    The Individual Defendants were also motivated to engage in their fraudulent scheme to realize personal benefits under the Company's equity incentive plans and

Management Cash Incentive Plan.  The Company has three equity incentive plans: the 2010 Employee, Director and Consultant Equity Incentive Plan, the 2013 Equity Incentive Plan, and the 2023 Equity Incentive Plan that provide for the granting of stock options, restricted stock, stock appreciation rights, stock units, cash awards, and cash settled bonus awards to certain employees and members of the board of directors.  Subject to and conditioned upon the acceptance by the FDA of Aldeyra's submission of an NDA for reproxalap, the Company's management would receive cash settled bonus awards which would vest in four installments.

292.    As Defendants stated in Aldeyra's August 3, 2023 Form 10-Q, as of June 30, 2023, $2.8 million was accrued as compensation expense for cash settled bonus awards because the requisite performance criteria of submitting the reproxalap NDA to the FDA had been met; there was no unrecognized expense as of June 30, 2023.

293.    For FY 2023, Brady earned a base salary of $581,170 and was eligible to receive an annual cash target bonus of 55% of his base salary; Greenberg earned a base salary of $330,000 and was eligible to receive an annual cash target bonus of 35% of his base salary. Brady was paid $338,410 under Aldeyra's 2022 performance bonus plan and earned $2,858,490 in total compensation for FY 2022.  Greenberg, who was appointed as Interim CFO in May 2022, earned $1,482,055 in total compensation for FY 2022 and received $99,000 under Aldeyra's 2022 performance bonus plan.

294.    For FY 2021, Reed earned a base salary of $432,132, received $172,857 under Aldeyra's 2021 performance bonus plan and earned $1,848,134 in total compensation.

### C.    Defendants' Fraudulent Statements Concerned Aldeyra's Core Operations

295.    The core operations doctrine further supports a strong inference of Defendants' scienter.  Reproxalap for DED was Aldeyra's lead product candidate, which had the potential to capture a market of millions of people that suffer from the condition globally.  As Defendants stated in Aldeyra's November 3, 2023 Form 10-Q,

> Our business is dependent in large part on the successful commercialization of reproxalap.  If we are unable to successfully obtain marketing approval for reproxalap, or experience significant delays in doing so, or if, after obtaining

marketing approval, we fail to successfully commercialize reproxalap, our business will be materially harmed …. If we remain responsible for funding further development and commercialization of reproxalap, we may be unable to raise the additional capital required to further develop and commercialize reproxalap or enter into a collaboration agreement with another pharmaceutical company with equivalent or comparable terms, or at all.

296.    As the Company stated in Aldeyra's August 3, 2023 Form 10-Q for example, "To date, substantially all of our research and development expenses have been incurred in connection with reproxalap, ADX-2191, ADX-629, and the discovery of novel platform molecules."

297.    Defendants further stated in Aldeyra's August 3, 2023 Form 10-Q that "[p]rior to and following potential NDA approval, we will invest a significant portion of our time and financial resources on the commercialization of reproxalap. We cannot accurately predict when or if reproxalap will receive marketing approval. Our ability to generate product revenues will depend on our obtaining marketing approval for, and commercializing reproxalap."

298.    Further, ADX-2191 was Aldeyra's second lead product candidate.  Although ADX-2191 was designed to treat a rare disease, FDA approval would provide Aldeyra with significant financial benefits as a result of the FDA's orphan drug designation program, including seven years of market exclusivity and tax credits as well as waivers for certain costs associated with drug approval.

299.    The core operations inference is further supported by the fact that at all relevant times, Aldeyra was an extremely small company.  For example, as Defendants stated in Aldeyra's November 3, 2023 Form 10-Q, as of September 30, 2023, the Company had "only 12 full-time employees[.]"

300.    Moreover, as Aldeyra stated in its 2021 10-K filed with the SEC on March 17, 2022, Aldeyra was "highly dependent on the development, regulatory, commercial, and financial expertise of our senior management team", which included Brady and Greenberg.  That the Individual Defendants were extremely experienced in the biotech industry and FDA regulatory approval process further supports an inference of scienter.  For example, Brady touted his 30

years of experience in clinical development and graduated with a Ph.D. in pathology from Duke University and an M.D. from Duke University School of Medicine. Greenberg previously served as corporate controller for a biotechnology company focused on drugs for use in oncological treatments and Reed previously served as Vice President and Head of Finance for Bristol-Myers' Squibb's U.S. and Puerto Rico operations.

### D.    **Aldeyra Acted With Corporate Scienter**

301.    Each of the Individual Defendants was a high-ranking management-level employee of Aldeyra. The scienter of each of the Individual Defendants and of all other management-level employees of Aldeyra, including each high-ranking officer or director, is imputable to Aldeyra. The knowledge of each of these individuals should therefore be imputed to Aldeyra for the purposes of assessing corporate scienter.

302.    Even aside from the scienter of the Individual Defendants, the facts alleged herein raise a strong inference of corporate scienter as to Aldeyra as an entity. Corporate scienter may be alleged independent of individual defendants where a statement would have been approved by corporate officials sufficiently knowledgeable about the company to know the statement was false. Here, the statements alleged were made to the investing public regarding the Company's operations, finances, business practices and lead drug candidates—all important topics that would necessarily require approval by appropriate corporate officers who, as alleged, had very different information in their hands at the time from what was disclosed to the investor.

## VII.    **LOSS CAUSATION**

303.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Plaintiffs and the Class.

304.    Throughout the Class Period, as detailed herein, Defendants made materially false and/or misleading statements and/or omissions. This course of wrongful conduct caused the price of Aldeyra securities to be artificially inflated. But for Defendants' misrepresentations and/or omissions, Plaintiffs and the other members of the Class would not have purchased Aldeyra securities or would not have purchased such securities at artificially inflated prices.

Later, when Defendants' prior misrepresentations and/or omissions were disclosed to the market, and/or when the concealed risks materialized, the price of Aldeyra shares fell significantly as the prior artificial price inflation was dissipated.  As a result of their purchases and/or acquisition of Aldeyra securities during the Class Period, Plaintiffs and other members of the Class suffered economic losses, i.e., damages, under the Exchange Act.  The timing and magnitude of the decline in the prices of the Company's shares negate any inference that the economic losses and damages suffered by Plaintiffs and other members of the Class were caused by changed market conditions, macroeconomic factors, or Company-specific facts unrelated to Defendants' wrongful conduct.

305.   As detailed in *e.g.*, ¶¶20-21, 23-26, *supra*, the truth regarding the Company's progress towards FDA approval of the Reproxalap NDA and the ADX-2191 NDA was partially revealed, and/or the concealed risks materialized, on or about: December 20, 2021, June 21, 2023, and October 16, 2023.  As a direct result of these partial disclosures, the price of Aldeyra's stock declined significantly, precipitously, thereby damaging investors as the artificial inflation in Aldeyra's stock price was removed.

## VIII.   CLASS ACTION ALLEGATIONS

306.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Aldeyra common stock between January 7, 2021, and October 16, 2023, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers, and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

307.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Aldeyra's shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or

thousands of members in the proposed Class. Millions of Aldeyra shares were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Aldeyra or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

308.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

309.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

310.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Aldeyra; and

(c)    whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(d)    whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and,

(e)    to what extent the members of the Class have sustained damages and the proper measure of damages.

311.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

312.   Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)      Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)      the omissions and misrepresentations were material;

(c)      the Company's securities are traded in efficient markets;

(d)      the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e)      the Company traded on the NASDAQ, and was covered by market analysts;

(f)      the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

(g)      Plaintiffs and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and;

(h)      unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

313.   Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

314.   Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in Affiliated Ute Citizens of the State of Utah v. United States, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material

information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## IX.    APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

315.    The market for Aldeyra's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Aldeyra's securities traded at artificially inflated prices during the Class Period.  On April 27, 2021, the Company's share price reached a Class Period high of $15.95 per share. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Aldeyra's securities and market information relating to Aldeyra, and have been damaged thereby.

316.    During the Class Period, the artificial inflation of Aldeyra's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Aldeyra's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Aldeyra and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

317.    At all relevant times, the market for Aldeyra's securities was an efficient market for the following reasons, among others:

(a)    Aldeyra's shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)      As a regulated issuer, Aldeyra filed periodic public reports with the SEC and/or the NASDAQ;

(c)      Aldeyra regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)      Aldeyra was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

318.    As a result of the foregoing, the market for Aldeyra's securities promptly digested current information regarding Aldeyra from all publicly available sources and reflected such information in Aldeyra's share price.  Under these circumstances, all purchasers of Aldeyra's securities during the Class Period suffered similar injury through their purchase of Aldeyra's securities at artificially inflated prices and a presumption of reliance applies.

319.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## X.    NO SAFE HARBOR

320.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Aldeyra who knew that the statement was false when made.

## XI.    CLAIMS

### FIRST CLAIM
#### Violation of Section 10(b) of The Exchange Act and
#### Rule 10b-5 Promulgated Thereunder
#### Against All Defendants

321.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

322.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Aldeyra's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

144

323.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Aldeyra's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

324.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Aldeyra's financial well-being and prospects, as specified herein.

325.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Aldeyra's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Aldeyra and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

326.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans,

projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

327.   Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Aldeyra's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

328.   As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Aldeyra's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Aldeyra's securities during the Class Period at artificially high prices and were damaged thereby.

329.    At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Aldeyra was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Aldeyra securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

330.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

331.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM
### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

332.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

333.    The Individual Defendants acted as controlling persons of Aldeyra within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after

these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

334.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

335.    As set forth above, Aldeyra and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XII.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## XIII.    <u>JURY TRIAL DEMANDED</u>

Plaintiffs hereby demand a trial by jury.

Dated: January 2, 2024

*/s/ Natalie S. Pang*
Casey E. Sadler (*pro hac vice*)
   csadler@glancylaw.com
Natalie S. Pang (*pro hac vice*)
   npang@glancylaw.com
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150

*Counsel for Plaintiffs and Lead Counsel for the Class*

Joseph P. Calandrelli (BBO # 666128)
   jcalandrelli@ocmlaw.net
O'CONNOR, CARNATHAN & MACK, LLC
10 Mall Road, Suite 301
Burlington, MA 01803
Telephone: (781) 359-9034

*Liaison Counsel for Lead Plaintiff and Liaison Counsel for the Class*

## **PROOF OF SERVICE**

I hereby certify that on this 2nd day of January, 2024, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

_s/ Natalie S. Pang_
Natalie S. Pang