**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **JULIANA PAICE, individually and on behalf of all others similarly situated,** )<br>)<br>)<br>) | |
| **Plaintiff** )<br>)<br>) | |
| **v.** )<br>)<br>) | **Civil Action No. 23-cv-11737** |
| **ALDEYRA THERAPEUTICS, INC., TODD C. BRADY, JOSHUA REED and BRUCE GREENBERG,** )<br>)<br>)<br>) | |
| **Defendants.** )<br>)<br>) | |

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                     **March 14, 2025**

## I.    Introduction

Lead Plaintiff Joseph Lombard and named Plaintiff John Levon (collectively, "Plaintiffs")[1]

assert this putative class action against Defendants Aldeyra Therapeutics, Inc. ("Aldeyra" or the

"Company"), Aldeyra's Chief Executive Officer ("CEO"), Todd C. Brady ("Brady"), Aldeyra's

Chief Financial Officer ("CFO") until April 2022, Joshua Reed ("Reed"), and Aldeyra's Interim

CFO since April 2022, Bruce Greenberg ("Greenberg") (collectively, "Defendants"), alleging

securities fraud in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934

("Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10b-5 ("Rule 10b-5"),

between January 7, 2021 and October 16, 2023 (the "Class Period").  D. 27.  Defendants have

---

[1] The Court, upon Plaintiffs' motion, appointed Joseph Lombard as Lead Plaintiff in this matter.  D. 19.

moved to dismiss the amended complaint.  D. 30.  For the reasons stated below, the Court
ALLOWS the motion to dismiss. !

## II.     Standard of Review

For allegations of securities fraud under Sections 10(b) and 20(a) of the Exchange Act, a
plaintiff "must plead the circumstances of the fraud with particularity, pursuant to Rule 9(b)," Hill
v. Gozani, 638 F.3d 40, 55 (1st Cir. 2011), and, pursuant to the Private Securities Litigation Reform
Act ("PSLRA"), must also "specify each statement alleged to have been misleading [and] the
reason or reasons why the statement is misleading," id. (alteration in original) (citation and internal
quotation marks omitted).  As part of the inquiry under Tellabs v. Makor Issues & Rights, Ltd.,
551 U.S. 308, 322–23 (2007), courts engage in a particularized scrutiny of private securities
complaints.  See, e.g., Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 996 (9th Cir. 2009).
As required by Tellabs, the Court considers the allegations collectively to determine whether they
give rise to a strong inference of scienter.  Id. at 991–92 (citing Tellabs, 551 U.S. at 323).

As with any Rule 12(b)(6) motion, the Court must "accept well-pleaded factual allegations
in the complaint as true and view all reasonable inferences in the plaintiffs' favor."  ACA Fin.
Guar. Corp. v. Advest, Inc., 512 F.3d 46, 58 (1st Cir. 2008).

## III.     Factual Background

### A.     Factual Allegations

The following facts are drawn from Plaintiffs' amended complaint, D. 27, from exhibits
Defendants filed in support of their motion, which were incorporated by reference in the amended

complaint and/or are public documents, see D. 32, D. 39,[2] including the FDA guidance documents referenced in Plaintiffs' amended complaint.[3]

Aldeyra is a biotechnology company founded in 2004 that focuses on the development and commercialization of treatments for immune-mediated diseases. D. 27 ¶ 43. During the Class Period, the Company was focused on achieving FDA approval of New Drug Applications ("NDAs") for two of its drugs: reproxalap as its first priority and ADX-2191 as its second priority. Id. ¶ 7.

The process for obtaining FDA approval for a new drug generally involves clinical studies conducted in three phases. Id. ¶¶ 50–53. In Phase 1, the product is first introduced into humans to determine the most frequent side effects, dose tolerance and how the drug is metabolized and excreted. Id. ¶ 53. In Phase 2, the product is evaluated through controlled studies to evaluate possible adverse side effects and safety risks, to evaluate the efficacy of the drug for specific targeted indications and to determine dose tolerance and optimal dosage. Id. In Phase 3, the

---

[2] Although the Court ordinarily "may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment." Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co., 267 F.3d 30, 33 (1st Cir. 2001). "There is, however, a narrow exception 'for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint.'" Id. (quoting Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993)).

[3] These are U.S. Food and Drug Admin., FDA-2016-D-4460, Multiple Endpoints in Clinical Trials: Guidance for Industry (2022) ("Multiple Endpoints Guidance"), 2022 WL 17101213, at *1 (Oct. 1, 2022); U.S. Food and Drug Admin., FDA-2008-D-0449, Integrated Summary of Effectiveness: Guidance for Industry (2015) ("ISE Guidance"), 2015 WL 6125285, at *1 (Oct. 1, 2015); U.S. Food and Drug Admin., FDA-1999-D-0738, Guidance for Industry: Applications Covered by § 505(b)(2) (1999) ("Indust. 505(b)(2) Guidance"), 1999 WL 35763819, at *1 (Oct. 1, 1999), and U.S. Food and Drug Admin., FDA-2017-D-5974, Determining Whether to Submit an ANDA or a 505(b)(2) Application: Guidance for Industry (2019) ("ANDA 505(b)(2) Guidance"), 2019 WL 8224123, at *1 (May 1, 2019).

product is evaluated through expanded controlled and uncontrolled trials to further evaluate dosage and to obtain evidence of potential clinical efficacy and safety.  Id.

After these phases are complete, a sponsoring company meets with the FDA for a "pre-NDA meeting" to exchange information about the proposed drug marketing application.  Id. ¶ 58 (citing 21 C.F.R. § 312.47(b)(2) (2024)).  This meeting provides an opportunity to:  "(1) 'uncover any major unresolved problems,' (2) 'identify those studies that the sponsor is relying on as adequate and well-controlled to establish the drug's effectiveness,' (3) 'identify the status of ongoing or needed studies adequate to assess pediatric safety and effectiveness,' (4) 'acquaint FDA reviewers with the general information to be submitted in the marketing application (including technical information),' (5) 'discuss appropriate methods for statistical analysis of the data' and (6) discuss the best approach to the presentation and formatting of data in the marketing application."  Id. (quoting 21 C.F.R. § 312.47(b)(2)).

After the pre-NDA meeting the developer formally can request FDA approval of their drug by submitting an NDA to the FDA.  Id. ¶ 60.  The NDA must include all clinical data and must designate as "pivotal" the trials that establish the drug's safety and efficacy.  Id.  The FDA either accepts or refuses the filing.  Id. ¶ 63 (citing 21 C.F.R. § 314.101(a) (2024)).  If an NDA is accepted, the FDA performs a substantive review and either approves the NDA or issues a Complete Response Letter ("CRL") rejecting the NDA.  Id. ¶ 64.  The two therapies at issue, reproxalap and ADX-2191, were governed by different sections of the Federal Food, Drug and Cosmetic Act ("FDCA") and were, therefore, subject to different approval processes.  See id. ¶¶ 12, 14, 51.

1.      *Aldeyra Delays Submission of its NDA for Reproxalap and the FDA, After Accepting the NDA, Indicates that Aldeyra Would Need to Conduct an Additional Trial to Satisfy Efficacy Requirements*

Reproxalap is a topical solution developed for the treatment of dry eye disease ("DED"), a chronic condition associated with eye dryness, redness, irritation and itchiness. Id. ¶ 45. The NDA for reproxalap (the "Reproxalap NDA") was subject to § 505(b)(1) of the FDCA, the developmental pathway applicable to novel drugs, which requires the developer to conduct all clinical trials necessary to demonstrate the drug's safety and efficacy for its intended use. Id. ¶ 51; 21 U.S.C. § 355(b)(1). According to FDA guidance, to gain FDA approval for a DED therapy, Aldeyra needed to submit at least two studies demonstrating statistically significant improvement on a subjective symptom of DED (ocular pain, ocular itching or blurred vision) and at least two studies demonstrating statistically significant improvement on an objective sign of DED (corneal staining, conjunctival staining or decreased tear breakup time and decreased Schirmer's tear test score). See id. ¶¶ 72, 207, 211. Prior to the Class Period, Aldeyra had already conducted multiple late-stage clinical trials with mixed results. Id. ¶ 74. The Company, therefore, conducted additional Phase 3 clinical trials during the Class Period to complete the NDA requirements. See id. ¶¶ 77–81.

Clinical trials are designed to meet pre-determined endpoints reflecting the intended effects of the drug. Id. ¶ 54. Primary endpoints are designed to establish the intended effect of the drug and are used to demonstrate a drug's efficacy. Id. Secondary endpoints lend support to primary endpoints and/or demonstrate additional clinically important effects, but do not have to be met to establish a drug's efficacy. Id. Defendants have stated that primary endpoints are "the only endpoints that ultimately matter." Id. ¶ 112. Some trials are designed with multiple primary

endpoints.  Id. ¶ 55.  Non-binding FDA guidance[4] cited in the amended complaint explains that some studies with multiple primary endpoints must demonstrate an effect on all primary endpoints to support a conclusion of effectiveness, while others need only demonstrate an effect on one of multiple primary endpoints.  See id. ¶¶ 54–55; Multiple Endpoints Guidance, supra n.3.  When an effect on multiple primary endpoints is necessary, those endpoints are referred to as co-primary endpoints.  Multiple Endpoints Guidance, supra n.3.

Separate, non-binding FDA guidance[5] cited in the amended complaint instructs drug developers to include an integrated summary of effectiveness ("ISE") in their NDA.  D. 27 ¶¶ 61–62 (citing ISE Guidance, supra n.3).  "The ISE is a comprehensive integrated analysis of the effectiveness of a study drug.  The purpose of the ISE is to describe the available information regarding effectiveness, delineate strengths and weaknesses, and highlight important missing information."  ISE Guidance, supra n.3.  The guidance instructs that ISEs should "include both close examination of individual study results and, when appropriate, combined quantitative analyses (pooled analyses)," but cautions that "prospectively planned efficacy analyses across two or more studies in a development program is uncommon," and most pooled analyses "are designed to probe the data for trends across more than one study."  Id.  The guidance also notes that the "the integrated analysis is not a substitute for the analysis of individual studies . . . the individual studies . . . that demonstrate the effect of the drug . . . are [the] studies that provide the substantial evidence of effectiveness required for approval."  Id.

---

[4] The Multiple Endpoints Guidance notes that it "represents the current thinking of [the FDA] on this topic.  It does not establish any rights for any person and is not binding on FDA or the public.  You can use an alternative approach if it satisfies the requirements of the applicable statutes and regulations."  Multiple Endpoints Guidance, supra n.3.

[5] Like the Multiple Endpoints Guidance, the ISE Guidance notes that it "represents the current thinking of [the FDA]" and that "[i] general, FDA's guidance documents do not establish legally enforceable responsibilities."  ISE Guidance, supra n.3.

In December 2019, prior to the start of the Class Period, Aldeyra had disclosed that its Phase 3 RENEW Part 1 Trial ("RENEW Part 1 Trial") showed statistically significant improvement in its co-primary symptom endpoint (ocular dryness), but not its co-primary sign endpoint (ocular staining). D. 27 ¶ 4. According to Plaintiffs, because the trial did not meet one of its co-primary endpoints it could not help satisfy the efficacy requirements for the Reproxalap NDA. See, e.g., id. ¶ 57. Nevertheless, throughout the Class Period, Defendants represented to investors that they believed the RENEW Part 1 Trial and a separate trial called the Phase 2 Formulation Trial satisfied its symptom trial requirements. Id. ¶ 76.

At the start of the Class Period on January 7, 2021, Aldeyra announced positive results from its "run-in cohort" of the Phase 3 TRANQUILITY-1 Trial and Brady shared on a public conference call that Aldeyra "expect[ed] to initiate the main cohort of TRANQUILITY in February." Id. ¶ 177. On the same call, David B. McMullin, Aldeyra's Chief Business Officer stated that the Company "expect[ed] to be in a position to file [its] NDA at the end of [the] year." Id. ¶ 180. Throughout the Class Period, the Company represented that it would designate either its Phase 3 TRANQUILITY-1 Trial or its Phase 3 TRANQUILITY-2 Trial as one of its pivotal sign trials. Id. ¶ 77. Defendants also represented that if either trial failed, they could pool the results with those from the other TRANQUILITY trial or with positive results from separate trials as a backup plan. Id. Plaintiffs assert that such pooling was impermissible under the ISE Guidance. Id. ¶ 73.

On November 2, 2021, Aldeyra disclosed that the Phase 2 Dry Eye Chamber Trial had achieved its primary sign endpoint of ocular redness. Id. ¶ 106. On November 9, 2021, the Company disclosed the study could serve as one of its pivotal sign trials. Id. ¶ 108.

On December 20, 2021, the Company announced the "main cohort" results of the TRANQUILITY-1 Trial and shared that although the primary endpoint of ocular redness was not met, a secondary endpoint was met.  Id. ¶ 217.  In this disclosure, Aldeyra also adjusted its anticipated submission date for the Reproxalap NDA to mid-2022.  Id.  Following this announcement, Aldeyra's stock price fell by $3.63, or 50.9%, to close at $3.50 per share on December 21, 2021.  Id. ¶ 118.  During the Class Period, Defendants represented that the results from the TRANQUILITY-1 study could be pooled to meet Aldeyra's efficacy requirements even though the study failed to meet its primary endpoint.  Id. ¶ 79.

On June 8, 2022, Aldeyra announced that the TRANQUILITY-2 Trial had met its primary endpoint and stated that it believed it had now satisfied its sign trial requirements.  Id. ¶ 243.  Nevertheless, the Company would continue with two additional trials, which it believed would provide extra support for the Reproxalap NDA:  the 1-Day Schirmer's Test Trial and the Crossover Trial.  See id. ¶¶ 245–46.  Brady also shared that the Company expected to hold its pre-NDA meeting with the FDA "in the third quarter of 2022 followed by a potential NDA submission soon thereafter."  Id. ¶ 243.  On July 12, 2022, after announcing that the Crossover Trial met its primary sign endpoints and its secondary symptom endpoints, id. ¶ 252, Brady stated that the one-day Schirmer trial would be put on hold and "in the very unlikely situation that there are remaining questions about the clinical package, we'll be prepared to initiate that trial effectively immediately," id. ¶ 135.

On November 29, 2022, Aldeyra submitted an NDA designating the RENEW Part 1 Trial and Phase 2 Formulation Trial as its two pivotal symptom trials, the Phase 3 TRANQUILITY-2 Trial and the Phase 2 Dry Eye Chamber Trial as its two pivotal sign trials and the Crossover Trial

as a fifth pivotal trial.  Id. ¶¶ 82, 266.  Aldeyra announced that the FDA accepted this NDA on February 7, 2023.  Id. ¶ 271.

On October 16, 2023, Aldeyra disclosed the results of a late-cycle review meeting with the FDA regarding the Reproxalap NDA, in which the FDA "indicated that Aldeyra needs to conduct an additional clinical trial to satisfy efficacy requirements."  Id.  ¶ 281.  Throughout the Class Period, Defendants had represented that they were on track to satisfy the FDA's chemistry, manufacturing and control ("CMC") requirements, see id. ¶¶ 188, 194, 203, 230, 248, yet in the October 16, 2023, disclosure Aldeyra revealed the FDA had requested certain CMC details, id. ¶ 281.  This disclosure also stated that following receipt of the FDA's feedback, the Company had "submitted responses to the FDA that Aldeyra believes to be sufficient to mitigate the identified review issues[.]"  Id.  Following this announcement, Aldeyra's stock price fell by $3.60, of 66.3%, to close at $1.83 per share on October 16, 2023.  Id. ¶ 163.

On November 27, 2023, after the Class Period had ended, Aldeyra disclosed it had received a CRL from the FDA denying the Reproxalap NDA, noting that Aldeyra's NDA "did not demonstrate efficacy in treating ocular symptoms associated with dry eyes" and would require "at least one additional adequate and well-controlled study to demonstrate a positive effect on the treatment of ocular symptoms of dry eye."  Id. ¶ 165.

### 2.    After Accepting the NDA, the FDA Issues a CRL for ADX-2191

ADX-2191 is an injectable solution Alderya designed to treat a rare ocular cancer called primary vitreoretinal lymphoma ("PVRL").  Id. ¶¶ 6, 45.  Because ADX-2191 was a modification of an FDA-approved drug, methotextrate, rather than a novel therapy, it was subject to an alternate FDA approval process pursuant to FDCA § 505(b)(2).  21 U.S.C. § 355(b)(2); D. 27 ¶¶ 45, 66.

9

Under § 505(b)(2), an NDA may rely upon clinical trials conducted by someone other than the applicant to demonstrate the efficacy and safety of the proposed drug.  Id. ¶ 67.

The amended complaint references two guidance documents concerning § 502(b)(2) applications.  See e.g., D. 27 ¶ 68 (referencing Indust. 505(b)(2) Guidance, supra n.3); id. ¶ 69 (referencing ANDA 505(b)(2) Guidance, supra n.3).  Both are non-binding and describe "the Agency's current thinking on a topic and should be viewed only as recommendations."  ANDA 505(b)(2) Guidance, supra n.3; see Indust. 505(b)(2) Guidance, supra n.3.  The Industry 505(b)(2) Guidance is draft and was never finalized.  See ANDA 505(b)(2) Guidance, supra n.3 (describing the Indus. 505 Guidance, supra n.3 as a "draft").  The ANDA 505(b)(2) Guidance provides that "[a] 505(b)(2) applicant may rely on FDA's finding of safety and/or effectiveness for a listed drug only to the extent that the proposed product in the 505(b)(2) application shares characteristics . . . in common with the relied-upon listed drug(s)."  Id.  Although "[t]he applicant is expected to establish a bridge (e.g., by using comparative bioavailability data) between the proposed drug product and each listed drug that the applicant seeks to rely upon to demonstrate that reliance on the listed drug is scientifically justified," a scientific bridge is not always necessary "[i]f FDA has approved one or more pharmaceutically equivalent products in one or more NDAs before the date of the submission of the original 505(b)(2) application."  Id.

On January 14, 2021, Aldeyra stated that it had received comments from the FDA which it believed "indicated that submission of a[n NDA] for ADX-2191 for the treatment of PVRL may be possible without performing clinical trials."  D. 27 ¶ 91.  The Company reiterated this belief throughout the Class Period.  See id. ¶¶ 190, 227, 255.  On December 21, 2022, the Company announced it had submitted an NDA for ADX-2191 "supported by a combination of published literature on the safety and efficacy of methotextrate for the treatment of primary vitreoretinal

lymphoma and safety data from the recently completed Phase 3 GUARD Trial of ADX-2191 in proliferative vitreoretinopathy."  Id. ¶ 269.  On March 2, 2023, the Company announced the FDA had accepted the NDA.  Id. ¶ 273.  On June 21, 2023, Aldeyra disclosed that it had received a CRL from the FDA denying the ADX-2191 NDA.  Id. ¶ 159.  According to that press release, the FDA had cited a "lack of substantial evidence of effectiveness" due to "a lack of adequate and well-controlled investigations" in the NDA submission.  Id.  Following this announcement, Aldeyra's stock price fell by $2.92, or 27.44%, to close at $7.72 per share on June 21, 2023.  Id. ¶ 161.

> 3.    *Throughout the Class Period, Aldeyra Repeatedly Disclosed the Risk that the FDA Might Not Approve the NDAs*

Throughout the Class Period, Aldeyra repeatedly disclosed the risks associated with the FDA approval process.  For example, Aldeyra disclosed that it was "dependent in large part on successful continued development and ultimate regulatory approval and successful commercialization of reproxalap and ADX-2191," D. 32-40 at 4; see D. 32-26 at 9; D. 32-29 at 9; D. 32-37 at 9, and that while it was "currently planning to submit" an NDA to the FDA for reproxalap, "[Aldeyra] can provide no assurances that the FDA will accept [this] NDA[] for review" and, "even if FDA does accept [Aldeyra's] NDA[] for review, there can be no assurance that FDA will agree with [its] interpretation of the data, that FDA will not require [Aldeyra] to conduct additional clinical trials or provide additional data, or that FDA will approve [Aldeyra's] NDA[] in a timely fashion, or at all," D. 32-18 at 4; see D. 32-26 at 10; D. 32-29 at 6; D. 32-37 at 4; D. 32-40 at 4.  After the NDAs for reproxalap and ADX-2191 were accepted by FDA in early 2023, Aldeyra further warned that "FDA's decision to accept the NDAs for filing . . . does not indicate that it has made any decision regarding approval," that "FDA has substantial discretion in the approval process and may disagree with [Aldeyra's] interpretation of or the sufficiency of the data from [its] clinical trials," that "FDA could also require that [Aldeyra] conduct additional

studies or clinical trials" and that "[t]here can be no assurance that NDAs accepted for filing by the FDA will be approved in a timely manner or at all." D. 32-49 at 11; see D. 32-52.

    **B.**    **Plaintiffs Allege Defendants Made Materially Misleading Statements and/or Omissions about Reproxalap and ADX-2191 During the Class Period**

Plaintiffs allege that during the Class Period Defendants made materially misleading statements and/or omissions about reproxalap and ADX-2191 in violation of Section 10(b), SEC Rule 10b-5 and Section 20(a) of the Exchange Act which caused significant loss to investors who purchased Aldeyra's stock during the Class Period in reliance upon Defendants' false and/or misleading statements and/or omissions. D. 27 ¶¶ 177, 179, 180, 182, 184, 186, 188, 190, 192, 193, 194, 196, 198, 200, 201, 203, 205, 207, 209, 211, 213, 215, 217, 219, 221, 223, 225, 227, 229, 230, 232, 234, 235, 237, 239, 241, 243, 245, 246, 248, 250, 252, 253, 255, 256, 258, 261, 263, 264, 266, 268, 269, 271, 273, 275, 277, 279, 281.

With respect to reproxalap, Plaintiffs challenge multiple categories of statements concerning: (i) the progress of clinical trials;[6] (ii) the timeline of the NDA submission and potential commercialization;[7] (iii) the content of the NDA, including Defendants' optimistic beliefs about its strength[8] and (iv) the adequacy of Aldeyra's CMC data.[9] Plaintiffs allege these statements were "false and/or misleading" because: (i) under FDA guidance, the Phase 3 RENEW-Part 1 Trial

---

    [6] Id. ¶¶ 177, 186, 188, 192, 193, 196, 198, 205, 207, 209, 211, 217, 219, 223, 229, 230, 232, 241, 243, 245, 246, 252, 258.

    [7] Id. ¶¶ 177, 179, 180, 192, 194, 200, 201, 207, 209, 221, 225, 229, 230, 232, 237, 241, 252, 264.

    [8] Id. ¶¶ 179, 180, 182, 184, 188, 193, 196, 200, 203, 207, 211, 213, 215, 217, 219, 223, 230, 232, 235, 237, 241, 243, 245, 246, 250, 252, 253, 258, 261, 263, 264, 266, 271, 275, 281.

    [9] Id. ¶¶ 188, 194, 203, 230, 248.

could not support an NDA because it failed to meet one of its co-primary endpoints;[10] (ii) Defendants intended to "pool" data in their NDA submission but FDA guidance prohibited using pooled data to show efficacy;[11] (iii) Defendants' predicted approval timeline would be delayed due to enrollment challenges and a need for additional trials to make up for the purported deficiencies in the existing trials[12] and (iv) CMC data needed for the NDA was insufficient.[13]

With respect to ADX-2191, Plaintiffs challenge statements concerning: (i) the content of Aldeyra's NDA for ADX-2191[14] and (ii) the expected timing of the NDA submission and commercial prospects for ADX- 2191.[15] Plaintiffs allege these statements were "false and/or misleading" because the FDA would not approve a "literature-based" NDA for ADX-2191.[16]

Except for the allegations regarding non-disclosure of program delays and deficiencies in CMC data, each of these purported misrepresentations stems from the non-disclosure of the NDAs' alleged non-compliance with FDA guidance.

---

[10] Id. ¶¶ 178, 181, 183, 185, 187, 189, 195, 197, 199, 202, 204, 206, 208, 210, 212, 214, 216, 218, 220, 224, 231, 233, 236, 238, 242, 244, 247, 251, 254, 262, 265, 267, 272, 276, 282.

[11] Id. ¶¶ 178, 181, 183, 185, 187, 189, 195, 197, 204, 206, 208, 210, 212, 216, 218, 220, 224, 236, 242, 247, 251, 254, 262, 265, 267, 272, 282.

[12] Id. ¶¶ 178, 181, 183, 185, 187, 189, 202, 204, 208, 210, 212, 216, 218, 222, 224, 231, 233, 238, 240, 242, 244, 247, 249, 259.

[13] Id. ¶¶ 189, 204, 231, 249.

[14] Id. ¶¶ 190, 198, 227, 255, 256, 268, 269, 273, 275, 277, 279.

[15] Id. ¶¶ 201, 209, 239, 264, 279.

[16] Id. ¶¶ 191, 199, 202, 210, 228, 240, 257, 265, 270, 274, 276, 278, 280.

IV.    **Procedural History**

This class action was initiated on July 31, 2023.  D. 1.  Plaintiffs filed an amended complaint on January 2, 2024.  D. 27.  Defendants have now moved to dismiss.  D. 30.  The Court heard the parties on the pending motion and took the matter under advisement.  D. 43.

V.    **Discussion**

A.    **Section 10(b) and Rule 10b-5 Claim (Count I)**

To state a claim under Section 10(b) and Rule 10b-5, Plaintiffs must plead the following "six elements":  "(1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation."  City of Miami Fire Fighters' & Police Officers' Ret. Tr. v. CVS Health Corp., 46 F.4th 22, 30 (1st Cir. 2022) (quoting Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc., 22 F.4th 1, 6 (1st Cir. 2021)).  Defendants argue that Plaintiffs have failed to plead a material misrepresentation or omission, scienter and loss causation.  D. 31 at 18–38.

1.    *Scienter*

Defendants argue that Plaintiffs have failed to allege facts supporting a strong inference of scienter.  D. 31 at 18–30.  "Scienter is defined as either the 'intentional or willful conduct designed to deceive or defraud investors' or 'a high degree of recklessness.'"  Metzler Asset Mgmt. GmbH v. Kingsley, 928 F.3d 151, 158 (1st Cir. 2019) (quoting In re Biogen Inc. Sec. Litig., 857 F.3d 34, 41 (1st Cir. 2017)).  Recklessness in this context refers to "a highly unreasonable omission" involving "an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers and sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  Brennan v. Zafgen, Inc., 853 F.3d 606, 613 (1st Cir. 2017) (internal quotation marks and citation omitted).  This "definition of recklessness does not encompass

ordinary negligence and is closer to a lesser form of intent than merely a greater degree of ordinary negligence." Greebel v. FTP Software, Inc., 194 F.3d 185, 199 (1st Cir. 1999); see Brennan, 853 F.3d at 613. Defendants must have had the requisite scienter at the time of the allegedly fraudulent statements. See In re Ariad Pharms., Inc. Sec. Litig., 842 F.3d 744, 751 (1st Cir. 2016).

PSLRA's requirement to plead facts giving rise to a "strong inference" of scienter means that "[a] complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, 551 U.S. at 324. Thus, in evaluating securities class action complaints, courts "must take into account plausible opposing inferences." Id. at 323. Courts conducting such an inquiry must determine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Tellabs, 551 U.S. at 322–23 (emphasis in original).

a)    <u>Actual knowledge or recklessness regarding noncompliance with applicable FDA guidance</u>

Plaintiffs claim that Defendants had actual knowledge of Aldeyra's noncompliance with FDA guidance. D. 33 at 28–30. The only facts Plaintiffs highlight to support this claim are references the Defendants made to a FDA Guidance document. D. 33 at 28 (citing D. 27 ¶¶ 108, 112, 207). According to Plaintiffs, the applicable guidance was "straightforward and, on its face, [] not capable of reasonable alternative interpretations," therefore, to the extent it "can be considered a matter of 'scientific opinion' . . . Defendants knowingly, or at minimum, recklessly, departed from their own 'scientific opinion.'" Id. at 28–29.

Such allegations, however, do not indicate that Defendants intentionally or recklessly disregarded their noncompliance with applicable FDA Guidance. See D. 31 at 22–24; D. 38 at 7–12. Although the guidance concerning multiple endpoint trials noted that trials with co-primary

endpoints must meet both endpoints to be considered effective, that same guidance identified circumstances in which a trial may be sufficient if it meets only one of several endpoints. D. 31 at 23; Multiple Endpoints Guidance, <u>supra</u> n.3. Defendants used the term "co-primary endpoint" in reference to the endpoints of the RENEW Part 1 Trial, <u>see</u> <u>e.g.</u>, D. 27 ¶ 168, but this hardly suggests recklessness. Plaintiffs, for one example, cannot explain why, if Defendants knew prior to the Class Period that Aldeyra had not fulfilled its symptom requirements, they would spend most of the Class Period investing in trials with primary sign endpoints, and no time and money investing in trials with primary symptom endpoints. Plaintiffs' purported fraudulent inference – that Defendants made significant investments in one category of clinical trial, while choosing not to correct a known deficiency in another category – is less compelling than the competing non-fraudulent inference – that Defendants thought they complied with the guidance and proceeded accordingly. <u>Tellabs</u>, 551 U.S. at 324.

Plaintiffs' theories regarding the ISE Guidance and the ANDA 505(b)(2) Guidance are even less compelling. While Plaintiffs assert the ISE Guidance prohibits applicants from "pool[ing] the positive results of multiple trials together to demonstrate efficacy," D. 27 ¶ 73, the guidance encourages pooling for some purposes, D. 23 at 39 (citing ISE Guidance, <u>supra</u> n.2). As Defendants explain, "[w]hile the guidance says that 'prospectively planned efficacy analyses across two or more studies in a development program is [sic] uncommon,' 'uncommon' does not mean prohibited." D. 31 at 23 n.25 (citing ISE Guidance, <u>supra</u> n.3). Similarly, Plaintiffs allege the ANDA 505(b)(2) Guidance required Aldeyra "to provide bridging evidence to justify its reliance on prior studies showing the safety and efficacy of methotrexate in its FDA-approved iterations as sufficient to demonstrate the safety and efficacy of ADX-2191 to treat PVRL to gain FDA approval." D. 27 ¶ 191. This guidance, however, requires bridging only when "scientifically

necessary." D. 31 at 24 (citing ANDA 505(b)(2) Guidance, supra n.3). Plaintiffs have not pled facts suggesting that Defendants knew bridging data was "scientifically necessary" for ADX-2191.

As Defendants observe, D. 31 at 18–19; D. 38 at 7, the amended complaint does not otherwise identify any admission, internal record, witnessed discussion or communication to suggest that Alderya knew or was warned that its NDAs failed to comply with FDA guidance. D. 27. Instead, the facts supporting Plaintiffs' theory of fraud were publicly disclosed. D. 38 at 8. The applicable FDA guidance was public, so were the facts Plaintiffs allege support non-compliance. See id. at 8–9; D. 27 ¶¶ 4, 17, 136. Without facts to support their theory, Plaintiffs' scienter allegations amount to their own scientific opinion. But a scientific disagreement cannot support a claim of securities fraud. See Harrington v. Tetraphase, No. 16-cv-10133-LTS, 2017 WL 1946305, at *5 (D. Mass. May 9, 2017) (stating that "scientific opinions are just that: opinions"); In re Sepracor, Inc. Sec. Litig., 308 F. Supp. 2d 20, 35–36 (D. Mass. 2004) (rejecting scienter allegations based upon "subjective scientific disagreements");[17] In re Medimmune, Inc. Sec. Litig., 873 F. Supp. 953, 966–67 (D. Md. 1995) (rejecting scienter allegations because "[m]edical researchers may well differ over the adequacy of given testing procedures" and plaintiffs "pleaded no specific facts to show why [d]efendants knew or should have known [their use of blinding in a study] to be a problem").

---

[17] Plaintiffs rely upon a separate holding in Sepracor to argue Defendants were obliged to disclose known facts concerning their deviations from FDA guidance. D. 33 at 21–22. But the facts Plaintiffs rely upon to establish Aldeyra's deviations from FDA guidance were disclosed. In contrast, the allegations that survived in Sepracor related to a fact that was withheld – that the Company's drug had a specific side-effect explicitly disallowed by the FDA. Sepracor, 308 F. Supp. 2d. at 28.

> b)    <u>Knowledge or recklessness with respect to CMC data and program delays</u>

Plaintiffs allege Aldeyra knowingly made materially false and/or misleading statements concerning the adequacy of its CMC data, D. 27 ¶¶ 189, 204, 231, 249, but the only fact supporting this inference is the FDA's October 2023 request for information regarding CMC, <u>id.</u> ¶ 281. This request alone cannot support an inference that Aldeyra knowingly or recklessly made materially false and/or misleading positive representations regarding its CMC package based upon the information they possessed at the time. <u>See</u> <u>Corban v. Sarepta Therapeutics, Inc.</u>, 868 F.3d 31, 39 (1st Cir. 2017) (concluding an "overly optimistic" announcement did not support securities fraud in the absence of prior knowledge). !!

The same is true for Plaintiffs' allegations regarding program delays. As Defendants note, the amended complaint contains no allegation "that any [i]ndividual Defendant was alerted to any delays before they were disclosed, or otherwise did not honestly believe" in the Company's timeline predictions. D. 31 at 23. A subsequent adjustment of a company's timeline cannot support an inference of scienter. <u>See</u> <u>e.g.</u>, <u>Ganem v. InVivo Therapeutics Holdings Corp.</u>, 845 F.3d 447, 457 (1st Cir. 2017) (affirming dismissal where plaintiff did not "point to any FDA requirement" supporting contention that company should have known its projected timeline for submission of data was "impossible to achieve" and explaining that defendant did not commit securities fraud by failing to have "greater clairvoyance" (citation omitted)).

> c)    <u>Motive and Opportunity</u>

!

A "plaintiff may combine various facts and circumstances indicating fraudulent intent to show a strong inference of scienter," including allegations "that the defendants had the motive ('concrete benefits that could be realized by . . . the false statements and wrongful nondisclosures') and opportunity ('the means and likely prospect of achieving concrete benefits by the means

alleged') to commit the fraud." Aldridge, 284 F.3d at 82 (alteration in original) (quoting Novak v. Kasaks, 216 F.3d 300, 307 (2d Cir. 2000)) (further citation omitted). "[W]hile mere allegations of motive and opportunity alone may be insufficient, together with additional factual support, evidence of motive and opportunity may establish a strong inference of scienter." Id.

As alleged, Defendants misled investors by selling the Company's stock at artificially inflated prices to "raise much-needed cash to continue to operate the business as a going concern," to win "a lucrative commercial partnership with a larger, more established company," to meet the Company's "numerous financial obligations" and to realize personal benefits under the Company's equity incentive plans and Management Cash Incentive Plan. D. 27 ¶¶ 284–91.

Even assuming Plaintiffs adequately pled motive, they still have not alleged sufficient facts to establish a strong inference of scienter. Plaintiffs cite Skiadas v. Acer Therapeutics Inc., No. 19-cv-6137-GHW, 2020 WL 4208442, at *7 (S.D.N.Y. July 21, 2020) for the proposition that allegations regarding a defendant company's need to raise capital may establish scienter. D. 33 at 31. Skiadas, however, noted that the defendants' need to raise money "was only one factor supporting an inference of scienter." Skiadas, 2020 WL 4208442, at *5. Here, Plaintiffs have plead no additional facts to support such an inference. Accordingly, Plaintiffs' allegations of Defendants' motive and opportunity fail to establish a strong inference of scienter. Geffon v. Micrion Corp., 249 F.3d 29, 36 (1st Cir. 2001) (asserting that "a plaintiff must allege some additional misconduct from which a jury can draw a reasonable inference of intentional deception"); see Lenartz v. Am. Superconductor Corp., 879 F. Supp. 2d 167, 185–86 (D. Mass. 2012) (noting that the "mere statement" that a company obtained funding tied to an allegedly inflated stock price is "insufficient to create a strong inference either of an intent to deceive or of recklessness" (internal citation omitted)).

d)      <u>Core Operations Theory</u>

Plaintiffs further contend that a "core operations" theory supports a strong inference of scienter.  D. 27 ¶¶ 295–300.  Under such a theory, "[f]acts critical to a business's core operations . . . are so apparent that their knowledge may be attributed to the company and its officers." <u>Crowell v. Ionics, Inc.</u>, 343 F. Supp. 2d 1, 19 (D. Mass. 2004) (alteration and internal citation omitted).  Courts, however, "have been hesitant to apply significant weight to 'core operations' allegations without other significant evidence of a defendant's intent or recklessness, or a 'plus factor.'"  <u>In re Biogen Inc. Sec. Litig.</u>, 193 F. Supp. 3d 5, 51 (D. Mass. 2016) (quoting <u>In re A123 Sys., Inc. Sec. Litig.</u>, 930 F. Supp. 2d 278, 285 (D. Mass. 2013)).  "As a general matter, corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information conveyed to management and related to the fraud or other allegations supporting scienter."  <u>Metzler</u>, 928 F.3d at 165 (quoting <u>S. Ferry LP, No. 2 v. Killinger</u>, 542 F.3d 776, 784–85 (9th Cir. 2008)) (internal quotation marks and further citation omitted).

Plaintiffs argue that the core operations doctrine supports a strong inference of scienter because Reproxalap and ADX-2191 were Aldeyra's first and second lead product candidates respectively, Aldeyra was "an extremely small Company" that stated publicly that it was "highly dependent on the development, regulatory, commercial, and financial expertise of [its] senior management team" and the individual Defendants were "extremely experienced in the biotech industry and FDA regulatory approval process."  D. 27 ¶¶ 295–300.  Moreover, Plaintiffs argue that Defendants' references to FDA Guidance as "requirements" suggests "an inference that Defendants knew or recklessly disregarded the risks of Aldeyra's noncompliance with FDA Guidance."  D. 33 at 32.  None of these allegations provide "significant evidence of . . . intent or

20

recklessness" because they do not show that Defendants knew they were not complying with FDA Guidance.  See In re Biogen, 193 F. Supp. 3d at 51.

 e)  Weighing Opposing Inferences

  Considering the complaint as a whole including "plausible opposing inferences," Tellabs, 551 U.S. at 323, the stronger inferences favor Defendants.  Plaintiffs' theory of scienter relies upon the unsupported claim that Defendants had actual knowledge or at least recklessly disregarded that they were not in compliance with FDA Guidance.  See, e.g., D. 33 at 34–35.  But multiple factors support a stronger inference of nonfraudulent intent.  First, Aldeyra's investment in multiple, separate clinical trials for reproxalap before and during the Class Period demonstrates that it thought "positive results were possible, even if not probable."  D. 27 ¶¶ 74–75, 77–81;  Loc. No. 8 IBEW Ret. Plan & Tr. v. Vertex Pharms., Inc., 838 F.3d 76, 81 (1st Cir. 2016).

  Second, multiple studies showing reproxalap's safety and efficacy support an inference that Defendants believed the NDAs for reproxalap and ADX-2191 were compelling.[18]  Whitehead v. Inotek Pharms. Corp., No. 17-cv-10025-LTS, 2018 WL 4732774, at *5 (D. Mass. June 27, 2018) (reasoning that a trial with mixed positive and negative results supported an inference that defendants had "expressed their sincere view as to the future of [their product]").

  Third, Aldeyra's preliminary interactions with the FDA support an inference that Defendants were genuinely optimistic about its approval prospects.  Specifically, Aldeyra met with the FDA at least three times between March 2021 and September 2022 and announced that it believed it was "aligned with the FDA on the content of the regulatory package."  Id. ¶ 142.

---

[18] See id. ¶ 46 (RENEW Part 1 Trial met co-primary symptom endpoint of ocular dryness); id. ¶ 78 (Phase 2 Dry Eye Chamber Trial met primary sign endpoint of ocular redness); id. ¶ 80 (TRANQUILITY-2 Trial met primary sign endpoint of Schirmer's Test); id. ¶ 81 (Crossover Trial met primary sign endpoints of ocular redness and Schirmer's Test); id. ¶ 150 (safety trial showed "lack of treatment-related serious adverse events").

Likewise, after discussing ADX-2191 with the FDA in January 2021 and December 2022, the Company interpreted the FDA's feedback on its literature-based approach as positive.  Id. ¶¶ 91, 147.  Moreover, the FDA's acceptance of both NDAs reflects its "threshold determination" that they were "sufficiently complete to permit a substantive review."  Corban, 868 F.3d at 34.

Finally, a nonculpable inference is particularly strong because Defendants repeatedly published disclaimers about the possibility that the FDA would require additional studies or data collection, see Corban, 868 F.3d at 38–39, and promptly disclosed the FDA's adverse decisions, D. 27 ¶¶ 23, 25; see Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc., 778 F.3d 228, 243 (1st Cir. 2015) (stating that company's prompt disclosure of FDA warning letter did not represent "the actions of a company bent on deceiving investors as to their future earnings prospects"); In re Genzyme Corp. Sec. Litig., 754 F.3d 31, 42 (1st Cir. 2014).  In addition, the purported "deficiencies" in the NDAs were disclosed:  Aldeyra announced both that its RENEW Part 1 Trial was designed with two co-primary endpoints and only one was met, D. 27 ¶ 4, and that it submitted its RENEW Part 1 Trial as one of its five "pivotal" trials for its NDA,  id. ¶ 82.  Likewise, the basis for Plaintiffs' allegations concerning the pooling of data comes from public information.  See, e.g., id. ¶ 215.

Because the allegations in the amended complaint provide more support for nonculpable explanations for Defendants' statements than culpable ones, Plaintiffs have not carried their burden of pleading facts and circumstances supporting a strong inference of scienter.  See Leavitt v. Alnylam Pharms. Inc., 451 F. Supp. 3d 176, 187–88 (D. Mass. 2020) (noting that plaintiff bears the burden of asserting facts regarding scienter).

f)      Corporate Scienter

Plaintiffs allege corporate scienter by asserting that (1) the scienter of the individual Defendants should be imputed to the Company, or, alternatively, (2) other "appropriate corporate officers" had knowledge related to the alleged fraud.  D. 27 ¶¶ 301–02.  But as discussed, Plaintiffs have not alleged the scienter of any individual Defendant, nor have they plead facts that suggest any other "appropriate corporate officer" had knowledge related to the alleged fraud, see, e.g., Isham v. Perini Corp., 665 F. Supp. 2d 28, 37 (D. Mass. 2009).  Plaintiffs' corporate scienter claim thus fails.

2.      *Actionable Misrepresentations or Omissions*

Although the Court need not reach this element in the absence of the requisite element of scienter sufficiently plead, the Court addresses it in the interest of completeness.  Defendants argue that the amended complaint fails to allege an actual misstatement or omission on multiple grounds, including that (1) it does not plead with particularity that any statements about reproxalap or ADX-2191 were false or misleading when made and (2) the amended complaint challenges forward-looking statements immunized by the PSLRA.  D. 31 at 30–37.[19]

a)      Materially False or Misleading

"To establish a material misrepresentation or omission, [Plaintiffs] must show 'that defendants made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading.'"  Ganem, 845 F.3d at 454 (quoting Geffon, 249 F.3d at 34).

---

[19]  Defendants also assert that the amended complaint fails to allege a misstatement or omission on the grounds that it challenges inactionable statements of opinion and immaterial puffery.  Id.  The Court need not address these grounds because it otherwise concludes the amended complaint fails to plead a misstatement or omission.

With respect to affirmative statements, the truth or falsity of same is "a relatively straightforward analysis," see In re Cytyc Corp. Sec. Litig., No. 02-cv-12399-NMG, 2005 WL 3801468, at *14 (D. Mass. Mar. 2, 2005), report and recommendation adopted, No. 02-cv-12399-NMG (D. Mass. Mar. 22, 2005), but whether a statement is misleading "depends on the perspective of a reasonable investor," Karth v. Keryx Biopharmaceuticals, Inc., 6 F.4th 123, 135 (1st Cir. 2021) (quoting Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 575 U.S. 175, 186 (2015)).

With respect to omissions, Section 10(b) "do[es] not create an affirmative duty to disclose any and all material information." In re Bos. Sci. Corp. Sec. Litig., 686 F.3d 21, 27 (1st Cir. 2012) (alteration in original) (quoting Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 44 (2011)); see Sec. & Exch. Comm'n v. Johnston, 986 F.3d 63, 72 (1st Cir. 2021) (noting that "[i]t is well-settled that the 'mere possession of . . . nonpublic information does not create a duty to disclose it'" (quoting In re Smith & Wesson Holding Corp. Sec. Litig., 669 F.3d 68, 74 (1st Cir. 2012))). Moreover, the duty to disclose "extends . . . only where affirmative statements are made and the speaker fails to 'reveal . . . those facts that are needed so that what was revealed would not be so incomplete as to mislead.'" Bos. Sci. Corp., 686 F.3d at 27 (alteration in original) (quoting Hill, 638 F.3d at 57).

"Information is material if a reasonable investor would have viewed it as 'having significantly altered the total mix of information made available.'" Ponsa-Rabell v. Santander Sec. LLC, 35 F.4th 26, 33 (1st Cir. 2022) (quoting Miss. Pub. Emps.' Ret. Sys. v. Bos. Sci. Corp., 523 F.3d 75, 85 (1st Cir. 2008)). The Court considers "the entirety of the relevant facts available at the time of the allegedly misleading statement, not simply the words of the statement itself." Id. Although "[m]ateriality is usually a matter for the trier of fact," ACA Fin., 512 F.3d at 65, "courts

have demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace—loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available." Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1217 (1st Cir. 1996).

The amended complaint fails to identify any statement that was false or misleading when made. All purported deficiencies in the NDAs were disclosed, as was the possibility of enrollment delays and changes to the approval timeline. See, e.g., D. 27 ¶¶ 4, 17, 136; D. 32-10 at 15; Simon v. Abiomed Inc., 37 F. Supp. 3d 499, 521 (D. Mass. 2014) (concluding a company's emphasis of favorable data was not misleading because investors "had access to the full information"), aff'd, 778 F.3d 228 (1st Cir. 2015). Likewise, although Plaintiffs assert the reproxalap CMC data was insufficient, they do not explain why or how. They have, therefore, failed to "plead the circumstances of the fraud with particularity, pursuant to Rule 9(b)." Hill, 638 F.3d at 55.

   b)   Safe Harbor

The PSLRA's "safe harbor" provisions further immunize Defendants' statements. These provisions "sharply limit liability of companies and their management for certain 'forward-looking statements,' . . . when such statements are accompanied by appropriate cautionary language." Wesson, 669 F.3d at 71 n.3 (citing 15 U.S.C. § 78u-5). Forward-looking statements include statements "of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer." Meyer v. Biopure Corp., 221 F. Supp. 2d 195, 203 (D. Mass. 2022) (quoting 15 U.S.C. § 78u–5(i)(1)(B)). "[T]o be meaningful, cautionary statements must be 'substantive and tailored to the specific future projections, estimates

or opinions . . . which plaintiffs challenge.'" Isham, 665 F. Supp. 2d at 39 (quoting In re Smith & Wesson Holding Corp. Sec. Litig., 604 F. Supp. 2d 332, 340 (D. Mass. 2009)).  Further, "if a forward-looking statement is accompanied by meaningful cautionary language the defendant's state of mind is wholly irrelevant."  Leavitt, 451 F. Supp. 3d at 186 (citing In re Stone & Webster, Inc., Sec. Litig., 414 F.3d 187, 212 (1st Cir. 2005)).

Here, Defendants' alleged statements discussing the timeline of program studies, the timeline for NDA submission, the contents of its CMC package and the approval prospects for its NDAs are forward-looking.  Leavitt, 451 F. Supp. 3d at 186 (referring to challenged statements, "which discussed potential FDA approval," as "typical forward-looking statements" because they "anticipated a hoped-for future event, FDA approval" and, therefore, "fit squarely within the PSLRA's safe harbor"); In re Sanofi Sec. Litig., 87 F. Supp. 3d 510, 535 (S.D.N.Y. 2015) (noting that statements about FDA approval "are classically forward-looking—they address what defendants expected to occur in the future"), aff'd sub nom. Tongue v. Sanofi, 816 F.3d 199 (2d Cir. 2016).  Moreover, these statements were accompanied by meaningful cautionary language. Aldeyra warned of the exact risks that came to pass, cautioning that the FDA "may disagree with our interpretation of or the sufficiency of the data from our clinical trials" or require "additional studies, including clinical trials."  See, e.g., D. 32-10 at 8; D. 32-12 at 5.  Harrington, 2017 WL 1946305, at *9 (concluding that "statements identify[ing] specific risk factors including . . . the possibility of the FDA not approving the drug . . . [are] precisely what the law requires").

Relying on the First Circuit's decision in Carbonite, Plaintiffs argue that the Company's cautionary statements do not provide PSLRA safe harbor protection because they were not forward-looking and instead "were couched in the 'present tense to describe [Defendants'] beliefs about the then-existing status' of the submission of the NDAs, the contents of the NDAs and

commercialization of the drugs."  D. 33 at 26 (alteration in original) (emphasis omitted) (citing <u>Carbonite</u>, 22 F.4th at 8).  But the safe harbor defines "statement[s] of the plans and objectives of management for future operations" as "forward-looking."  15 U.S.C. § 78u-5(i)(1)(B).  It does not require that these statements are made in the future tense.  <u>Id</u>.  Moreover, <u>Carbonite</u> dealt with a present tense statement used to describe the then-existing status of a product the company had already put out into the market, not a future event.[20]  <u>Carbonite</u>, 22 F.4th at 8.

Plaintiffs also argue that Aldeyra's risk factors were themselves misleading because they "were couched as hypothetical when Defendants knew such risks were substantially likely to materialize, or had already materialized," because "Aldeyra had deviated from applicable FDA Guidance."  D. 33 at 26 n.11.  But a risk disclosure cannot be misleading merely because it fails to specify the probability of a risk.  <u>See</u> <u>Hill</u>, 638 F.3d at 60 (noting "where the level of risk is unknown and the existence of a risk is disclosed, we shall hesitate to conclude that disclosure is misleading merely because it did not state that the risk was 'serious'").

Here, Defendants disclosed to investors the risks known at the time of the relevant SEC filings, press releases and analyst conference calls.  Plaintiffs have not alleged sufficient facts to allege that a more precise degree of risk was or should have been known.  <u>Cf.</u> <u>id</u>.  Accordingly, Defendants' forward-looking statements, accompanied by meaningful cautionary language, fall within the PSLRA's safe harbor.

For all these reasons, the amended complaint also fails to allege an actionable misstatement or omission.

---

[20] <u>Brumbaugh v. Wave Sys. Corp.</u>, 416 F. Supp. 2d 239, 251–52 (D. Mass. 2006), cited by Plaintiffs, is also inapposite.  There, the cautionary language provided by the defendant related only tangentially to the subject matter of the allegedly misleading press release.  The Court, therefore, found that the cautionary language failed to warn against the implication in the underlying press release with sufficient clarity to suggest caution.  <u>Id</u>.

### B.    Plaintiffs' Claims Under Regulation S-K Fail

The Supreme Court's decision in Macquarie Infrastructure Corp. v. Mobal Partners, L.P., requires dismissal of Plaintiffs' claims under Items 303 and 105 of Regulation S-K.  Macquarie Infrastructure Corp. v. Mobal Partners, L.P., 601 U.S. 257, 263 (2024) (holding "Rule 10b–5(b) does not proscribe pure omissions" and instead requires only "disclosure of information necessary to ensure that statements already made are clear and complete").[21]

### C.    Loss Causation

Even if Plaintiffs had sufficiently alleged scienter or materially false and misleading statements, their claims still fail in the absence of loss causation.  The PSLRA provides that "the plaintiff shall have the burden of proving that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u–4(b)(4).  Plaintiffs may establish loss causation by showing that a corrective disclosure was "a 'substantial' cause of their losses."  See Mass. Ret. Sys. v. CVS Caremark Corp., 716 F.3d 229, 239 (1st Cir. 2013) (quoting FindWhat Inv. Grp. v. FindWhat.com, 658 F.3d 1282, 1309 (11th Cir. 2011)).  A "corrective disclosure" occurs when a company "release[s] . . . information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud."  Id. at 237 (quoting FindWhat Inv. Grp., 658 F.3d at 1312); see Coyne v. Metabolix, Inc., 943 F. Supp. 2d 259, 273 (D. Mass. 2013) (explaining that "the announcement must connect the current, present, negative information to the earlier false or misleading statement" (emphasis omitted)).

Plaintiffs cannot show loss causation because they have not alleged any corrective disclosure.  According to the amended complaint, Aldeyra's stock price fell after it disclosed (1)

---

[21] Plaintiffs allege Aldeyra's risk disclosures are actionable under Macquarie because they contain half-truths (not pure omissions), D. 33 at 26 n.11, but as we have already concluded, Plaintiffs have not adequately plead a false or misleading statement.

that the Phase 3 TRANQUILITY-1 Trial did not meet its primary endpoint, (2) negative feedback from the FDA concerning the reproxalap NDA and (3) its receipt of a CRL for ADX-2191. D. 27 ¶¶ 20–21, 23–26, 304–05.    Plaintiffs have not adequately alleged that Defendants "reveal[ed] to the market [a] pertinent truth that was previously concealed or obscured by the company's fraud."  Mass. Ret. Sys, 716 F.3d at 237; see In re Wayfair, Inc. Sec. Litig., 471 F. Supp. 3d 332, 350 (D. Mass. 2020) (concluding that a press release "was not a 'corrective disclosure' because [p]laintiffs have not adequately pleaded scienter, so there is no adequate allegation that the defendants 'concealed' or 'obscured' any information from the public").  The Company's announcements did not correct some untruth about its NDA submissions, but rather updated investors on new developments.

Plaintiffs assert they have also established loss causation "by alleging that the subject of the fraudulent statement or omission was the cause of the actual loss suffered [or] that [the] defendants' misstatements and omissions concealed the price-volatility risk . . . that materialized and played some part in diminishing the market value of the security."  D. 33 at 35 (alteration in original) (quoting In re Evergreen Ultra Short Opportunities Fund Sec. Litig., 705 F. Supp. 2d 86, 95 (D. Mass. 2010)).  But Plaintiffs' theory cannot support loss causation because the risk that materialized here — the FDA's non-approval of the NDAs — was the risk that was disclosed. Pizzuto v. Homology Medicines, Inc., No. 23-cv-10858-AK, 2024 WL 1436025, at *19 (D. Mass. Mar. 31, 2024) (no loss causation where "[d]efendants did not conceal the risk . . . but disclosed that risk several times throughout the Class Period") (internal citation omitted).

## VI.    Section 20(a) Claim (Count II)

Plaintiffs claim that Brady, Reed and Greenberg are liable under Section 20(a) of the Exchange Act based upon their positions of control and authority within the Company.

D. 27 ¶¶ 332–35.  Section 20(a) imposes joint and several liability on "[e]very person who, directly or indirectly, controls any person liable" for a securities fraud violation.  15 U.S.C. § 78t(a).  Thus, to state a claim under Section 20(a), Plaintiffs must allege a primary violation of the Exchange Act.  ACA Fin., 512 F.3d at 67 (stating that "[t]he plain terms of [S]ection 20(a) indicate that it only creates liability derivative of an underlying securities violation").  Because Plaintiffs fail to plead a primary securities law violation, Plaintiffs' claim under Section 20(a) against Brady, Reed and Greenberg also fails.

## VII.  Leave to Amend

A party may amend a complaint with the court's leave, which the court "should freely give" when "justice so requires."  Fed. R. Civ. P. Rule 15(a)(2).  Leave to amend may be "denied for several reasons, including undue delay, bad faith, dilatory motive of the requesting party, repeated failure to cure deficiencies, and futility of amendment."  Hagerty ex rel. United States v. Cyberonics, Inc., 844 F.3d 26, 34 (1st Cir. 2016) (internal quotation marks and citation omitted).

Here, Plaintiffs do not formally request leave to amend the amended complaint.  Instead, they request at the end of their opposition that if the Court determines the amended complaint fails to adequately state a claim for relief, they should be granted leave to further amend the complaint.  D. 33 at 36.  Other courts in similar circumstances have refused such "informal request[s]."  See, e.g., Biogen, 193 F. Supp. 3d at 55 (denying "plaintiffs' informal request for leave to amend" in a securities fraud class action where, instead of "formally request[ing] leave to amend the amended complaint," plaintiffs requested same "on the final page of their thirty-page opposition to defendants' motion to dismiss"); ACA Fin., 512 F.3d at 57 (rejecting plaintiffs' argument that district court erred in denying leave to amend because they "took no action to add new allegations" in response to defendants' motion to dismiss "even though they knew what they would add if they

amended," and noting that allowing such a practice would "lead to delays, inefficiencies, and wasted work").

Nor do Plaintiffs suggest "that new information has been discovered such that amendment would not be futile."  See Sousa v. Sonus Networks, Inc., 261 F. Supp. 3d 112, 121 (D. Mass. 2017).  Notwithstanding the "liberal" standard for adjudicating motions to amend, ACA Fin., 512 F.3d at 56, the Court DENIES leave to amend for the aforementioned reasons.

## VIII.    Conclusion

For the foregoing reasons, Defendants' motion to dismiss, D. 30, is ALLOWED.

**So Ordered.**

/s Denise J. Casper
United States District Judge